FW

**RECEIVED**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS   JUN 12 2017  CW
EASTERN DIVISION

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Shaka Freeman )
_____ )
_____ )
_____ )
_____ )
(Name of the plaintiff or plaintiffs) )
)
)
v. )
_____ )
Metropolitan Water Reclamation )
District of ~~Greater~~ Chicago )
S.F ~~MWRD, The District~~ )
(Name of the defendant or defendants) )

CIVIL ACTION

**1:17-cv-04409**
**Judge Harry D. Leinenweber**
**Magistrate Judge M. David Weisman**

<u>COMPLAINT OF EMPLOYMENT DISCRIMINATION</u>

1. This is an action for employment discrimination.

2. The plaintiff is  Shaka Freeman  of the county of  Cook  in the state of  Illinois .

3. The defendant is Metropolitan Water Reclamation District of Greater Chicago, whose street address is  100 East Erie Street ,
(city) Chicago  (county) Cook  (state) Illinois  (ZIP) 60611- 3154
(Defendant's telephone number)  (312) - 751-5600

4. The plaintiff sought employment or was employed by the defendant at (street address)
(Stickney Plant) 6001 W. Pershing Rd  (city) Cicero
(county) Cook  (state) Illinois  (ZIP code) 60804

me

5. The plaintiff [*check one box*]

(a) ☐    was denied employment by the defendant.

(b) ☐    was hired and is still employed by the defendant.

(c) ☑    was employed but is no longer employed by the defendant.

6. The defendant discriminated against the plaintiff on or about, or beginning on or about,
(month) _November_, (day) _05_, (year) _2013_.

7.1    *(Choose paragraph 7.1 or 7.2, do not complete both.)*

       (a) The defendant is not a federal governmental agency, and the plaintiff [*check

       one box*] ☐ has not ☑ has    filed a charge or charges against the defendant

asserting the acts of discrimination indicated in this complaint with any of the following
government agencies:

     (i)      ☐ the United States Equal Employment Opportunity Commission, on or about
         (month) _March_ (day) _13_ (year) _2016_.

     (ii)      ☐ the Illinois Department of Human Rights, on or about
         (month)_____ (day)_____ (year)_____.

   (b) If charges *were* filed with an agency indicated above, a copy of the charge is

attached.    ☐ YES.    ☐ NO, but plaintiff will file a copy of the charge within 14 days.

It is the policy of both the Equal Employment Opportunity Commission and the Illinois
Department of Human Rights to cross-file with the other agency all charges received. The
plaintiff has no reason to believe that this policy was not followed in this case.

7.2      The defendant is a federal governmental agency, and

       (a) the plaintiff previously filed a Complaint of Employment Discrimination with the
       defendant asserting the acts of discrimination indicated in this court complaint.

☐ Yes (month)_____ (day)_____ (year) _____

☐ No, did not file Complaint of Employment Discrimination

(b) The plaintiff received a Final Agency Decision on (month) *March*
(day) *20* (year) *2017*. *(Received through Email 3/27/17 was not mailed)*

(c) Attached is a copy of the

(i) Complaint of Employment Discrimination,

☑ YES ☐ NO, but a copy will be filed within 14 days.
*written complaint of Employment Discrimination (was denied EEOC Form 5*
*Charge of Discrimination form for Ammended Charges by EEOC After numerous Requests)*
(ii) Final Agency Decision

☑ YES ☐ NO, but a copy will be filed within 14 days.

8. *(Complete paragraph 8 only if defendant is not a federal governmental agency.)*

(a) ☐ the United States Equal Employment Opportunity Commission has not issued

a *Notice of Right to Sue*.

(b) ☐ the United States Equal Employment Opportunity Commission has issued a

*Notice of Right to Sue*, which was received by the plaintiff on

(month) *March* (day) *27* (year) *2017* a copy of which

*Notice* is attached to this complaint.

9. The defendant discriminated against the plaintiff because of the plaintiff's [*check only
those that apply*]:

(a) ☐ Age (Age Discrimination Employment Act).

(b) ☑ Color (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

(c) ☑ Disability (Americans with Disabilities Act or Rehabilitation Act) ADAA

(d) ☑ National Origin (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

(e) ☑ Race (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

(f) ☐ Religion (Title VII of the Civil Rights Act of 1964)

(g) ☑ Sex (Title VII of the Civil Rights Act of 1964)

10. If the defendant is a state, county, municipal (city, town or village) or other local governmental agency, plaintiff further alleges discrimination on the basis of race, color, or national origin (42 U.S.C. § 1983).

11. Jurisdiction over the statutory violation alleged is conferred as follows: for Title VII claims by 28 U.S.C.§1331, 28 U.S.C.§1343(a)(3), and 42 U.S.C.§2000e-5(f)(3); for 42 U.S.C.§1981 and §1983 by 42 U.S.C.§1988; for the A.D.E.A. by 42 U.S.C.§12117; for the Rehabilitation Act, 29 U.S.C. § 791.

12. The defendant [*check only those that apply*]

(a) ☐ failed to hire the plaintiff.

(b) ☑ terminated the plaintiff's employment.

(c) ☑ failed to promote the plaintiff.

(d) ☐ failed to reasonably accommodate the plaintiff's religion.

(e) ☑ failed to reasonably accommodate the plaintiff's disabilities.

(f) ☑ failed to stop harassment;

(g) ☑ retaliated against the plaintiff because the plaintiff did something to assert rights protected by the laws identified in paragraphs 9 and 10 above;

(h) ☐ other (specify): _please see Attachment (h)_

_____

4

**(h)    other (specify):**

**1)**    Failed to stop intersectional overlapping discrimination against me with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's intersectional overlapping discrimination: race-(African American), Sex-Gender Identity-Male, National origin- Ancestry-American Indian ( Yankton Sioux Tribe)  Culture-First & Last Name, Physical Characteristics-Hair, Perception), Disability-(Alcoholism) (Americans with Disabilities Act, ADAA ).

**2)**    Failed to stop intersectional overlapping discrimination in regards to: Limiting, segregating, or classifying his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's overlapping intersectional protected classes:  Race-(African American), Sex-Gender Identity-Male, National origin- Ancestry-American Indian ( Yankton Sioux Tribe) Culture-First & Last Name, Physical Characteristics-Hair, Perception), Disability-(Alcoholism) (Americans with Disabilities Act, ADAA ).

**3)**    Used a particular employment practice ( policy) to Discriminate:  Burden of proof in disparate impact cases

(1) (A) An unlawful employment practice based on disparate impact is established under this subchapter only if-

(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of overlapping intersectional protected classes: Race-(African American), Sex-Gender Identity-Male, National origin- Ancestry-American Indian ( Yankton Sioux Tribe) Culture-First & Last Name, Physical Characteristics-Hair), Disability-(Alcoholism) (Americans with Disabilities Act, ADAA ).  and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

(ii) the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

**4)**    Used neutral employment policies and practices that have a disproportionately negative effect on applicants or employees of a particular overlapping intersectional protected classes: Race-(African American), Sex-Gender Identity-Male, National origin- Ancestry-American Indian ( Yankton Sioux Tribe) Culture-First & Last Name, Physical Characteristics-Hair, Perception), Disability-(Alcoholism) (Americans with Disabilities Act, ADAA).   if the polices or practices at issue are not job-related and necessary to the operation of the business.

**5)**    Used Discriminatory use of test scores

It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of  :  overlapping intersectional protected classes:  Race-(African American), Sex-Gender Identity-Male, National origin- Ancestry-American Indian ( Yankton Sioux Tribe)  Culture-First & Last Name, Physical Characteristics-Hair, Perception), Disability-(Alcoholism) (Americans with Disabilities Act, ADAA ).

(m) Impermissible consideration of race, color, religion, sex, or national origin, disabilty in employment practices

**6)**     Unlawfully Recruited ( Recruitment) new positions that discriminated against me due to: overlapping intersectional protected classes:  Race-(African American), Sex-Gender Identity-Male, National origin- Ancestry-American Indian ( Yankton Sioux Tribe)  Culture-First & Last Name, Physical Characteristics-Hair, Perception), Disability-(Alcoholism) (Americans with Disabilities Act, ADAA ).

**7)**     Unlawfully hired and recruited, promoted, terminated/disciplined and gave performance rating in a corrupt, discriminatory, devaluing manner due to overlapping intersectional protected classes: Race-(African American), Sex-Gender Identity-Male, National origin- Ancestry-American Indian ( Yankton Sioux Tribe)  Culture-First & Last Name, Physical Characteristics-Hair, Perception), Disability-(Alcoholism) (Americans with Disabilities Act, ADAA ).

**8)**     Failed to stop **Municipal Liability:**

> Government entities cannot be held liable under § 1983 unless an official policy or custom caused the deprivation of constitutional rights. Kujawski v. Bd. of Comm'rs. of Bartholomew County, Indiana, 183 F.3d 734, 737 (7th Cir. 1999). An unconstitutional policy or custom can be: 1) an express policy that causes a constitutional deprivation; 2) a widespread practice that is so well-settled that it constitutes a "custom" with the force of law even though it is not authorized by an express policy or written law; or 3) an allegation that the constitutional injury was caused by a person with final policymaking authority

**9)     Failed to stop Denial of Equal Protection Clause:**

The Equal Protection Clause is part of the Fourteenth Amendment to the United States Constitution. The clause, which took effect in 1868, provides that no state shall deny to any person within its jurisdiction "the equal protection of the laws".

A primary motivation for this clause was to validate the equality provisions contained in the Civil Rights Act of 1866, which guaranteed that all people would have rights equal to those of all citizens. As a whole, the Fourteenth Amendment marked a large shift in American constitutionalism, by applying substantially more constitutional restrictions against the states than had applied before the Civil War.

The meaning of the Equal Protection Clause has been the subject of much debate, and inspired the well-known phrase "Equal Justice Under Law". This clause was the basis for *Brown v. Board of Education* (1954), the Supreme Court decision that helped to dismantle racial segregation, and also the basis for many other decisions rejecting discrimination against people belonging to various groups.

The Equal Protection Clause itself applies only to state and local governments. However, the Supreme Court held in *Bolling v. Sharpe* (1954) that equal protection requirements apply to the federal government through the Due Process Clause of the Fifth Amendment.

The Equal Protection Clause is located at the end of Section 1 of the Fourteenth Amendment:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any

person of life, liberty, or property, without due process of law; *nor deny to any person within its jurisdiction the equal protection of the laws*."

**10)** Failed to stop Hostile Work Environment (Harassment) - ADA Interference-Coercion-ADA Retaliation.

**11)** Failed to stop harassing conduct as Retaliation.

**12)** Failed to stop Retaliation for complaining about discrimination/harassment intentional job interference, filed a charge of discrimination, or participated in an employment discrimination investigation or lawsuit.

**13).** Failed to stop Retaliation due to: (1) Discloses or threatens to disclose to a supervisor or to a public body an activity, policy, or practice of any officer, member, State agency, or other State employee that the State employee reasonably believes is in violation of a law, rule, or regulation

(2) Provides information to or testifies before any

public body conducting an investigation, hearing, or inquiry into any violation of a law, rule, or regulation by any officer, member, State agency, or other State employee.

**14)** Failed to stop Same Discrimination: (Harassment, Coercion, Intentional Job Interference, Retaliation, Denial of normal terms and conditions of employment including IL Civil Code of Procedure, MWRD: Complaint procedure, denial of Anti-Retaliation, Anti-Harassment, Anti-Discrimination policy, Denial of ADA rights (EAP), Denial of Performance Management program, Denial of assistance from the EEO Coordinator in regards to ADA rights reasonable accommodations and interactive process and properly reporting my substance abuse problem and all stated in (h) but not limited to all stated in 12 page 4. (Derrick Stinson, Beverly Sanders, Barbara McGowan, Karie Steele, Timothy Bradley, John Kendall, William Lockett, Ramone Adams).

_____

_____

_____

_____

13.  The facts supporting the plaintiff's claim of discrimination are as follows:

Please see Attachment Timeline of Events
88 pages, Timeline of Events From FOIA, Discipline
for suspended driver's license along with Ron Prior
(I am the only person probationary and non probationary 1 out of 21
to be Terminated/Sepereted from Employer for a suspended drivers
and 1 out of 20 to be labeled unsatisfactory performance due to a suspended
and Terminated/Sepereted as a result
I was unlawfully labeled Termination of Probation segregating M/employee Drivers License

14.  [AGE DISCRIMINATION ONLY] Defendant knowingly, intentionally, and willfully
     discriminated against the plaintiff.

15.  The plaintiff demands that the case be tried by a jury. ☑ YES  ☐ NO

16.  THEREFORE, the plaintiff asks that the court grant the following relief to the plaintiff
     [check only those that apply]

(a) ☐  Direct the defendant to hire the plaintiff.

(b) ☑  Direct the defendant to re-employ the plaintiff.

(c) ☑  Direct the defendant to promote the plaintiff.

(d) ☐  Direct the defendant to reasonably accommodate the plaintiff's religion.

(e) ☑  Direct the defendant to reasonably accommodate the plaintiff's disabilities.

(f) ☐  Direct the defendant to (specify): hold all supervisers, Stickney Plant
Management, HR Director, HR Staff, Law Dept., Civil Service Board members
Return Me to Exact position + location, shift hired
Eliminate Civil Service Board Hearing process and use Alternative
Dispute Resolution
Seperete from employer

5

Board of Commissioners, Department Head,
employees, Executive Director and all over 20 people
involved including Police Chief- Police Department Head
liable (Discipline/Termination)

(g) ☑ If available, grant the plaintiff appropriate injunctive relief, lost wages, liquidated/double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witness fees.

(h) ☑ Grant such other relief as the Court may find appropriate.

(Plaintiff's signature)

*Sheka Freeman*

(Plaintiff's name)

Sheka Freeman

(Plaintiff's street address)

1827 S. St. Louis Ave Apt 2

(City) Chicago     (State) IL     (ZIP) 60623

(Plaintiff's telephone number) (404)- 580-2433

Date: 6-12-17

6

**Amended Charges Part 1:  1/30/17**

**Complaining Party:**
Shaka Arconge Freeman-Treatment Plant Operator 1-Midnight Shift Stickney WRP
1827 S. St. Louis Ave
Chicago, IL 60623
404-580-2433

**Respondents Address:**
Metropolitan Water Reclamation District of Chicago- MWRD- District.
MWRD Headquarters- 100 East Erie Street Chicago IL 60611- (312) 751-5600
Stickney Plant Water Reclamation Plant WRP- 6001 W. Pershing Road, Cicero IL 60804-708-588-4079

**Respondents: Final Policy Making Authorities:**

`70 ILCS 2605/4) (from Ch. 42, par. 323)`
Based on said stated policies, procedures, and statutes **the Board of Commissioners, Civil Service Board, Director of Human Resource, Department Heads, District Management** all share **equally** in **establishing** the policies of The District: Deprivation of my Constitutional rights were caused by:

### 1) Board of Commissioners- Board of Trustees-MWRD Corporate Authority but not limited to:

Mariyana T. Spyropoulos-President, Barbara J. McGowan-Vice President, Frank Avila-Chairman of Finance, Timothy Bradford-Commissioner, Debra Shore-Commissioner, Kari Steele-Commissioner, David J. Walsh-Commissioner.

**1a)**

   (70 ILCS 2605/4.16) (from Ch. 42, par. 323.16)
   Sec. 4.16. The Director shall investigate the efficiency of all officers and employees and of all groups of officers and employees in the classified service and shall report to each officer, board or other authority in charge of any office or department of the sanitary district its findings and recommendations relative to increasing efficiency and economy therein. **In case the recommendations made by the Director are not carried into effect within a reasonable time, or in case of a difference of opinion with reference to such findings or recommendations between the Director and the officer, or authority in charge of an office or department concerned in any such findings or recommendations,** *(the report, accompanied by a note of the relevant facts shall be transmitted to the board of trustees (Board of Commissioners) for its final decision.)*

**1b)   FOIA Timeline of Events part 31 pdf:** ( as collected and provided by the HR Department and IT Department to FOIA has provided):

**8/26/15  6:25 pm:**

"Korcal sent Bonner an email asking why the **District** is **treating Freeman different** from other employees ( **who have had their driver's licenses suspended/revoked while on probation).**"

1

**1c)  8.26.15 Part 11 pdf:**

"From:     Korcal, Denice
Sent:      Wednesday, August 26, 2015 6:25pm
To:        Bonner, Roxanne
Subject:  Re: Mr. Freeman Driver's License 081815"

"Why are we **treating** him **differently** than other **employees**?
Sent from my iphone"

**1d)  9.18.15(2) Part 20 pdf:**

From: Cummings, Joseph
Sent: Friday, September 18, 2015 3:02pm
To:    Bonner, Roxanne; Heidenreich Kaye; McElligott, Eileen, Korcal, Denice; Sharma, Manju
CC:   Garelli, Brett; Dring, Reed; Soukup, Thomas; Boswick, Suzanne
Subject: RE: SHAKA FREEMAN

" He wanted to know the person who fired him and ruled out that it was the ED because Freeman dismissed the credibility of the termination letter for not listing the violations. He said he can't be fired without being provided a summary of all the things he did wrong and again wanted to know who fired him. I stated that there isn't a person who terminated him, he has been terminated by his employer. He looked surprised so I repeated that **there isn't a person that terminated him, he was terminated by the MWRD"**

**1e)  Timeline of Events Part 31 pdf:**

**"8/24/15**
**7:22pm:  Korcal sent an email to Bonner to terminate Freeman's probation."**

**1f)  9.4.15 part 14 pdf:**

From: Bonner, Roxanne, Sent: Friday, September 04, 2015 4:29pm, To: Reed Dring, Brett Garelli, Joseph Cummings, Manju Sharma, CC: Brian Deitz, Thomas Soukup, Subject: RE: Mr. Freeman Driver's License 081815:

"This email is to follow up that the HR Department recommends the termination of Mr. Freeman due to his inability to carry out his full range of duties while on probation.

Tom or Brian would be happy to help with any further questions."

**1g)  9/4/15 4:42 pm:** M & O prepares a draft memo to terminate Freeman.

**1h)  9/9/15:**   Inter-Office memo prepared and transmitted from Sharma to David St. Pierre (Executive Director) regarding recommendation for Freeman's termination of probation.

**1i)  9/17/15  8:26 am:**  Bonner sent an email to Korcal and Liane Talkington (Secretary to Officer) informing them that M & O needs the termination letter for Freeman so M & O can terminate him the next morning (9/18/15).

**1j)  9/17/15  2:36 pm:**  Bonner sent Cummings a letter addressed to Freeman informing him that his employment will be terminated. Bonner instructed Cummings to present this letter to Freeman at his termination meeting.

**1k)  9/18/15 :**  Freeman Terminated from District employment.

**2)**  **Human Resource Director-** Director-Denice Korcal "Director".

**3)**  **Assistant Director/Employment Relations Manager-**Roxanne Bonner.

**4)**  **Assistant Director/EEO-Coordinator-**Ted Kosowski.

**5)**  **Human Resource Department** but not limited to: Brian Deitz, Thomas Soukup, Suzanne Boswick, Assistant HR Director- Beverly Sanders.

**6)**  **Maintenance & Operations Department-Department** Head-Manju Sharma, Brett Garelli but not limited to.

**7)**  **Stickney Plant WRP Management and Supporting Staff but not limited to supervisors, employees:** Reed Dring-Operations Manager, Joseph Cummings-AETPO1, TPO 3 Derrick Stinson-Midnight Shift, TPO 3 Paul Donnelly-Midnight Shift, TPO 3-Anthony Venuso-Afternoon Shift, TPO 3-Charles Svazas-Afternoon Shift, TPO 3-Anthony Halaska-Day Shift, TPO 2-William Lockett-Midnight Shift, TPO 2-Ramone Adams-Midnight Shift, but not limited to midnight shift labors as well.

**8)**  **District Management-Eileen** M. McElligott-Department Head (secure work environment) for MWRD Police Department.

**9)**  **District Management-**Kaye Heidenreich- MWRD Police Chief.

**10)**  **Final Policy Making Authority-Executive Director-**David St. Pierre.

**11)**  **Final Policy Making Authority-Law Department:**  Ron Hill-General Counsel, Joseph Cook-Lawyer but not limited to.

**12)**  **Final Policy Making Authority: Civil Service Board Members:**

**John Kendall-**Chairman of the Civil Service Board, **Victoria Almeida-**Vice Chairman and member of Civil Service Board and **Donald J. Storino-**Secretary and Member of the Civil Service Board.

**The following are my Protected Classes under Civil Rights Act- Title VII, American Disability Act, Equal Protection Clause as amended -** The Equal Protection Clause itself applies only to state and local governments:

3

The Equal Protection Clause is located at the end of Section 1 of the Fourteenth Amendment:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; *nor deny to any person within its jurisdiction the equal protection of the laws*."

Municipal liability under under § 1983, in regards to Indirect Evidence, Director Evidence, Disparate Impact, Disparate Treatment and EEOC protected laws and guidelines and EEOC prohibited employment practices:

**Shaka Freeman's Protected Classes:**

**Race and National Origin, Color overlap in regards to characteristics and perception:**

Race under Title VII include: For the collection of federal data on race and ethnicity, the Office of Management and Budget (OMB) has provided the following five racial categories: *American Indian or Alaska Native; Asian; Black or African American; Native Hawaiian or Other Pacific Islander*; and *White*; and one ethnicity category, *Hispanic or Latino*.

Title VII's prohibition of race discrimination generally encompasses:

- **Ancestry:** Employment discrimination because of racial or ethnic ancestry. Discrimination against a person because of his or her ancestry can violate Title VII's prohibition against race discrimination. Note that there can be considerable overlap between "race" and "national origin," but they are not identical.[14] For example, discrimination against a Chinese American might be targeted at her Asian ancestry and not her Chinese national origin. In that case, she would have a claim of discrimination based on race, not national origin.

- **Physical Characteristics:** Employment discrimination based on a person's physical characteristics associated with race, such as a person's color, hair, facial features, height and weight.[15]

- **Culture:** Employment discrimination because of cultural characteristics related to race or ethnicity. Title VII prohibits employment discrimination against a person because of cultural characteristics often linked to race or ethnicity, such as a person's name,[18] cultural dress and grooming practices,[19] or accent or manner of speech. For example, an employment decision based on a person having a so-called "Black accent," or "sounding White," violates Title VII if the accent or manner of speech does not materially interfere with the ability to perform job duties.

- **Perception:** Employment discrimination against an individual based on a belief that the individual is a member of a particular racial group, regardless of how the individual identifies himself. Discrimination against an individual based on a perception of his or her race violates Title VII even if that perception is wrong.

- Employment Discrimination Based on National Origin Group or Ethnicity

4

- Title VII also prohibits employment discrimination against individuals because of their national origin group. A "national origin group," or an "ethnic group," is a group of people sharing a common language, culture, ancestry, race, and/or other social characteristics.[22] Hispanics, Arabs, and Roma are ethnic or national origin groups.[23]

- Employment discrimination against members of a national origin group includes discrimination based on:

  - **Physical, linguistic, or cultural traits**: Employment discrimination against an individual because she has physical, linguistic, and/or cultural characteristics closely associated with a national origin group.[25] For example, subjecting an individual to an adverse employment action because of her African-sounding accent or traditional African style of dress could constitute discrimination based on African origin.[26]

  Employment discrimination based on place of origin *or* national origin (ethnic) group includes discrimination involving:

  - **Perception**: Employment discrimination based on the belief that an individual (or her ancestors) is from one or more particular countries, or belongs to one or more particular national origin groups. For example, Title VII prohibits employment discrimination based on the perception that someone is from the Middle East or is of Arab ethnicity, regardless of how she identifies herself or whether she is, in fact, from one or more Middle Eastern countries or ethnically Arab.[27]

**Shaka Freemans Protected Classes:**

**Race**- African American, American Indian

**Ancestry**- American Indian- 5/32 Blood Yankton Sioux Tribe Descendent. My mother Denise Dobbs is a Registered Yankton Sioux tribe member 5/16 Blood, my grandmother Vera Mae Feather Dobbs 5/8 Blood Yankton Sioux Tribe member, My Great Grandmother- Mabel Arconge Feather ½ Blood Yankton Sioux Tribe member is also the grandmother of Russell Means ( Indian Activist, Actor Autobiography "Where White Men Fear To Tread" he is my Uncle). All that is needed to be legally American Indian (Yankton Sioux Tribal member is to identify 1/16  6% Indian blood on my Fathers side and he has the same Indian hair as I do clearly he has at least 1/16 %.

**Culture:** My  First Name Shaka ( Culture-Continent of Africa- National origin) I was named after Shaka Zulu African Chief-ton/Warrior.

**Culture Characteristics:** Hair- Identifies me as a Black Indian/American Indian, Facial bone structure as well.

**Color:** Skin tone identifies ancestry of American Indian.

**Race:** African American: linguistic- Accent- Southern accent ( southern drawl) raised in Alabama 5 to 17 age and lived in Atlanta Georgia- 1/2002 to 5/2013 9 and half years and Opelika Alabama 3/2014 to 2/2015.

**Disability:** Qualified individual with a disability Alcoholism was receiving supervised treatment and the employer perceived me to have a disability which qualifies me as stated by Statute, and (denied me normal terms and conditions to those outside of my overlapping and intersectional combined protected classes which intern deprived me of my Constitutional Rights and injuring my employment opportunities.)

**Position Statement:**

I was given a pretextual fraudulent Negative Performance Appraisal and adverse action of Separation/Termination, discharged on 9/18/15, Retaliated against and intentionally discriminated with respect to terms, conditions, or privileges of employment and I was limited, segregated and classified for employment in a way which would deprive or tend to deprive my of employment opportunities and otherwise adversely affect my status as an employee, because of overlapping protected classes and intersectional discrimination because of race, color, national origin, Disability, retaliation, Ancestry, Physical Characteristics, Culture, Retaliation

I was terminated without warning and never failed to perform my duties in a satisfactory manner. I reported to my immediate supervisors Derrick Stinson and Paul Donnelly that I self enrolled in the EAP program for Alcohol abuse that was not job related and reported I was receiving (supervised treatment which qualifies me as a qualified individual with a disability of alcoholism) as I went to 3 counseling sessions with a licensed certified substance abuse counselor prior to 8/18/15 I told this to my immediate supervisors Derrick Stinson and Paul Donnelly. The employers claims they did not know about my disability of Alcoholism and did not perceive me to have a disability of alcoholism the evidence, timeline of events and their statements and the way the described my essential job functions in terms of a disability of Alcoholism say other wise and saying they did not know is not a defense to disability discrimination and other intersection discrimination ex:

"Given the nature of his offense, allowing him to drive an unmonitored District vehicle would expose the District to unacceptable liability. Therefore, the District will not approve his request for an employer's exemption." Manju Sharma-9/9/15

The employer has also limited and segregated my employment opportunities by stating the following

 "When other probationary employees were unable to perform their responsibilities due to driver's license restrictions, the District has terminated their probationary appointments."


The employer not only describes my ability to perform the essential job functions in regards to my disability and segregates and limits and subjects me to different terms and conditions of employment and I was not terminated of probationary appointment I was Separated/Terminated from the Treatment Plant Operator 1 position "due to driver license restrictions". My position TPO 1 does not require a valid drivers license for satisfactory performance of my duties and driving duties are not part of the essential job functions. And all of those other Permanent, probationary

6

employees whose jobs all required a valid drivers license for satisfactory performance of their jobs except Anthony Rendon for a total of 19: ex. Probationary employees: George Lemon, Sasha Powell-new hire, Ron Prior. I never failed to perform my duties in a satisfactory performance as well as I was not warned, written up or violated any company policies prior to termination of my employment. Anthony Rendon who's job does not require a valid drivers license and he and the other 3 were not Separated/Terminated. Sasha Powell did not get Separated/Terminated after also violating Intolerable and Major offenses and only received 1 day suspension and or not any discipline, Ron Prior did not receive any discipline. They were returned to CS Status/employee change and I was Separated/Terminated which are two different actions they stayed employed for the same actions and similar actions of suspended drivers license and DUI arrest. ( the employer is trying to defeat my comparisons by segregating my employment through words and classifying my Separation/Termination in a discriminatory manner due to race, ancestry, disability as I am the only person out of 21 documented by the employer permanent and probationary to be Separated/Terminated for the offense of unsatisfactory performance in regards to a suspended drivers license and I have other comparisons that show my difference was due unlawful acts and intersectional discrimination and overlapping protected classes

The are also 17 others with the same offense of suspended drivers license that were not terminated as I am the only person out of 21 who was terminated/Separated for a suspended drivers license/unsatisfactory performance all of those 19 others except Anthony Rendon were unsatisfactory performance due to failing to maintain a valid drivers license and they were not terminated and my difference in treatment is due to all of my overlapping protected classes and intersectional discrimination.

Ramone Adams a probationary TPO 2 employee was unsatisfactory performance of the same duties working on the same shift for a whole year the entire year long probationary period as the chain of Custody forms for the composite samples clearly show this and he was not Separated/Terminated and he was not demoted and was promoted while being unsatisfactory performance ( he delivered the samples over 80 times unsatisfactory with a valid drivers license and was using the employers vehicle. This is why the employer can not limit my comparisons to just those with a suspended drivers license rather the action of unsatisfactory performance as well. My difference in treatment from similar situated Ramone Adams was due to my overlapping protected classes and intersectional discrimination as stated.

**Roxanne Bonner 8/24/15:** "My concern is that will we find that he cannot do his job without a vehicle when a sample goes bad."

The employer (final policy making authorities) deviated from the Performance management Program. all claims of unsatisfactory performance were second hand not by my immediate supervisors, The respondents ignored and refused to have a interactive process in regards to my rights under ADA ( self-enrollment in the EAP program) while also perceiving me to have a disability of Alcoholism in secret coercion harming my employment opportunities. The employer, Board of Commissioners, Executive Director, HR director, Civil Service Board, EEO Coordinator, Employment Relations Manager also deviated from policy by refusing to investigate my complaints of violations of Anti-discrimination, Anti-retaliation, and Anti-harassment policy version 1 and version 2 along with MWRD Act 4.16 and other policies allowing the Board of Commissioners and final policy authorities to report, investigate and to have zero tolerance for discrimination as my complaints were referred to outside agencies and ignored and false claims of lack of jurisdiction to investigate

7

unlawful acts and including discrimination but not limited to were made. The employer intentionally harmed my employment opportunities as the only exception to the 4.11 probation policy is unlawful acts as stated in the Mary O'Donnell 2009 Civil Service Board case by not investigating my discrimination complaints they intentionally harmed my employment opportunities.

The final policy making authorities used the employment policy 4.11 to discriminate against me along other neutral policies (Disparate Impact) in conjunction to discriminate against me causing disparate impact charge due to my overlapping protected classes resulting in intentional intersectional discrimination. The employer also denied me a interactive process regarding alternative performance work methods and did not grant me a chance to correct any perceived problems. The Respondents also made second hand and false claims that I had to leave the plant to perform my duties and also made false claims that the duties of the TPO 1 cannot be performed without the used of a vehicle with or without assistances and without accommodations. The Stickney Plant Management and HR Department and Department Head made numerous pretext statements and spread myths about my performance in a harassing hostile work environment manner that was used by the final policy making authorities to unlawfully deprive me of my constitutional rights and I presented these facts, emails and complaints, motions, amended complaints but the employer referred my complaints to outside agencies.

**John Webb II-** white Male-Disability-Treatment Plant Operator 1 we were similar situated due to disability and enrolling in the EAP and performing the same duties and same position and I was not given the same opportunities by the Civil Service Board to see if I could perform my duties and reinstate my employment even after the employer knew on 11/8/15 when my drivers license became valid on 10/2/15. I was subjected to different terms and conditions of employment due to my overlapping protected classes and the intersectional discrimination.

I also made complaints of harassment, discrimination, against Ramone Adams to my supervisors, and I made complaints of discrimination to the Civil Service Board (administrative hearing) that are directly linked to adverse actions and I was Separated/Terminated and denied reinstatement as a result of the intersectional discrimination.

The employer also engaged in unlawful hiring and promotional practices and including disparate impact- using a employment practice and disparate treatment race being a motivating factor in regards to the TPO 1 position.

Title VII is violated by recruiting persons only from largely homogeneous sources if the recruitment practice has a racial purpose, or if it has a significant racial impact and cannot be justified as job related and consistent with business necessity. For example, Title VII might be violated if a municipal employer with an overwhelmingly White population and workforce abuts a major city with an overwhelmingly Black population, but the municipality only hires its own residents.

The employer only wants to hire whites, internal hires outside my race and family members of employees ex Dev Rijal-Greeta Rijal, Matthew Donnelly –Paul Donnelly and a audit will show this disparity. The employer only wants to hire internal candidates in a unlawful manner as the employer promoted, recruited, and hired 8 lab techs unlawfully gave them promotional exams and the Lab tech position is not in the fix line of promotion for the TPO 1 and those lab techs were all outside my race ( African American , American Indian). Those unlawfully hired internal lab candidates were unlawfully ranked hirer then superior qualified African Americans effecting their employment status

8

the pattern and practice shows Maurice Smith was the most qualified and hired first off the 2013 TPO 1 list but was not ranked on the highest list A list and was not hired first for the TPO 2 promotional position from the 2016 TPO 2 list and Eric Love is not even on the 2016 TPO 2 list after being the 4 most qualified superior qualified to those outside his race showing a test is being used to discriminated African Americans.

### Discriminatory Screening of Recruits

The process of screening or culling recruits presents another opportunity for discrimination. Race obviously cannot be used as a screening criterion. Nor may employers use a screening criterion that has a significantly disparate racial impact unless it is proven to be job related and consistent with business necessity.

The employer ranked 67 % of the most qualified superior qualified African Americans from the 2013 TPO 1 elgible list: Shaka Freeman, Eric Love on the lowest category for hire by using a test and invalid their work experience and occupational license and interview score due to race and my overlapping protected classes and those on the highest list are hired first.

## B. HIRING AND PROMOTION

The law generally leaves it to the employer's business judgment to determine who should be hired or promoted. Within that context, however, an applicant's race should not affect his or her chances. This means that employers cannot treat persons of different races differently in the hiring or promotion process. Nor may employers use selection criteria that have a significant discriminatory effect without being able to prove that the criteria are job-related and consistent with business necessity. Thus, a sound way for employers both to achieve business goals and to comply with the law is to hire and promote based on job-related ability, as measured by uniform and consistently applied qualification/selection standards.

### 1. Uniform and Consistently Applied Standards

When making hiring and promotion decisions, employers must apply the same selection criteria to persons of different races, and apply them in the same way, giving the same weight to each criterion for each person. The reasons given for selection decisions should be credible and supported by the evidence.

**Response:** The employer held 67 % or higher of the most qualified (African Americans, American Indians) candidates on the 2013 TPO 1 eligibility list to different selection, hiring, and promotion criteria due to overlapping protected classes and due to intersectional discrimination.

### Job-Related Standards, Consistent with Business Necessity

In an employer's important effort to hire the best candidate, it might unintentionally engage in race discrimination by using selection standards that measure differences between racial groups

9

that are not related to the job. Title VII provides that, if a selection standard is shown to have a significant impact based on race, the employer must demonstrate that the standard is job-related and consistent with business necessity. Thus, employers should be sure to "measure the person for the job and not the person in the abstract."[88]

**Response:** I was passed over 14 times after being the 3rd most qualified overall candidate by far as my qualifications jump of the page. Eric Love was passed over by 19 times after being the 4th superior qualified as his qualifications jump off the page. The 8 internal lab techs illegally promoted through a invalidated unlawful seniority system that was not bona-fide. None of the internal lab tech candidates and those outside of the race of African American 18 of them hired, ranked, and promoted, recruited did not have any prior wastewater treatment work experience nor did they have a wastewater treatment occupational license like the 3 blacks as Maurice Smith was chosen first because he was the most qualified. Had their not been as many openings then Shaka Freeman and Eric Love would not have been hired as the previous 2010 TPO 1 eligible list hired less than 13 from that list showing clear disparate impact. Shaka Freeman and Eric Love were held to different job related standards and qualifications effecting all the 3 blacks opportunity for promotion as the TPO 2 has a seniority system in place and by hiring Shaka Freeman and Eric Love when they did it effect their seniority status length of service in the fixed line of promotion and the fact the first 3 hires for the TPO 2 position were the internal lab techs who were unlawfully given a promotional exams for the TPO 1 position which is not a promotional position and the personal forms show these unlawful promotions as they are listed in their hire as promotional hires and also meaning they were unlawfully ranked higher meaning there test scores were used as disparate impact and to discriminated against the black candidates as part of a pattern and practice as they took promotional exams and not a original exam. The result of the unlawful recruiting, hiring, ranking of the labs techs resulted in those candidates being ranked hire then Maurice Smith on the 2016 TPO 2 list. There is not a non discriminatory reasons for Internal lab tech Panu Lansiri who was the 15th person hired off the TPO 1 2013 list but he is being hired prior to Maurice Smith and if I was terminated I would not have been hired based on my qualifications as well and Eric Love 4th most qualified TPO 1 2013 list is not even on the list off the 2016 TPO 1 eligible list. There is a direct link that race was a factor for the two Asians hired first as the Department Head Manju Sharma is Asian and recommends the hire's. The first 4 hires for promotion to TPO 2 are the internal lab techs who were unlawfully ranked and hired and now promoted prior to superior qualified African Americans due to intersectional discrimination race and unlawful discrimination, disparate impact, disparate treatment also showing a Pattern and Practice of violating the Civil Rights of those in my overlapping protected classes due to intersectional discrimination.

TPO II #16039 (P) - Hired 16-319 - Attachment B

| Category | Last Name | Suffix | First Name | Gender | Race | Start Date | End Date |
|----------|-----------|--------|------------|--------|------|------------|----------|
| B | Lansiri | | Panu | M | A | 8/29/2016 | Present |
| A | Schipma | | Jane | F | W | 9/5/2016 | Present |
| A | Rijal | | Dev | M | A | 9/5/2016 | Present |

2016 16-

**319 Attachment D**

# TREATMENT PLANT OPERATOR II #16039 (P)

FINAL ELIGIBLE LIST

I hereby certify that the following list contains the names of successful Promotional examination candidates for the classification of **Treatment Plant Operator II**. This list is arranged by categories and has been revised to reflect successful claims for veterans' preference.

| | Last Name | First Name | | M.I. | | Ethnicity | Gender |
|---|---|---|---|---|---|---|---|
| **Category A** | | | | | | | |
| | @ Antony | Raju | | | | A | M |
| | Daly | Jonathan | | C | | W | M |
| | Iu | Kim | | | | A | M |
| | @ Quinn | John | | C | | W | M |
| | Quinn | John | | C | | W | M |
| | Rijal | Dev | | | | A | M |
| | Salerno | Michael | | C | | W | M |
| | A Schackart | Richard | | A | | W | M |
| | A Schipma | Jane | | C | | W | F |

**Total 9**

| | Last Name | First Name | | M.I. | | Ethnicity | Gender |
|---|---|---|---|---|---|---|---|
| **Category B** | | | | | | | |
| | Adams | Richard | | M | | W | M |
| | * Alkovich | John | | W | M | | |
| | Antony | Raju | | | | A | M |
| | Arambula | Miguel | | A | | H | M |
| | @ Buettner | Mark | | E | | W | M |
| | Buettner | Mark | | E | | W | M |
| | * Collins | Rory | J | W | M | | |
| | Kavanaugh | Michael | | E | | W | M |
| | * Lansiri | Panu | | A | M | | |
| | Olszewski | Jonathan | | D | | W | M |

| | | | | |
|---|---|---|---|---|
| Parker | Maria | K | H | F |
| @ Phillips | Thomas | M | W | M |
| @ Rogers | Robert | | B | M |
| Rogers | Robert | | B | M |
| Smith Sr | Maurice | D | B | M |
| *  Wiater | Zachary | J | W | M |

**Total  16** Treatment Plant Operator II #16039

(P)

May 9, 2016
Page 2 of 2

**Category C**

| | | | | |
|---|---|---|---|---|
| *  Butler | Afton  Y | B | F | |
| Phillips | Thomas | M | W | M |

**Total  2**

A  Appointed but have not started.

@  This list includes names from an existing Final Eligible List for this classification.  Name will be removed by November 5, 2016.

*  Eligibility contingent upon completion of one year of service and civil service status with the District as a Treatment Plant Operator I by March 4, 2017.

12

*A Hachment D*

15-310

November 5, 2013

# TREATMENT PLANT OPERATOR I #13044 (O)

## FINAL ELIGIBLE LIST

I hereby certify that the following list contains the names of successful Original Entrance examination candidates for the classification of **Treatment Plant Operator I**. This list is arranged by categories and has been revised to reflect successful claims for veterans' preference.

| Last Name | | First Name | M.I. | Ethnicity | Gender | |
|---|---|---|---|---|---|---|
| **Category A** | | | | | | |
| Beda | | Peter | J | W | M | |
| Gill | | Lawrence | D | W | M | |
| Iu | | Kim | | A | M | |
| Smales | | Don | S | W | M | |
| Smith | Sr | Maurice | D | B | M | |
| Special | | Scott | A | W | M | |
| | | | | | | **Total 6** |
| **Category B** | | | | | | |
| Adams | | Richard | M | W | M | |
| Alkovich | | John | | W | M | |
| Barcelona | | Christian | J | W | M | |
| Burns | | Ashley | N | W | F | |
| Gerzon | Jr | James | L | W | M | |
| Jackson | | Kevin | | W | M | |
| Merritello | | Ron | | W | M | |
| O'Donoghue | | Thomas | P | W | M | |
| Rijal | | Dev | | A | M | |
| Salerno | | Michael | C | W | M | |
| Schackart | | Richard | A | W | M | |
| Shrestha | | Abhilasha | | A | F | |
| Siew | | Michael | L | A | M | |
| Stephens | | Lyra | B | A | F | |
| | | | | | | **Total 14** |
| **Category C** | | | | | | |
| Abma | | Kathleen | E | W | F | |
| Arambula | | Miguel | A | H | M | |
| Barrera | | Leonardo | | H | M | |
| Basile | | Christopher | J | W | M | |
| Boone | | Afton | Y | B | F | |
| Collins | | Rory | J | W | M | |
| Costello | | Joseph | E | W | M | |
| Czapla | | Daniel | K | W | M | |
| Fitzpatrick | | Robert | J | W | M | |
| Freeman | | Shaka | A | B | M | |
| Gavin | | Kenneth | D | W | M | |

| | | | | |
|---|---|---|---|---|
| Kavanaugh | Michael | E | W | M |
| Kothera | Ken | | W | M |
| Lansiri | Panu | | A | M |
| Love | Eric | W | B | M |
| McEathron | Glen | A | W | M |
| O'Brien | Garrett | A | W | M |
| Olszewski | Jonathan | D | W | M |
| O'Rourke | Timothy | J | W | M |
| Osborne | Michael | P | W | M |
| Paglini | Jack | | W | M |
| Park | Tyler | G | A | M |
| Parmer Jr | Dan | G | W | M |
| Pellegrino | Robert | A | W | M |
| Rohan | Patrick | K | W | M |
| Schipma | Jane | C | W | F |
| Vassi | Anna | | W | F |
| Wiater | Zachary | J | W | M |
| Wright | Stephen | P | W | M |

**Total 29**

*A copy of this list is on file in the Human Resources Department.*

I also qualified for a mddp permit with a BAIID installed that would allow me to drive my personal vehicle that was granted to Mark Williams and Anthony Rendon. I also qualified for a work exemption the could immediately be approved by the employer: ex. Ron prior, Stephen Cook, Reuben Johnson Bey Jr., Alan B. Smith, Robert Barnett all normal terms and conditions of employment. The employer denied me these normal terms and conditions and then implemented unlawful qualifications standards of driving a vehicle as a defacto requirement and terminated my employment as a result of segregating and limiting my employment opportunities due to my overlapping protected classes and intentional intersectional discrimination.

The timeline of events from FOIA clearly show that my Separation/Termination was not due to unsatisfactory performance for failing to fulfill my duties and for failing to maintain a valid drivers as valid license is not a requirement for satisfactory performance of the TPO 1 duties. The timeline of events also show I was performing my duties in the manner my lead supervisors requested me to along with the knowledge and approval by the Stickney Plant Operations Manager-Reed Dring as stated in his email on 8/26/15. The timeline of events also show that the HR director Denice Korcal did not give approval for my termination as she clearly points to the higher final policy making authorities therefore by using the 4.11 policy to deny my appeal of my termination ( denying my reinstatement unlawfully) to the Civil Service Board as stated by the MWRD act without the approval of the HR Director only points to Disparate Impact and Disparate Treatment by the Final Policy Making Authorities due to my overlapping protected classes and intersectional discrimination along with the statistical evidence and comparisons 1 out of 23 people including 5 probationary employees and 18 other employees committing the similar and same actions were not Separated/Terminated discharged from the employer and Probationary and Permanent employees are classified as Civil Service Employees and being similar situated does not apply regarding the EEOC investigation and a cause to belief violations occurred as a court would decide that with that being said that is not a defense to the comparisons during the EEOC investigation. Probationary: 1) Sasha Powell, 2) George Lemon, 3) Ron Prior, 4) Anthony Rendon, 5) Ramone Adams; Permanent: 6) Alan Fischer, 7) Roosevelt Johnson, 8) Tracy Matthews, 9) Chris Almore, 10) Saleema Ali, 11) Preston Stover, 12) Dan Feeney, 13) Hardin Davis, 14) George Lemon, 15) Andrew Freeman, 16) Alan Smith, 17) Robert Barnett, 18) Rueben Johnson Bey jr., 19) Quinton Brown, 20) Mark Williams, 21) Robert Quezada, 22) Stephen Cook, 23) Shaka Freeman. Reference-Discipline Related to Drivers license Suspension /Revocation FOIA Pdf request

I filled out my EEO form and stated African American Native American on the form at the time of hire. And I also reported to the employer for a second time my enrollment in the EAP program Due to my 3rd DUI and reported my race discrimination due to African American and American Indian: ancestry filed in my numerous motions and amended complaints to the Civil Service Board that is clearly documented and the statements the employer did not know I had a disability or they did not know about my ancestry of American Indian is not a defense that is valid whether they knew or not. The Civil Service Board and Law Department, HR department stated my numerous paragraphs of discrimination are not in jurisdiction to investigate and referred my complaints to outside agencies and clearly not a defense. The employers reasons for Separation/Termination are pretext and unbelievable due to facts, and direct evidence

There is a clear pattern and practice of violations of Constitutional Rights when you have all of the Final Policy Making Authorities including EEO Coordinator, Employment Relations Manager, Civil Service Board, HR Director, Executive Director, Board of Commissioners referring your complaints of discrimination, retaliation, and harassment to outside agencies and going against policies that state

15

otherwise. The employer also uses fraudulent negative Performance appraisals as pretext along with neutral policies 4.11 to deprive those on probation of there employment opportunities due to race, national origin, Disability (perceived disability by the employer) and including overlapping intersectional discrimination. The employer also uses test scores and unlawful seniority systems to treat those in the protected class of race (African American, American Indian) but not limited to, to treat them in a disproportionate negative manner due to their protected classes. The employer used same race discrimination ( Civil Service Board-Chairman-John Kendall, Derrick Stinson-Lead supervisor, Ramone Adams-coworker, Beverly Sanders along with others in secret coercion to hide the intentional discrimination

**1) Charge:** Pattern and Practice of violations of Civil Rights and systematic disproportionate negative treatment to a class of people due to of Race, Color, National Origin, Ancestry, Culture, Physical Characteristics, Disability, Retaliation under Civil Rights Act of 1964 Title VII as amended and American Disabilities Act and including Disparate Impact, and Disparate Treatment, Denied reasonable accommodations, unlawful qualifications used regarding EEOC unlawful prohibited employment practices:

Disparate Impact and Disparate Treatment overlapping protected classes of and intersectional discrimination in regards to: Discipline/Termination, Hiring, Recruitment, Promotion, Retention, Pre-textual Performance Appraisals/Performance Evaluations used to hide discrimination, failure to investigate complaints of violations of the Anti-Discrimination, Anti-Retaliation, Anti-Harassment Policies and adhere to policies and statutes and violations of Equal Protection Clause

**2) Charge:** Intentional and unintentional violations of Intersectional Discrimination Overlapping Protected classes of Race, Color, National Origin, Ancestry, Culture, Physical Characteristics, Disability, Retaliation under Civil Rights Act of 1964 Title VII as amended and American Disabilities Act and including Disparate Impact, and Disparate Treatment, Denied reasonable accommodations, unlawful qualifications used regarding EEOC unlawful prohibited employment practices:

Discipline/Termination, Hiring, Recruitment, Promotion, Retention, Pre-textual Performance Appraisals/Performance Evaluations used to hide discrimination, failure to investigate complaints of violations of the Anti-Discrimination, Anti-Retaliation, Anti-Harassment Policies and adhere to policies and statutes and violations of Equal Protection Clause.

## UNLAWFUL EMPLOYMENT PRACTICES

SEC. 2000e-2. *[Section 703]*

(a) Employer practices

It shall be an unlawful employment practice for an employer -

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against
>
> any individual with respect to his compensation, terms, conditions, or privileges of
>
> employment, because of such individual's race, color, religion, sex, or national origin; or

16

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

(k) Burden of proof in disparate impact cases

(1) (A) An unlawful employment practice based on disparate impact is established under this subchapter only if-

(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

(ii) the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

## (l) Prohibition of discriminatory use of test scores

It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin.

(m) Impermissible consideration of race, color, religion, sex, or national origin in employment practices

Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

The laws enforced by EEOC prohibit an employer or other covered entity from using neutral employment policies and practices that have a disproportionately negative effect on applicants or employees of a particular race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), or national origin, or on an individual with a disability or class of individuals with disabilities, if the polices or practices at issue are not job-related and necessary to the operation of the business.

17

**3) Charge:** Disability Discrimination under ADA Act: Denied Reasonable accommodations, unlawful qualifications standards used that are not bonafide occupational qualifications, Disparate Impact.

## EEOC: III. ADA INTERFERENCE PROVISION-ADA Guide Retaliation:

**The ADA prohibits not just retaliation, but also "interference" with the exercise or enjoyment of ADA rights. The interference provision is broader than the anti-retaliation provision, protecting any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights.**

In addition to retaliation, the ADA prohibits "interference" with the exercise or enjoyment of ADA rights, or with the assistance of another in exercising or enjoying those rights.[178] The scope of the interference provision is broader than the anti-retaliation provision. It protects any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights. 42 U.S.C. § 12203(b).[179] As with ADA retaliation, an applicant or employee need not establish that he is an "individual with a disability" or "qualified" in order to prove interference under the ADA

The statute, regulations, and court decisions have not separately defined the terms "coerce," "intimidate," "threaten," and "interfere." Rather, as a group, these terms have been interpreted to include at least certain types of actions which, whether or not they rise to the level of unlawful retaliation, are nevertheless actionable as interference.[180]

Of course, many instances of employer threats or coercion might in and of themselves be actionable under the ADA as a denial of accommodation, discrimination, or retaliation, and many examples in this section could be actionable under those theories of liability as well. Because the "interference" provision is broader, however, it will reach even those instances when conduct does not meet the "materially adverse" standard required for retaliation. Examples of conduct by an employer prohibited under the ADA as interference would include:

- coercing an individual to relinquish or forgo an accommodation to which he or she is otherwise entitled;

- intimidating an applicant from requesting accommodation for the application process by indicating that such a request will result in the applicant not being hired;

- threatening an employee with loss of employment or other adverse treatment if he does not "voluntarily" submit to a medical examination or inquiry that is otherwise prohibited under the statute;

- issuing a policy or requirement that purports to limit an employee's rights to invoke ADA protections (e.g., a fixed leave policy that states "no exceptions will be made for any reason");

- interfering with a former employee's right to file an ADA lawsuit against the former employer by stating that a negative job reference will be given to prospective employers if the suit is filed; and

- subjecting an employee to unwarranted discipline, demotion, or other adverse treatment because he assisted a coworker in requesting reasonable accommodation.

The interference provision does not apply to any and all conduct or statements that an individual finds intimidating.[175] In the Commission's view, it only prohibits conduct that is reasonably likely to interfere with the exercise or enjoyment of ADA rights.[176]

## Harassment or Hostile Work Environment

The ADA prohibits an employer from harassing an employee based on his or her disability.

**Definition of Harassment:** Harassment or a hostile working environment exists when the workplace is filled with intimidation, ridicule and insult which is bad enough to [INVALID] the conditions of employment.

The victim must perceive the harassment to be hostile or abusive. In addition, a reasonably objective person must consider it hostile or abusive.

## Examples of Supervisor Harassment

1. Mimicking and ridiculing your speech, gait, or other traits;
2. Spreading myths about you and your disability;
3. Fostering an atmosphere of resentment and pity among your co-workers;
4. Blaming you for problems or errors that you did not make;
5. Criticizing your abilities privately or in front of others;
6. Excessive hovering over you.

You can tell if there is harassment by looking at all aspects of the employer's conduct. This means looking at the conduct in the following ways:

- How often it happens;
- How severe the conduct really is;
- Whether it's threatening and humiliating, or merely offensive; and
- Whether it interferes with your work performance.

It is not enough to show mere snubs, or unjust criticism, or rude conduct. The harassment must be excessive and disgraceful.

Whether an employer can be held responsible for a supervisor's harassment depends on a number of things, including:

- The employer's awareness of the conduct;
- The degree to which the employer took steps to prevent or repair the problem; and
- Whether the supervisor occupied a high enough place in the business to blame the employer.

**Note:** It is usually wise to report harassing behavior, even by a supervisor, to someone in authority.

**Standards, Employment Tests, or Other [INVALID]ion Criteria**
When you apply for a job, the employer cannot use any of the following to screen you out:
- Qualification standards;
- Employment tests; or
- Other [INVALID]ion criteria that screens out a person because of his or her disability.
  - **Ways Employers Discriminate By Unlawfully Limiting or Classifying**
    1. Limiting your duties based on a presumption about your abilities;
    2. Adopting a separate track of job promotion for employees with disabilities;
    3. Assigning or reassigning you to a particular office or installation based on disability;
    4. Requiring that you use particular facilities, such as segregated break-rooms or lunch rooms;
    5. Denying you a job based on generalized fears about your safety, or assumptions about absenteeism rates for persons with your kind of disability.


**4) Charge:** The employer violated my equal protection of laws due to my overlapping protected classes and intersectional discrimination.

**Equal Protection Clause**

The Equal Protection Clause is part of the Fourteenth Amendment to the United States Constitution. The clause, which took effect in 1868, provides that no state shall deny to any person within its jurisdiction "the equal protection of the laws".

A primary motivation for this clause was to validate the equality provisions contained in the Civil Rights Act of 1866, which guaranteed that all people would have rights equal to those of all citizens. As a whole, the Fourteenth Amendment marked a large shift in American constitutionalism, by applying substantially more constitutional restrictions against the states than had applied before the Civil War.

The meaning of the Equal Protection Clause has been the subject of much debate, and inspired the well-known phrase "Equal Justice Under Law". This clause was the basis for *Brown v. Board of Education* (1954), the Supreme Court decision that helped to dismantle racial segregation, and also the basis for many other decisions rejecting discrimination against people belonging to various groups.

The Equal Protection Clause itself applies only to state and local governments. However, the Supreme Court held in *Bolling v. Sharpe* (1954) that equal protection requirements apply to the federal government through the Due Process Clause of the Fifth Amendment.

The Equal Protection Clause is located at the end of Section 1 of the Fourteenth Amendment:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; *nor deny to any person within its jurisdiction the equal protection of the laws*."

20

5) **Charges:   Retaliation Harassment -Hostile Work Environment-**

B. Materially Adverse Action- EEOC Guide Retaliation

3. Harassing Conduct as Retaliation

Sometimes retaliatory conduct is characterized as "retaliatory harassment." The threshold for establishing retaliatory harassment is different than for discriminatory hostile work environment. Retaliatory harassing conduct can be challenged under the *Burlington Northern* standard even if it is not severe or pervasive enough to alter the terms and conditions of employment.[131] If the conduct would be sufficiently material to deter protected activity in the given context, even if it were insufficiently severe or pervasive to create a hostile work environment, there would be actionable retaliation.

6) **Charge: Municipal Liability:**

Government entities cannot be held liable under § 1983 unless an official policy or custom caused the deprivation of constitutional rights. Kujawski v. Bd. of Comm'rs. of Bartholomew County, Indiana, 183 F.3d 734, 737 (7th Cir. 1999). An unconstitutional policy or custom can be: 1) an express policy that causes a constitutional deprivation; 2) a widespread practice that is so well-settled that it constitutes a "custom" with the force of law even though it is not authorized by an express policy or written law; or 3) an allegation that the constitutional injury was caused by a person with final policymaking authority

The 4.11 Probationary Policy was used unlawfully by the Final Policy Making Authority: Board of Commissioners, HR Director-Denice Korcal, Civil Service Board members, Department Head-Manju Sharma, Executive Director-David St. Pierre, Employment Relations Manager-Roxanne Bonner to deprive my constitutional rights and or employment opportunities as stated:

```
70 ILCS 2605/4) (from Ch. 42, par. 323)

The board of commissioners has full power to pass all necessary ordinances,
orders, rules, resolutions and regulations for the proper management and
conduct of the business of the board of commissioners and the corporation and
for carrying into effect the object for which the sanitary district is
formed. All ordinances, orders, rules, resolutions and regulations passed by
the board of commissioners must, before they take effect, be approved by the
president of the board of commissioners.

Based on said stated policies, procedures, and statutes the Board of
Commissioners, Civil Service Board, Director of Human Resource, Department
Heads, District Management all share equally in establishing the policies of
the District.
```

B. Section 1983

Gage also claims that the District should be liable for the deprivation of her constitutional rights. Government entities cannot be held liable under § 1983 unless an official policy or custom caused the deprivation of constitutional rights. Kujawski v. Bd. of Comm'rs. of Bartholomew County, Indiana, 183

21

F.3d 734, 737 (7th Cir. 1999). An unconstitutional policy or custom can be: 1) an express policy that causes a constitutional deprivation; 2) a widespread practice that is so well-settled that it constitutes a "custom" with the force of law even though it is not authorized by an express policy or written law; or 3) an allegation that the constitutional injury was caused by a person with final policymaking authority. Palmer v. Marion County, 327 F.3d 588, 594-95 (7th Cir. 2003). There must be an "affirmative link" between the policy and the alleged constitutional violation. **Gage does not identify a specific written policy that caused the termination of her probation. Moreover, the parties agree that the District's Board of Commissioners establishes the policies of the District**

**7)**

**Charges:**

**Harassment under Title VII and ADA Act:**

## Harassment

Harassment is a form of employment discrimination that violates Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, (ADEA), and the Americans with Disabilities Act of 1990, (ADA).

Harassment is unwelcome conduct that is based on race, color, religion, sex (including pregnancy), national origin, age (40 or older), disability or genetic information. Harassment becomes unlawful where 1) enduring the offensive conduct becomes a condition of continued employment, or 2) the conduct is severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive. Anti-discrimination laws also prohibit harassment against individuals in retaliation for filing a discrimination charge, testifying, or participating in any way in an investigation, proceeding, or lawsuit under these laws; or opposing employment practices that they reasonably believe discriminate against individuals, in violation of these laws.

Petty slights, annoyances, and isolated incidents (unless extremely serious) will not rise to the level of illegality. To be unlawful, the conduct must create a work environment that would be intimidating, hostile, or offensive to reasonable people.

Offensive conduct may include, but is not limited to, offensive jokes, slurs, epithets or name calling, physical assaults or threats, intimidation, ridicule or mockery, insults or put-downs, offensive objects or pictures, and interference with work performance. Harassment can occur in a variety of circumstances, including, but not limited to, the following:

- The harasser can be the victim's supervisor, a supervisor in another area, an agent of the employer, a co-worker, or a non-employee.
- The victim does not have to be the person harassed, but can be anyone affected by the offensive conduct.
- Unlawful harassment may occur without economic injury to, or discharge of, the victim.

Prevention is the best tool to eliminate harassment in the workplace. Employers are encouraged to take appropriate steps to prevent and correct unlawful harassment. They should clearly communicate to employees that unwelcome harassing conduct will not be tolerated. They can do this by establishing an effective complaint or grievance process, providing anti-harassment training to their managers and employees, and taking immediate and appropriate action when an employee complains. Employers should strive to create an environment in which employees feel free to raise concerns and are confident that those concerns will be addressed.

Employees are encouraged to inform the harasser directly that the conduct is unwelcome and must stop. Employees should also report harassment to management at an early stage to prevent its escalation.

## Employer Liability for Harassment

The employer is automatically liable for harassment by a supervisor that results in a negative employment action such as termination, failure to promote or hire, and loss of wages. If the supervisor's harassment results in a hostile work environment, the employer can avoid liability only if it can prove that: 1) it reasonably tried to prevent

and promptly correct the harassing behavior; and 2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer.

The employer will be liable for harassment by non-supervisory employees or non-employees over whom it has control (e.g., independent contractors or customers on the premises), if it knew, or should have known about the harassment and failed to take prompt and appropriate corrective action.

When investigating allegations of harassment, the EEOC looks at the entire record: including the nature of the conduct, and the context in which the alleged incidents occurred. A determination of whether harassment is severe or pervasive enough to be illegal is made on a case-by-case basis.

If you believe that the harassment you are experiencing or witnessing is of a specifically sexual nature, you may want to see EEOC's information on sexual harassment.

**8)**

**Charges: I was disciplined differently due to my overlapping protected classes and Intersectional discrimination.**

**Discipline/Termination:**

An employer may not take into account a person's race, color, religion, sex (including gender identity, sexual orientation, a nd pregnancy), national origin, age (40 or older), disability or genetic information when making decisions about discipline or discharge. For example, if two employees commit a similar offense, an employer many not discipline them differently because of their race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information.

**9) Charges:** Unlawful Employment practices due to my overlapping protected classes and intersectional discrimination:

## Recruitment

It is also illegal for an employer to recruit new employees in a way that discriminates against them because of their race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information.

For example, an employer's reliance on word-of-mouth recruitment by its mostly Hispanic work force may violate the law if the result is that almost all new hires are Hispanic.

## Application & Hiring

It is illegal for an employer to discriminate against a job applicant because of his or her race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information. For example, an employer may not refuse to give employment applications to people of a certain race.

An employer may not base hiring decisions on stereotypes and assumptions about a person's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information.

If an employer requires job applicants to take a test, the test must be necessary and related to the job and the employer may not exclude people of a particular race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, or individuals with disabilities. In addition, the employer may not use a test that excludes applicants age 40 or older if the test is not based on a reasonable factor other than age.

## Job Assignments & Promotions

It is illegal for an employer to make decisions about job assignments and promotions based on an employee's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older),

23

disability or genetic information. For example, an employer may not give preference to employees of a certain race when making shift assignments and may not segregate employees of a particular national origin from other employees or from customers.

An employer may not base assignment and promotion decisions on stereotypes and assumptions about a person's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information.

If an employer requires employees to take a test before making decisions about assignments or promotions, the test may not exclude people of a particular race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), or national origin, or individuals with disabilities, unless the employer can show that the test is necessary and related to the job. In addition, the employer may not use a test that excludes employees age 40 or older if the test is not based on a reasonable factor other than age.

**10)**

**Charge:**

**Retaliation:**

An employer may not retaliate against employees for complaining of discrimination or harassment, whether through an internal company complaint process or through filing a charge of discrimination with the EEOC or a similar state agency.

An employer retaliates against an employee when it takes action to punish the employee for complaining of discrimination or harassment. Any adverse action against an employee can be retaliation, including firing, demotion, discipline, reductions in pay, or changes in job or shift assignment, if that action might deter a reasonable employee from making a complaint. Because enforcement of antidiscrimination laws depends on employee complaints, courts tend to define retaliation broadly.

Under the laws enforced by EEOC, it is illegal to discriminate against someone (applicant or employee) because of that person's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information. It is also illegal to retaliate against a person because he or she complained about discrimination, filed a charge of discrimination, or participated in an employment discrimination investigation or lawsuit.

B. Materially Adverse Action- EEOC Guide Retaliation

3. Harassing Conduct as Retaliation

Sometimes retaliatory conduct is characterized as "retaliatory harassment." The threshold for establishing retaliatory harassment is different than for discriminatory hostile work environment. Retaliatory harassing conduct can be challenged under the *Burlington Northern* standard even if it is not severe or pervasive enough to alter the terms and conditions of employment. If the conduct would be sufficiently material to deter

24

protected activity in the given context, even if it were insufficiently severe or pervasive to create a hostile work environment, there would be actionable retaliation.

## CIVIL LIABILITIES
## (740 ILCS 174/) Whistleblower Act.

(740 ILCS 174/1)
      Sec. 1. Short title. This Act may be cited as the
Whistleblower Act.
(Source: P.A. 93-544, eff. 1-1-04.)

(740 ILCS 174/15)
    Sec. 15. Retaliation for certain disclosures prohibited.
    (a) An employer may not retaliate against an employee who discloses
information in a court, an administrative hearing, or before a legislative
commission or committee, or in any other proceeding, where the employee has
reasonable cause to believe that the information discloses a violation of a
State or federal law, rule, or regulation.
    (b) An employer may not retaliate against an employee for disclosing
information to a government or law enforcement agency, where the employee has
reasonable cause to believe that the information discloses a violation of a
State or federal law, rule, or regulation.
(Source: P.A. 95-128, eff. 1-1-08.)

(740 ILCS 174/20.2)
    Sec. 20.2. Threatening retaliation. An employer may not threaten any
employee with any act or omission if that act or omission would constitute
retaliation against the employee under this Act.

### 5 ILCS 430/15-10)

**Sec. 15-10. Protected activity.** An officer, a member, a State employee, or a State agency shall not take any retaliatory action against a State employee because the State employee does any of the following:

(1) Discloses or threatens to disclose to a supervisor or to a public body an activity, policy, or practice of any officer, member, State agency, or other State employee that the State employee reasonably believes is is in violation of a law, rule, or regulation

(2) Provides information to or testifies before any

public body conducting an investigation, hearing, or inquiry into any violation of a law, rule, or regulation by any officer, member, State agency, or other State employee.

11) **Charge:**

**Same Race Discrimination:**

**Derrick Stinson** my Lead Supervisor intentionally harmed my employment along with others in coercion by stating he referred me to EAP when I notified I had self enrolled in the EAP program due to my 3rd DUI and blowing over the legal limit/Alcohol abuse and by stating so he is aiding and abetting the employer to make fraudulent claims they were not aware of me being a qualified individual with a disability of alcoholism and by enrolling in the EAP program prior to any perceived violation associated with the help sought I am protected from discipline.

He also failed to speak up about me not being unsatisfactory performance and how I was performing my duties with the assistance he ordered and not at my request and the reasons why he ordered the assistance due to waiting on the employer to approve my work exemption (normal terms and conditions)

**Ramone Adams** harassment and intentional job interference is part of the hostile work environment and tactics of same race discrimination used by the Stickney Plant Management/Respondents to hide discrimination, harassment, and a hostile work environment.

The employer also used the Black Civil Service Board Chairman-**John Kendall** to hide intentional discrimination when he retaliated against me, and unlawfully denied my appeal, unlawfully denied my reinstatement when my drivers license was valid and all others have been reinstated (normal terms and conditions), made numerous errors in law prejudicing my hearing, and ordered the mwrd police 2 times throwing me out of my civil service board hearing prejudicing my appeals of my termination.

**Beverly Sanders ( now new HR Director), Barbara McGowan, Keri Steele, Timothy Bradford**-Board of Commissioners when they became aware of the unlawfull acts by numerous personal they aide and abetting the discrimination and ignored the intentional discrimination harming my employment opportunities.

EEOC

Amended Charges
Part: 1, 2, 3, 4, 5, 6, 7, 8, 9

Shaka Freeman

Shaka Freeman    1/30/17

**Att:** EEOC Investigator Janel Smith 2/16/17:

**RE:** EEOC Form 5: **Please attach this letter with the EEOC Form 5** as part of my particulars along with my EEOC Amended Charges 1 through 9. Please submit, mail, email, scan the EEOC Form 5 so I can signed off on my Amended charges that I have already submitted also including sex (gender Male) as I have been requesting the EEOC Form 5 for over 15 days.

Amended 440-2016-00064

Shaka A. Freeman     (404) 580-2433     Date of Birth: 04/26/1975
1827 S. St. Louis Ave. Chicago, IL 60623

Metropolitan Water Reclamation District of Greater Chicago    500 +    (708) 588-4079
Stickney Plant: 6001 W. Pershing Road, Cicero, IL 60804;
MWRD Headquarters: 100 East Erie Street, Chicago, IL 60611      (312) 751-5000

**See attached multiple Respondents:** ( Final Policy Making Authorities but not limited to) under particulars below:

Discrimination Based on: Race, Retaliation, Color, Disability, **Sex (Gender Male)- Please include**, National Origin, Other: Ancestry & Culture but not limited to

I am including **sex (gender Male)** as part of my amended charges as well as I was treated differently and subjected to different terms and conditions of employment than Sasha Powell - ( Probationary) for the same actions( suspended drivers license) along with my other overlapping protected classes and overlapping Disparate Impact/Disparate Treatment and intersectional discrimination.

**Date(s) Discrimination Took Place:**

**Earliest:** 11/5/2013     **Terminated:** 09/18/15     **Latest:** 12/16/2015    **Continued: Yes**

**The Particulars Are ( If additional paper is needed, attach extra sheet(s):**

Pattern & Practice of intentional violations of Civil Rights against me and an entire class ( those with my protected classes) in regards to subjecting me and a class of people (those in my protected classes) to different terms and conditions of employment, and limiting, segregating and depriving employment opportunities in all aspects of employment: hiring, recruitment, promotion, inaccurate, fraudulent, negative performance evaluations ( used as pretext to hide discrimination), refusal to investigate complaints of violations of the Anti-Harassment, Anti-Discrimination, Anti-Retaliation while also referring your complaints to outside agencies, use of employment practices, test scores that causes (Disparate Impact), unlawful Seniority Systems that are not bona fide that are used to deny promotions along with the use of unlawful occupational qualification standards and fraudulent duties stated as pretext that are not bona-fide causing intersectional discrimination and overlapping Disparate Impact/Disparate Treatment and EEOC prohibited employment practices overlapping into intentional intersectional discrimination but not limited to:

**SEE ATTACHED:**

**Timeline of Events**  6/12/17 S-F 88 pages

**1)  8/2013:  First Act of Discrimination:**  A test score was used to segregate my employment opportunities ( Disparat Impact) 8  Internal lab tech 1's ( all outside of my race) we hired in the sequential order:  1)Dev Rijal- B list, 2) Kim Iu-A list, 3)Richard Adams-B list, 4)Richard Schackart-B list, 5)Jane Schimpa- C list  6)Miguel Arambula- C list 7)Rory Collins-C list, 8)Panu Lansiri-C list.

All 8  ended up on the 2013 TPO 1 eligible list  were unlawfully given promotional exams ( personal action forms show promotional hire unlawful promotion and hired and I was given the original entrance exam and my personal form states appointment) given them a 25 % seniority points given them a higher ranking advantage ( as 4 of the 8 were ranked on the A, B list and 6 of the 8 were hired be my hire including including 2 from the C list)  in regards to the overall test score while also showing that without the unlawful 25 %/ 25 points out of 100  points **Miguel Arambula, Rory Collins, Panu Lansiri, Jane Schipma** who were placed on the C list would not have qualified to be on the 2013 TPO 1  eligible list without the illegal and unlawful promotional seniority points they would not have been hired and Jane Schipma, Miguel Arambula,  were hired before me unlawfully and had not enough people retired I would not have been hired.

There is not a **bona fide senority system** in place for the TPO 1 as it is the grand level position ( Treatment Plant Operator 1 and the fixed line of promotion is TPO 1, TPO 2, TPO 3,). ( The Lab Tech 1 position is **not in the fixed line of promotion to the TPO 1** making the promotion exam given to the lab tech 1 to be promoted to TPO 1 unlawful hiring and recruitment practices all of the lab tech 1 unlawfully promoted were not African American) **Panu Lansiri** went on to be the first person promoted to the TPO 2 on 8/29/16 clearly showing that with the intentional discrimination I was denied promotion and the first three people promoted to the TPO 2 were 3 internal lab candidates over the first person hired off of the 2013 TPO 1 eligible list ( Maurice Smith-African American #1 person qualified due to superior qualifications as qualifications jump off the page (including prior wastewater treatment plant operator work experience and IEPA occupational license. **Jane Schipma** was the second person promoted 9/5/16, and Dev then Dev Rijal on 9/5/16.

**1a.**

# 29 CFR 1625.8 - Bona fide seniority systems.

- CFR
- eCFR
- Authorities (U.S. Code)
- Rulemaking

prev | next

§ 1625.8 Bona fide seniority systems.
Section 4(f)(2) of the Act provides that

* * * It shall not be unlawful for an employer, employment agency, or labor organization * * * to observe the terms of a bona fide seniority system * * * which is not a subterfuge to evade the

1

purposes of this Act except that no such seniority system * * * shall require or permit the involuntary retirement of any individual specified by section 12(a) of this Act because of the age of such individual. * * *

**(a)** Though a seniority system may be qualified by such factors as merit, capacity, or ability, any bona fide seniority system must be based on length of service as the primary criterion for the equitable allocation of available employment opportunities and prerogatives among younger and older workers.
**(b)** Adoption of a purported seniority system which gives those with longer service lesser rights, and results in discharge or less favored treatment to those within the protection of the Act, may, depending upon the circumstances, be a "subterfuge to evade the purposes" of the Act.
**(c)** Unless the essential terms and conditions of an alleged seniority system have been communicated to the affected employees and can be shown to be applied uniformly to all of those affected, regardless of age, it will not be considered a bona fide seniority system within the meaning of the Act.
**(d)** It should be noted that seniority systems which segregate, classify, or otherwise discriminate against individuals on the basis of race, color, religion, sex, or national origin, are prohibited under title VII of the Civil Rights Act of 1964, where that Act otherwise applies. The "bona fides" of such a system will be closely scrutinized to ensure that such a system is, in fact, bona fide under the ADEA

**1b.**   (70 ILCS 2605/4.10) (from Ch. 42, par. 323.10) MWRD Act:
      Sec. 4.10. Promotions. The Director shall note of record the duties (whether imposed by law, official regulation or practice) of **each classification in the classified service, and shall thereupon by rule fix lines for promotion from lower classifications to higher classifications in all cases where,** in his or her judgment, the experience gained in the lower classification may tend to qualify an employee to perform the duties of a higher classification. **In case of vacancy in higher classifications, which cannot be filled by reinstatement, the Director shall hold promotional examinations to fill such vacancy. Incumbents of classifications in lines of promotion established by the Director shall be solely eligible for such examination,** unless in the judgment of the Director, it is for the best interests of the service that original examination for such vacancy be held. In promotional examinations, efficiency and seniority in service shall form a part of such examination, but combined shall not carry a weight of more than 25% of the total examination points. Although efficiency and seniority in service shall not carry a weight of more than 25% of the total examination points, the Director may require candidates to separately pass the efficiency and seniority parts of the examination in order for the candidates to be eligible to take the subsequent parts of the examination. If the Director requires candidates to separately pass the efficiency and seniority parts of the examination, then any candidate who does not pass the efficiency and seniority parts of the examination shall fail the entire examination. All examinations for promotion shall be competitive. The method of examination, the rules governing the same, and the method of certifying shall be the same as provided for in the original examination.
(Source: P.A. 97-124, eff. 7-14-11.)

**1c.**     70 ILCS 2605/4) (from Ch. 42, par. 323) **It is the policy of this State that all powers granted, either expressly or by necessary implication, by this Act or any other Illinois statute to the District may be exercised by the District notwithstanding effects on competition.** It is the intention of

```
the General Assembly that the "State action exemption" to the application of
federal antitrust statutes be fully available to the District to the extent
its activities are authorized by law as stated herein.
(Source: P.A. 97-893, eff. 8-3-12; 98-463, eff. 8-16-13.)
```

1d.

### Ronald M. Hill

General Counsel

ronald.hill@mwrd.org

foiarequest@mwrd.org

David St. Pierre *Executive Directo*

January 20, 2017 Mr. Shaka Freeman

Re: FOIA 17-028

Dear Mr. Freeman:

Enclosed please find the promotional requirements for Treatment Plant Operator II. The Human Resources Department indicated that there is no existing line of promotion to Treatment Plant Operator I. This is the information you requested under the Freedom of Information Act.

Sincerely,

*Annie Wright*

Annie Wright

Public Affairs Specialist

HSW:AKW

1e.  **Employee Hanbook- Personnel Rules**- Page 7-1 **7.01 Preparation and Maintenance of Lists:** It shall be the duty of the Director of Human Resources to prepare and maintain lists of employees and applicants for employment, which lists shall determine the order in which employees shall be returned to duty and candidates for employment shall be certified for employment.

1f.  **Employee Handbook page 6-1 6.01 Purpose of Examinations:** The purpose of each examination is to obtain for the District the best qualified employees available, by means of evaluating the knowledges, skills and abilities of the candidates and predicting the degree to which each is competent to perform the duties of the class of positions, or to learn the duties, as may be appropriate. **This objective is accomplished by passing competent candidates and rejecting incompetent candidates and by (a) ranking the competent candidates in the relative order of the**

3

**degree of competence they possess, or (b) grouping competent candidates into categories of relative competence.** [Amendment No. 125, 03/04/83].

1g.

**11/5/13 TPO 1 Eligible List Hiring order of job offers and qualifications:**

1)   Don Smales- A Category- White Male- **Declined** Job offer 1/16/14 Qualified WW Treatment Operator with pior experience Indiana;

2) Lyra Stephens- B Category- Asian Female- **Declined** Job Offer 2/24/14 no prior work experience or license;

3) Maurice Smith- A Category- Black male- External Hire- 3/17/14 certified Licensed wastewater treatment Plant Operator with over 2 years of TPO wastewater work experience prior to examination and hire- certified IEPA –Class 4 wastewater license- 3/2008, **Superior Qualifications;**

4) **Dev Rijal**- B Category- Asian Male- **Internal lab tech** appointed 2/14/14-hired 3/24/15, no wastewater treatment plant operator work experience, no wastewater course, and no IEPA or any wastewater license prior to exam or hire; he has transferred around he was working at the Stickney Plant when I was hired.

**His mother works for MWRD Dr. Geeta Rijal:**   Head of the Analytical Microbiology and Biomonitoring Section at the Environmental Monitoring and Research Division of Metropolitan Water Reclamation District of Greater Chicago (District).

5) Michael Salerno- White male- external Hire- 4/21/14- no prior certified License wastewater treatment Plant Operator work experience, or IEPA or any wastewater license prior to examination and hire;

6) **Ashley Burns**- B Category- White Female- - appointed 5/18/14- no prior wastewater treatment Plant Operator work experience and nor wastewater course, and no IEPA or any wastewater license prior to exam and hire, 6/2015 to 10/2015.Current Position- Assistant Environment Chemist 10/2015 to present;

7) Kim Lu – A Category-Asian male-  **internal lab tech hire**- 5/19/14, no prior certified license wastewater treatment Plant Operator work experience, nor possessing a IEPA class 4 or any wastewater license or higher, and no wastewater course prior to examination and hire.

8) **Ron Merritello**- B Category- White Male- **Declined** Appointment - 6/20/14

9) **John Alkovich** – B-Category- White Male- **Declined** Appointment- 7/8/14

10)   Richard Adams- B Category- White Male- **Internal  lab tech Hire** 7/14/14 – no prior college education, no wastewater Treatment Plant Operator work experience and no IEPA, or any Wastewater License and no wastewater course prior to exam and hire;

11) **Peter J.  Beda** – A Category- White Male- External Hired 9/29/14- No wastewater treatment Plant Operator experience and no wastewater course and no IEPA or any wastewater License, no prior engineering allied science major, no 2 years of sub-professional engineering, scientific or treatment plant operations prior to exam and hire he **was not qualified** for the eligible exam and this also brings into question whether he actually scored in the 90 percentile on the eligible exam in a ethical manner. The Final Authority Policy Makers indirectly and directly have committed ethics violation for placing Peter J. Beda on the Examination list A category because he was not qualified

for the exam or position for hire, and he was hired as a result of the illegal political activity by Peter Beda.

MWRD Act (70 ILCS 2605/4.28) (from Ch. 42, par. 323.28)
Sec. 4.28 No applicant for appointment or promotion in the classified service shall ask for or receive a recommendation or assistance from any officer or employee in said service, or from any person in consideration of any political service to be rendered to or for such person or for the promotion of such person to any office or appointment.
(Source: Laws 1935, p. 744.)

Peter J. Beda used a political figure as his supervisor to verify employment information, recommendation and political service by using and putting that political figure on his employment application and was hired illegal over superior qualified African Americans Shaka Freeman and Eric Love:

**Joseph M. Stahura Mayor**
**City of Whiting**
**1443  119th Street**
**Whiting, IN 46394**
**Phone # (219) 659-7700**
**Fax #: (219) 473-4452**
Email: jstahura@whitingindiana.com

12) Stephen Wright- C-Category- White Male- appointed 10/16/14- **Rescinded-** 11/15/14
13)  Richard Schackart- B-Category-  White Male- **Internal lab tech** Candidate hired 10/20/14, no prior wastewater treatment Plant operator experience and no wastewater course and no IEPA or any wastewater License prior to exam or hire;
14)  Micheal E. Kavanaugh- C-Category-White Male- External candidate hired 11/25/14, no prior wastewater treatment Plant Operator experience and no wastewater course, and no IEPA or any wastewater license prior to exam and hire, no experience performing duties at the technician level in the areas of engineering, laboratory work or plant operations work;
15) Jane Schimpa – C- Category- White Female- Internal candidate hired 12/15/14-  no prior wastewater treatment Plant Operator work experience and no wastewater course, and no IEPA or any wastewater license prior to exam and hire;
16) Miguel Arambula- C-Category-Hispanic Male- Internal candidate hired 12/29/14- no prior wastewater treatment Plant Operator work experience and no wastewater course and no IEPA wastewater License prior to exam and hire;
17) Jonathan Olszewski- C-Category- White Male- external candidate hired 2/18/15- no prior wastewater treatment Plant operator work experience and no wastewater course and no IEPA or any wastewater license prior to exam and hire;

**18) Shaka Freeman –** C Category- **African American**, - external candidate hired 5/13/15,
2 years and 6 months of municipal wastewater treatment Plant operator work experience and certified licensed wastewater treatment operator, and I completed a wastewater course for 12 units earned, Georgia Class 3 wastewater treatment plant operator 8/2011 and IEPA Class 3 licensed 8/22/13 prior to and week of exam and prior to hire, of the 17 people appointed before me I was **3rd  most qualified of the total candidates offered jobs and I was 2nd most qualified among current TPO 1 hired from the 11/5/13 TPO eligible list** and had **superior qualifications** by far except for Maurice Smith- Black Male

5

chosen 1st, and Don Smales- White Male who **declined** who were more qualified but as the pattern and practice of treating African American/American Indian differently than whites, Asians, and Hispanics and those outside my protected class;

19) Rory Collins- C Category- white male- **Internal lab tech candidate** hired 6/15/2015, no prior wastewater treatment Plant operator work experience and no wastewater course, and no certified wastewater license or IEPA class 4 wastewater license prior to exam or hire;

20) Panu Lansiri – Asian Male- C Category- **internal lab tech candidate** hired 8/10/15, no prior wastewater treatment Plant operator work experience and no wastewater course, and no certified wastewater license or IEPA class 4 wastewater license prior to exam or hire;

21) Leonardo Barrera- Hispanic Male- declined appointed 8/28/15 declined 9/8/15;

22) Scott Special – White Male- appointed 9/11/15 declined 9/16/15;

23) Kenneth Gavin- White Male- C- Category external candidate hired 10/14/15, no prior wastewater treatment Plant operator work experience and no wastewater course, and no certified wastewater license or IEPA class 4 wastewater license prior to exam or hire;

**24) Eric Love- Black Male**- C- Category-external candidate hired 11/9/15, had prior wastewater treatment Plant operator work experience, had taken wastewater course, and had a IEPA class 4 wastewater license issued 8/2/11,

25) Kenneth W. Kothera- White Male- C-Category hired 11/9/15, Resigned 11/12/15 Voluntarily terminated.

26) John V. Alkovich- White Male- B-Category hired 11/18/15, no IEPA wastewater license prior to exam and hire;

27) Zachary J. Wiater-White Male-C-Category hired 1/11/16, no IEPA wastewater license prior to exam and hire;

28) Afton Y Butler-African American-Female hired 1/25/16, no IEPA wastewater license prior to exam and hire;

**Actually Hired From TPO 1 Eligible List 11/5/13 in order hired.**

1) Maurice Smith; 2) Dev Rijal- **Internal**; 3) Michael C. Salerno; 4) Kim Lu- **Internal**; 5) Ashly Burns- ( transferred to a Environment Chemist position) , 6) Richard M. Adams-**Internal**; 7) Peter J. Beda; 8) Richard Schackart-**Internal**; 9) Michael E. Kavanaugh; 10) Jane C. Schipma-**Internal**; 11) Miguel A. Arambula-**Internal**; 12) Jonathan D. Olszewski; 13) Shaka Freeman ( I was terminated 9/18/15); 14) Rory J. Collins-**Internal**; 15) Panu Lansiri-**Internal**; 16) Kenneth D. Gavin; 17) Eric W. Love; 18) Kenneth W. Kothera-Resigned-11/23/15 ; 19) John Alkovich; 20) Zachary J. Wiater; 21) Afton Butler;

**2)   11/5/13:  Second Act of discrimination:    A test score was used to segregate my employment.** I was unlawfully ranked on the lowest hiring list the C category even though I was superior qualified to all outside of my race 13 whites, 3 Asians, 1 Hispanic of the total of 21 hired from the 2013 TPO 1 eligible list as my qualifications jump off the page unlawful hiring practices occurred as part of the pattern and practice. My 2 years and 9 months of actual wastewater treatment plant operator work experience as defined by the IEPA, Illinois Class 3 Wastewater License/Georgia class 3 wastewater occupational licenses were invalidated and not used in my ranking. The 13 whites, 3 Asians, 1 Hispanic did not have any actual wastewater treatment Plant operator work experience as defined by the IEPA and none those 17 employees outside my race did not have a wastewater occupational license. The TPO 1 is not a entry level operator in training  position and requires two years of wastewater treatment Plant experience. 11 TPO 1 candidates who I was superior qualified were hired before me and if there had not been that many who retired I would not have been hired as part of the pattern and practice:

**2a)**    Ash v. Tyson Foods, Inc.
(Id.at 1197)- Supreme Court did not set standard but cited three courts of
appeals decisions as to how great the differences in qualifications must be
(a) "disparities in qualifications must be of such weight and significance
that no reasonable person, in the exercise of impartial judgment, could have
chosen the candidate selected over the plaintiff for the job in question"
(Id.); (b)" qualifications evidence standing alone may establish pretext
where the plaintiffs qualifications are clearly superior to those of the
selected job applicant" (c)" factfinder may infer pretext if a reasonable
employer would have found the plaintiff to be significantly better qualified
for the job"

**2b.**    Title VII Disparate Impact: (l) Prohibition of discriminatory use of test scores

It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin.

(m) Impermissible consideration of race, color, religion, sex, or national origin in employment practices

Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

**2c.**    A test was used to exclude Superior Qualified African Americans ( Shaka Freeman, Eric Love 2 of the 3 most superior qualified as qualifications jump off page as compared to those outside protected class) regarding recruitment, hiring, and promotion (ranking of the eligible list as those on the highest list will be hired first as stated) due to race, national origin-Ancestry-Culture-Physical Characteristics. The employer used the illegal promotional exam for the lab techs test and illegal ranking of the candidates to invalidate the prior work experience, Occupational License and due to the ranking I was not interviewed at the same time as those on the A, B, list invalidating my top interview score of A category (91). I was illegally ranked on the C list due to discrimination due to protected classes there are no identifiers of race on the exams. My first name Shaka ( I was named after Shaka Zulu the African King) identified me as a African American and this is another fact as to the charges and why the Respondents discriminated against me and ranked me on the lowest category as policy states those on the highest rankings will be hired first. There is not a Bona fide seniority system in place for the TPO 1 position as it is the ground level position so allowing the lab techs to be ranked according to a promotional exam and to hire them over superior qualified African Americans are clear intentional discrimination.

**2d.**

# GAGE v. METROPOLITAN WATER RECLAMATION DIST. OF GR.
**CHICAGO** United States District Court, N.D. Illinois, Eastern Division
August 17, 2004.

**CHERRIE L. GAGE, Plaintiff,**
v.
**METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO, Defendant.**

The opinion of the court was delivered by: MARVIN ASPEN, Chief Judge, District
"While the District admits it has not performed an analysis of the progression rates of African-Americans as compared to non-minority employees, it responds that Gage's analysis does not take into consideration several relevant variables. For instance, many of the positions at the District require an employee first to pass a competitive examination. Additionally, only **those employees who place in the highest category of test-takers may be selected for the position."**

## 2e.     August 27, 2014
# Illinois Environmental Protection Agency
# Division of Water Pollution Control
# Wastewater Operator Certification Guide

### 7. What is wastewater operating experience?
Wastewater operating experience is time spent performing the hands-on operational duties of a wastewater treatment works operator, which includes direct hands-on physical operation of wastewater treatment equipment and/or wastewater treatment processes, direct active field supervision of wastewater treatment equipment and/or wastewater treatment processes, and/or direct and active involvement in process control decisions for wastewater treatment processes. At this time, wastewater operator experience may be acquired at either municipal or industrial wastewater treatment facilities.

### 8. What does NOT count as hands-on wastewater operating experience?

Public works, street maintenance, meter reading, operating a Vactor truck, sludge hauling/handling and/or application, janitorial, grounds keeping, collection systems and/or drinking water operations, laboratory testing, electrical and/or maintenance mechanic work.

### Can an individual with an Operator-In-Training certificate be considered as the properly certified operator for a wastewater treatment facility?
No, the properly certified operator for a particular wastewater treatment facility must be certified at a level equal to or higher than the certification level required for that facility. An Operator-In-Training certificate does not meet this requirement.

## 2f.
# Illinois Environmental Protection Agency

"Bureau of Water 1021 North Grand Avenue East P.O. Box 19276 Springfield Illinois 62794-9276
Change in Personnel Notification Form
Instructions

2. This form must be typewritten or printed legibly. This form may be completed manually or online using Adobe Reader, a
copy of it saved locally, printed, and signed before it is submitted to:
Illinois Environmental Protection Agency
Wastewater Operator Certification Program
BOW/DWPC/CAS #19
1021 North Grand Avenue East
P.O. Box 19276
Springfield, IL 62794-9276
3. Fill out all applicable sections of the form.
Whenever a certified operator begins or terminates employment with a wastewater treatment works or pretreatment works,
the employee and the owner are required to notify the Agency of the change in writing within seven days.
4.
5.
6. An operator must notify the Agency within 30 days of any change of home address and other contact information.
7. Please keep a copy of your completed form for your records.
8. For questions about, or assistance with, filling out this form, please call: (217) 782-9720

**1. Use this form to make changes to wastewater treatment works operator employment and/or contact information.**
**Should the employment of the properly certified operator of a wastewater treatment works be terminated, the wastewater**
**treatment works owner shall be allowed 90 days to obtain a new properly certified operator. During the 90 day period,**
**an operator that is certified in any Class level other than Operator-In-Training, may operate the wastewater treatment works."**

**3)    12/17/13, 12/19/13, 12/20/13:**    I was unlawfully denied fair and equal opportunity regarding hire, recruitment, promotion, seniority when I was not interviewed ( oral test score) simultaneously (interview score was invalidated prior to ranking of the 2013 TPO 1 eligible candidates as those ranked on the A, B list prior to the hire of the first eligible TPO 1 candidate off the 2013 list Maurice Smith -A list 3/17/14 as all of those placed lawfully and unlawfully on the C list were not interviewed (oral test) as stated by Handbook policy. Those on the C list were not interviewed until all or 90 % or the majority of the 15 eligible candidates on the A, B list had been hired or offered a open position and turned it down as those on the C list were interviewed on 8/18/14, 8/19/14, 8/27/18, 8/28/14. I interviewed (oral test and scored a high score of 91 that was invalidated.

**3a.    Employee Handbook:  6.52**   Simultaneous Administration of Tests: All of the candidates authorized to take any written test shall be given that test simultaneously.

Performance tests, oral tests, and other tests shall also be administered simultaneously to all candidates in every case in which it is administratively feasible and practicable so to do.

**6.56** Scoring Oral Tests: Each oral test candidate shall be scored on several rating factors, each of which shall define clearly the trait or traits to be rated as part of that factor.

Numerical ratings shall be assigned in accordance with a predefined scale, in which the score of seventy (70) or its equivalent, is assigned to a candidate who is barely acceptable, in which higher scores are assigned for higher degrees of acceptability, and lower scores are assigned for lower degrees of unacceptability. The established scale shall be applied fairly and equally to all competitors by the Oral Examining Board.

**3b.**

# GAGE v. METROPOLITAN WATER RECLAMATION DIST. OF GR.
## CHICAGO United States District Court, N.D. Illinois, Eastern Division
August 17, 2004.

**CHERRIE L. GAGE, Plaintiff,**
**v.**
**METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO, Defendant.**

The opinion of the court was delivered by: MARVIN ASPEN, Chief Judge, District "While the District admits it has not performed an analysis of the progression rates of African-Americans as compared to non-minority employees, it responds that Gage's analysis does not take into consideration several relevant variables. For instance, many of the positions at the District require an employee first to pass a competitive examination. Additionally, only **those employees who place in the highest category of test-takers may be selected for the position."**

**4)   3/24/14:**   Dev R. Rijal Lab Tech 1 was unlawfully hired and promoted #2 overall out of the 21 ( unlawfully given a unlawful promotional exam) hired from the 2013 TPO 1 eligible list on **3/24/14** as I was the second most qualified as with superior qualifications to Dev R. Rijal as my qualifications jump off the page and I was unlawfully denied employment until 5/13/15 **14 months** later than I should have been hired due the pattern and practice of intentional discrimination against African Americans/American Indian, National origin-Culture-Names in regards to hire, recruitment, promotion, Termination, performance evaluation. Dev Rijal had did not have any seniority as he was only employed with the District for 5 months **10/21/13** as a **lab tech 1 positions are not in the fixed line of promotion of the TPO 1** and his **personal action form** shows he was given a promotional exam when the original TPO 1 exam was given during a week in 8/2013 simultaneously to all candidates clearly these facts show that how was he given a promotional exam when he **was not even employed at the District 8/2013**. His mother was employed as a scientist in the Research and Monitoring Department but he was not.

**5)   5/19/14 :**   Kim Iu internal lab tech was unlawfully (promotional exam) hired prior to my hire on 5/13/15.

**6)   7/14/14:**   Richard Adams internal lab tech 1 was unlawfully (promotional exam) hired prior to my hire on 5/13/15.

**7)   August 18, 19, 27, 28, 2014:**   Interview C list: (Oral Test) scored a high score of 91. Interviewed 8 months after those on the A, B list segregating my equal employment opportunities. Interview ( oral test score was invalidated as part of the pattern and practice and unlawful hiring, recruitment, promotion,

termination, performance evaluation.

**8)     9/29/14:**     Peter Beda was unlawfully hired ( Ethics violations) as part of the pattern and practice and was  unlawfully hired prior to my hire on 5/13/14 due to using political connections to verify his qualifications on his application and I found this out through requesting the employment applications for those hired from the same 2013 TPO 1 eligible list through FOIA 10/2015 and reported this to the final policy making authorities ( HR Director, Executive Director and was Retaliated against and he suddenly resigned from a 51, 000 a year job after I filed my EEOC charge 3/2016 ( the employer forced him to resign as a cover up:

MWRD Act (70 ILCS 2605/4.28) (from Ch. 42, par. 323.28)
Sec. 4.28 No applicant for appointment or promotion in the classified service
shall ask for or receive a recommendation or assistance from any officer or
employee in said service, or from any person in consideration of any
political service to be rendered to or for such person or for the promotion
of such person to any office or appointment.
(Source: Laws 1935, p. 744.)

**Peter J. Beda** used a political figure as his supervisor to verify employment
information, recommendation and political service by using and putting that
political figure on his employment application and was hired illegal over
superior qualified African Americans Shaka Freeman and Eric Love as part of
the pattern and practice:

**Joseph M. Stahura Mayor**
**City of Whiting**
**1443  119th Street**
**Whiting, IN 46394**
**Phone # (219) 659-7700**
**Fax #: (219) 473-4452**
Email: jstahura@whitingindiana.com

| 9/29/2014 | 3/10/2016 | Beda, Peter | 60 | Resignation | TPO 1 |
|---|---|---|---|---|---|

**9)     10/14/14:**     Micheal E. Kavanaugh- C-Category-White Male- External candidate chosen 10/14/14 and hired 11/25/14,  he had no prior wastewater treatment Plant Operator experience and no wastewater course, and no IEPA or any wastewater license prior to exam and hire, no experience performing duties at the technician level in the areas of engineering, laboratory work or plant operations work; is last job prior to hire was working at a pet store.
The vacancy I interviewed for I was denied. **Michael Kavanaugh** was chosen as
stated by the email and he had no sub-professional engineering, scientific or
plant operations work experience- 2009, no prior work experience as a
wastewater treatment plant operator and did not have a occupational
wastewater license.

My qualifications establish the pretext were my qualifications are clearly
superior to the selected job applicants including **Michael Kavanaugh the**
**refusal to hire me second overall was due to discrimination for protected**
**classes race, national origin-Ancestry-First Name-Characteristics, color,.**

This is Direct Evidence that white TPO 1 candidates and internal candidates
are systematically treated better than African Americans and African
Americans are discriminated against. I was the second most qualified
(qualifications jump off the page) overall of those hired including the A, B
list but I was chosen 5th out of the C list and 18th overall. His last job
prior to hire with the District was working at a pet shop unrelated to
wastewater treatment plant operator occupation. He was hired prior to my hire
as part of the pattern and practice on unlawful hiring, recruitment,
promotion, performance evaluations as he has been promoted to TPO 2 showing
my termination denied me promotion opportunities.

## MWRD Interview Thank You Letter

1 message

October 15, 2014
Shaka A Freeman
560 N Gay St. Apt 202
Auburn AL 36830

Dear Mr. Freeman:

The District would like to thank you for your recent interview for the Treatment Plant Operator I classification. Michael Kavanaugh was selected to fill the vacancy.

The eligible list for this classification is valid until November 5, 2016, and you will be considered for vacancies which occur before that date.

**NOTE: PLEASE DO NOT REPLY TO THIS EMAIL. THIS IS AN UNMONITORED EMAIL ACCOUNT.**

Sincerely,

Adele DeMooy

**Title VII Disparate Impact:** The employer used unlawful promotional test scores along with test scores being adjusted and test scores used to allow those outside my class race (African American) National Origin-Ancestry- (Yankton Sioux Tribe American Indian) who were not qualified to be a Wastewater Treatment Plant Operator as defined by the Illinois Environmental Protection Agency to or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin and have a negative disproportionate effect on African Americans and those with American Indian ancestry in regards to ranking on the TPO 1 eligible lists but not limited to for hire, recruitment, Promotion as part of a pattern and practice.

**10)     10/20/14:**     Richard Schackart internal lab tech 1 was unlawfully (promotional exam) hired prior to my hire on
5/13/15

**11)** **12/15/14:** Jane Schipma internal lab tech 1 was unlawfully ( promotional exam) hired prior to my hire on 5/13/15

**12)** **12/29/14:** Miquel Arambula internal lab tech 1 was unlawfully (promotional exam) hired prior to my hire on 5/13/15.

**13)** **5/13/15:** Hired and Appointed as Treatment Plant Operator 1, Stickney Plant, Midnight Shift 10:30pm to 6:30 am.

**14)** **7/26/15 11:27am:** I was recommended for the open TPO 1 afternoon shift Stickney Plant due to my above average performance over current 2013 TPO 1 eligible candidates including Panu Lansiri:

> From: "Svazas, Charles"
>
> To: "Cummings, Joseph" <CummingsJ@mwrd.org>
>
> Date: 7/26/2015 6:11:27 AM
>
> Subject: TPO 1

d\plainJoe, d\plain Anthony and I discussed the TPO 1 moves yesterday and came to the decision that Mr. Freeman would be our choice for the afternoon spot if Dev moves to days. d\plainChuck

**15)** **7/26/15:** I was given intentional lower 3 month performance evaluation than I should have received by Paul Donnelly who was not my lead supervisor and was only my lead over Derrick Stinson on 1 out of every 5 work days 40 hours worked and 2 out of 10 days biweekly 80 hours worked due to scheduling. I was unlawfully given a meets standards by a supervisor who had limited interaction working contact with me as compared to the Lead Supervisor who was my lead 4 out of 5 days 40 hour work week and 8 out of 10 work days and 80 hour work week and intentionally me a lower rating ( should have received a exceeds standards as I also have a history of exceeding standards performing wastewater treatment Plant Operator work in previous job) then I should have received based on my performance due to the pattern and practice of intentional discrimination segregating equal employment opportunities to those in my protected class ( African American/American Indian) also effecting your opportunity to be the first or second person promoted as those outside of your race receive exceeds standards performance evaluations. The performance evaluation was given 18 days before my 90 day 3month time period had expired.

**16)** **7/30/15:** I self enrolled in Supervised Treatment ( Through employers EAP program) for my 3rd DUI and Alcohol Abuse ( Initial Session One) Session 1:

Michelle D. Williams, LCSW, CADC, P.C. affirms your work an dignity as a person and provides a service system that support this affirmation. Michelle D. Williams, LCSW, CADC, P.C acknowledges that no

recipient of services shall be deprived of any rights, benefits, or privileges guaranteed by State or Federal Law.

Specifically, recipients of services are protected in accordance with the Mental Health and Developmental Disabilities Code.

**Page 1: Discrimination: 3.** No recipient of services is presumed legally incompetent except as determined by a court.

**17)     8/13/15:     Session 2:**    Supervised Treatment for 3rd DUI and Alcohol Abuse with Licensed Substance abuse counselor Michelle Williams.

**18)     8/18/15:     Session 3:**    Supervised Treatment for 3rd DUI and Alcohol Abuse with Licensed Substance abuse Counselor Michelle Williams.

**19)     8/18/15  2:00 am to 3:32 am:**     I requested a ( informal meeting) with my Lead Supervisor Derrick Stinson and met with both he and Paul Donnelly and I told them that I had got arrested on 7/11/15 and charged with a 3rd DUI which was a felony in the state of Illinois and that I blew over the limit and my drivers license as part of the summary suspension that my drivers license would be suspended on 8/26/15. I told then that after a 30 day waiting period that I qualified for MDDP restricted permit ( drive to work and back with a monitoring device attached to my personal vehicle) and I also qualified for a work permit that had to be approved by the employer and could be approved for applied for immediately and I requested to be granted both of these accommodations and normal terms and conditions of employment( as other employees have been granted these accommodations.

**19a.    8/18/15:**     I also told both of them that I had enrolled in the employers EAP program due my 3rd DUI and alcohol abuse and that I had went to 3 counselling sessions (supervised treatment) with my first session with Licensed substance abuse counselor Michelle Williams taking place on 7/30/15 and my third session taking place on 8/18/15. I was told by Derrick Stinson not to worry about the DUI and suspended drivers license because other employees at the Stickney Plant and employer has had this happen to them and he and the midnight shift would work around it until the employer approves the work permit. His response to me self reporting to the EAP Program for alcohol abuse and my 3rd DUI was he did want to know as this and told me to keep it to myself:

**19b.**     "Addiction to alcohol, illegal drugs, and legal or prescription drugs can qualify as a disability under the ADA as amended.[2] Former drug or current alcohol addiction will not qualify as a disability *per se*, rather the addiction must substantially limit one or more major life activity.[3] The ADA has specific rules     regarding drug addiction as a disability. The ADA states that "a qualified individual with a disability shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the    covered entity acts on the basis of such use.[4] " However, this exclusion does not apply to anyone who":

**Drug Addiction and Alcoholism:** A person who has participated or is participating in a supervised rehabilitation program and is no longer engaging in the illegal use of drugs is considered disabled under the employment provisions of the ADA. 42 U.S.C. § 12114(b).

# 42 U.S. Code § 12114 - Illegal use of drugs and alcohol

**§ 12114.**
**Illegal use of drugs and alcohol**
**(a) Qualified individual with a disability**
For purposes of this subchapter, a qualified individual with a disability shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use.

**(b) Rules of construction** Nothing in subsection (a) shall be construed to exclude as a qualified individual with a disability an individual who—
**(1)**
has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use;
**(2)**
is participating in a supervised rehabilitation program and is no longer engaging in such use; or
**(3)**
is erroneously regarded as engaging in such use, but is not engaging in such use;

except that it shall not be a violation of this chapter for a covered entity to adopt or administer reasonable policies or procedures, including but not limited to drug testing, designed to ensure that an individual described in paragraph (1) or (2) is no longer engaging in the illegal use of drugs.

## A. Whether Plaintiff Was "Disabled"

### 1. Under the ADAAA

The ADA, as amended by the ADAAA, makes it unlawful for an employer to

"discriminate against a qualified individual on the basis of disability in regard to . . . terms,

conditions, and privileges or employment." 42 U.S.C. § 12112(a).

Under the ADAAA, the definition of "disability" is construed in "favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). The Act defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individuals; (B) a record of such

an impairment; or (C) being regarded as having such an impairment." *Id.* § 12102(1).[1] The *See EEOC v. J.B. Hunt Transport, Inc.*, 321 F.3d 69, 75 (2d Cir. 2003) ("the [plaintiffs'] perceived unsuitability for the position of [driving sleeper trucks] cannot be characterized as a perceived inability to perform a broad range or a class of jobs. This is true even assuming that truck–driving in general is a sufficiently broad range or class of jobs to.

However, the ADAAA does not require a plaintiff to have a formal "diagnosis" in order to be "disabled"—an impairment that substantially limits a major life activity is all that is required.

        2.    *Under the CFEPA*

The CFEPA definition of physical disability is broader than the ADA or the ADAAA, because it covers "chronic" impairments even if not permanent.[2] *See Caruso v. Siemens Business*

An impairment lasting a single month has qualified as a disability under CFEPA. *See, e.g., Gilman Bros. Co. v. Comm'n Human rights & Opportunities*, No. CV950536075, 1997 WL 275578, *4–5 (Conn. Super. May 13, 1997) (the plaintiff's tendinitis and/or carpal tunnel syndrome, which plaintiff had for only one month prior to employer's adverse action, was a "chronic" handicap under CFEPA). Further, the Connecticut Supreme Court found that a plaintiff suffering from hypertension, and who had to take a two–week leave of absence as a result of high blood pressure was disabled under CFEPA. *Adriani v. Comm'n on Human Rights & Opportunities*, 220 Conn. 307, 314 n.7 (1991).

_____

ADAAA expanded the interpretation of the ADA's three–category definition of "disability." For example, "major life activity" includes "caring for oneself, performing manual tasks . . . walking, standing, lifting, bending, speaking, breathing . . , and working," as well as "the operation of a major bodily function," including "neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." Pub. L. No. 110–325, 122 Stat. 3553, 3555 (2008).

16

**19c.** **2/25/16:** Session Five ( with License Substance abuse Counselor Michelle Williams) focused on Mr. Freeman blame of job not alcohol for loss of employment. **Addressed with Mr. Freeman the alcoholism is the culprit for past and present DUI's.** Pt. given treatment referrals to Gateway and Healthcare Alternative Systems.

Gateway Intensive Outpatient Treatment for Substance abuse:
Problem: Shaka has been unable to control his use of substances as evidence by past relapses. I began my Intensive Out Patient Treatment for substance abuse on 3/7/16.


**20)** **8/18/15** **2:00am to 3:32am: First Acts of ADA Interference Retaliation**: When I informed my immediate supervisors of my enrollment in the employers EAP program (Supervised treatment) due to my 3rd DUI and alcohol abuse the employer knew and was informed of my disability of alcoholism and enrollment in supervised treatment which qualifies me as a qualified individual with a disability pursuant ADA, ADAA and this why Lead Derrick Stinson stated he did not want to know and to told me keep it to myself basically deterring me from reporting this to any other management or staff as to imply due to me being on probation it would harm my employment opportunities and as part of the interference to keep the false claims that he and the employer did not know.


**20a.** **8/18/15** **3:32am:** Derrick Stinson Stated " I am referred to EAP" which is ADA interference as I notified him that I self enrolled in the EAP program and had when to 3 counseling sessions including session 2 on 8/18/15.

**20b.** **8/18/15 to 12/16/15: I was denied as normal terms and conditions of employment rights and pursuant to ADA and ADAA rights but not limited to:**

**Interactive Process:** Generally, the employer's duty to accommodate is triggered by a request from the applicant or employee. Nevertheless, the regulations require an interactive process that requires good faith participation by both parties. 29 C.F.R. pt. 1630, app; *EEOC v. Sears*, 417 F.3d 789 (7th Cir. 2005); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809 (7th Cir. 2004) (employer not required to meet with plaintiff's attorney); *Lenker v. Methodist Hosp.*, 210 F.3d 792 (7th Cir. 2000); *See also Bultmeyer v. Fort Wayne Consolidated Sch.*, 100 F.3d 1281 (7th Cir. 1996) ("The employer has to meet the employee half-way and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help.").

**20c.** **8/18/15 to 12/16/15: I was denied as normal terms and conditions of employment rights and pursuant to ADA ADAA rights but not limited to:**

A Formal Interview ( written documented Interoffice Memorandum as Reference given to all Those in Maintenance and Operation Department but not limited to) and specifically as reference: (similar situated acts)Stephen Cook, White Male, Police Officer DUI charge and arrest- **July 21, 2014**, my arrest was July 11, 2015, suspended drivers license, given reasonable accommodations and or assistance with

performing his normal duties. The employer, Derrick Stinson, failed to report my enrollment in the EAP program due to my 3rd DUI and Alcohol Abuse to the **EEO Coordinator Ted Kosowski** as stated by the following Disability Policy Employee Handbook page 6-3 and I was denied all access to the EEO coordinator through phone calls and emails requests to speak with the EEO coordinator :

**E. Americans with Disabilities Act (ADA), as amended:** " Employees may request a workplace adjustment because of a disability in accordance with the ADA. According to the ADA, a person with a disability is one who has a physical or psychological impairment that substantially limits a major life activity, has a record or such impairment, or is regarded as having such impairment. A qualified individual with a disability is a person who can perform the essential functions of his or her job, with or without a reasonable workplace accommodation.

In order for the District to assess an employee's eligibility for ADA accommodation consideration and determine whether it can reasonably accommodate a request, the employee must enter into the ADA interactive process. For complete details, or to apply for a workplace accommodation under the ADA, contact the District's EEO Coordinator at 312-751-4443."

He reported the DUI charge and suspended drivers license to his supervisors on 7/24/14 and charges of discharge were not brought against him ( **until 9/18/14**) for violating Directive GS 99-01: Drivers license and Personnel Rules 11.041: Causes for Charge until 30 Day suspension pending discharge **9/20/14 to 10/19/14** : Eileen McElligott Administrative Service Manager ( responsible for safety and liability of the employer and Department Head of the employers Police Department) and the Employers Police Chief-Kay C. Heidenreich were directly involved as they were contacted on numerous occasions for direction in my exact same situation:

**September 18, 28 2014 Formal Interview with Officer Cook**:

**September 18, 2014 Formal Interview:** "Officer Cook has not driven a District vehicle or driven on District Property since his drivers license was suspended. Officer Cook has been given a desk assignment on his return to work from discretionary time and regular days off taken September 04-16, 2014.

**September 28, 2014 Formal Interview:** "Office Cook's next court date is September 25, 2014 and he said it is a hearing to challenge the suspension of the driver's license. It is Officer Cook's understanding that if he prevails at the September 25, 2014 court date that his driver's license will be immediately reinstated.

If Officer Cook does not prevail at his next court date, he stated he is qualified to apply for the temporary drivers **license 30 days after the initial suspension. He stated he has already submitted the paperwork for the work exemption portion** of the request for a temporary driver's license with the Illinois Secretary of State.

**I asked Officer Cook if he was still willing to verify his use of the Employee Assistance Program** and stated the he was willing to provide the documentation at the District's request. I asked Officer Cook if he had anything he would like to add and he stated that it has been his intention in dealing with the District from the beginning to straighten out the problem to the best of his ability and be able to come back to work as soon as possible. "

**20d.** I was a qualified individual with a disability of alcoholism as in the future the employer would make false pretext claims, ADA interference in there position statement 10/20/16 to my original eeoc charges and not my final amended charges filed on 1/30/17 that they did know I had a disability and that I did not state what the disability was and that I had not requested and were not aware of my requesting of reasonable accommodations. These facts are why the employer refused a formal interview, interactive process regarding my enrollment in the employers EAP program for my 3rd DUI and alcohol abuse, and this why Derrick Stinson stated I was referred to EAP falsely ( which still should have triggered a interactive process regarding my enrollment from the Stickney Plant Management, Maintenance and Operations Department-Manju Sharma, HR Director-Denice Korcal and the EEO Coordinator- Ted Kosowski as part of normal terms and conditions of employment under ADAA but not limited to but I was denied all normal terms and conditions of employment due to unlawful acts of ADA interference and coercions:

**Employers Position Statement 10/20/16 to original EEOC charge and not my amended charges:** "Mr Freeman claims that the District was aware of his disability but the District was not aware of any disability Mr. Freeman may have had. Mr. Freeman fails to state what his disability is in his Charge. Mr. Freeman also claims that he requested a reasonable accommodation and his accommodation was not provided. The District is not aware of Mr. Freeman requesting a reasonable accommodation for his alleged disability, or what that reasonable accommodation would have been."

**20e. EEOC:** III. ADA INTERFERENCE PROVISION-ADA Guide Retaliation:

**The ADA prohibits not just retaliation, but also "interference" with the exercise or enjoyment of ADA rights. The interference provision is broader than the anti-retaliation provision, protecting any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights.**

In addition to retaliation, the ADA prohibits "interference" with the exercise or enjoyment of ADA rights, or with the assistance of another in exercising or enjoying those rights.[175] The scope of the interference provision is broader than the anti-retaliation provision. It protects any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights. 42 U.S.C. § 12203(b).[176] As with ADA retaliation, an applicant or employee need not establish that he is an "individual with a disability" or "qualified" in order to prove interference under the ADA.

**20f. Title V ADA Act:**

(a) RETALIATION.--No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act.

(b) INTERFERENCE, COERCION, OR INTIMIDATION.--It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this Act.

**21)** **8/18/15 3:32am:** Derrick Stinson made his second violation ADA Interference Provision coercion with the Stickney Plant management and HR Department when he stated in his email to Joseph Cummings that **I was referred to EAP** when I told him I self enrolled in the EAP program due to Alcohol abuse on 7/30/15 and he clearly states in his email me requesting reasonable accommodations/normal terms and conditions of employment and there was no interactive process in good faith by immediate superverse Derrick Stinson, and Paul Donnelly and nor did they follow the Performance management program and his statement of I am referred to EAP should still have triggered a interactive process in good faith and including a formal interview regarding all facts related to my DUI arrest and suspended drivers license as part of normal terms and conditions of employment:

**21a.** **Interactive Process:** Generally, the employer's duty to accommodate is triggered by a request from the applicant or employee. Nevertheless, the regulations require an interactive process that requires good faith participation by both parties. 29 C.F.R. pt. 1630, app; *EEOC v. Sears*, 417 F.3d 789 (7th Cir. 2005); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809 (7th Cir. 2004) (employer not required to meet with plaintiff's attorney); *Lenker v. Methodist Hosp.*, 210 F.3d 792 (7th Cir. 2000); *See also Bultmeyer v. Fort Wayne Consolidated Sch.*, 100 F.3d 1281 (7th Cir. 1996) ("The employer has to meet the employee half-way and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help.").

**21b.** **8/18/15/ to 9/18/15:** I was denied ( the Performance Management Program ) normal terms and conditions of employment under ADA, ADAA and denied unlawfully denied under

Title VII (b) employment agency practices:

**(d)** Training Programs: It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.

**RULE 10**
**PERFORMANCE MANAGEMENT**
[Entire Rule Revised and Renumbered by Amendment No. 239, 04/02/91]
**10.01 Performance Evaluation Program:** The Director of Human Resources shall establish and maintain a system for evaluating the performance of all employees in the classified service.

**10.02 Establishment of Key Accountabilities:** At the beginning of the evaluation period, the supervisor will identify the key accountabilities and indices of performance of the job and present them to the employee. The employee will have the opportunity for meaningful input into the accountabilities and indices of performance. Once there is agreement on the accountabilities and

indices of performance, they will be forwarded up through the department channels for review. If the supervisor and employee cannot agree, the accountabilities and indices will be established by the Department Head or a person designated by the Department Head.

**10.03 Evaluations by Supervisor:** The employee's performance will be evaluated by the supervisor annually, or more frequently if necessitated by a personnel action, a change in accountabilities, or other reason determined by the supervisor, the Department Head, or the Director of Human Resources. The supervisor and employee will meet to discuss the evaluation by the supervisor. At or about the time of the performance evaluation meeting, accountabilities and indices of performance will be established for the next evaluation period.

**10.04 Review of the Evaluation:** After the employee and supervisor have met to discuss the evaluation, the evaluation shall be forwarded to the reviewer who is typically at the level above the supervisor, and then through the department channels to the Department Head or a person designated by the Department Head. If the employee feels that the evaluation does not accurately represent his or her performance during the evaluation period, a review of the evaluation by the reviewer may be requested. The request shall be made by indicating in the appropriate place on the evaluation form. The reviewer shall modify the evaluation if significant inaccuracy is found. If, after the review, the employee feels that the evaluation still inaccurately represents the performance during the evaluation period, a review of the evaluation by the Department Head or a person designated by the Department Head may be requested. The request for the review shall be indicated on the evaluation form. The Department Head or designee shall promptly investigate the evaluation and modify it if a significant inaccuracy is found.

**21c.**

From: "Stinson, Derrick"

To: "Cummings, Joseph" <CummingsJ@mwrd.org>

Date: 8/18/2015 3:31:56 AM

Subject: Mr. Freeman Driver's License

d\plainJoe, Paul and I met with Mr. Freeman at 3:00am this morning. d\plain d\plainThe subject matter being his driver's license will be suspended as of 12:01 am 08-26-2015 for six months. He is instructed not to drive any District Licensed Vehicles as of that time, and we need confirmation if he can be allowed to drive the go cart/gators. d\plain d\plainHe is also referred to EAP. d\plain d\plainMr. Freeman is immediately applying for the State's Monitoring Device Driving Permit Program ( for his personal car) and the Employment Exemption (this allows him to drive work vehicles only). Please review copies of documentation placed in outbox. I instructed Mr. Freeman to list you as primary contact if the DMV needed to verification for the Employment Exemption.

d\plain
d\plain
**d\plainDerrick David Stinson**
**d\plainTreatment Plant Operator 3**
**d\plain11-7 Shift Supervisor d\plainSWRP**

d\plain

**22).   8/18/15  8:03pm:**   Charles Svazas Afternoon Shift TPO 3 Supervisor ( I worked on the midnight shift. Charles Svazas committed to 3rd **violation** of the : **ADA INTERFERENCE PROVISION**: The ADA prohibits not just retaliation, but also "interference" with the exercise or enjoyment of ADA rights. The interference provision is broader than the anti-retaliation provision, protecting any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights and intentional job interference.

**3rd Violation:**      Sec. 4.21. No person or officer shall wilfully or corruptly by himself, or in cooperation with one or more persons, defeat, deceive or obstruct any person in respect to his or her right of examination and employment hereunder; or corruptly or falsely mark, grade, estimate or report upon the examination or proper standing of any person examined hereunder or aid in so doing; or wilfully or corruptly threaten to dismiss, transfer or bring charges against any employee in the classified civil service; or wilfully or corruptly make any false representation concerning the examination or concerning the person examined; or wilfully or corruptly furnish to any person any special or secret information for the purpose of either improving or injuring the prospects or chances of any persons so examined, or to be examined, being appointed, employed or promoted.

**22a.   First violation of:**

**Protected Inquiries**
An employer may ask about the ability to perform job related functions with or without a reasonable accommodation, as long as the inquiries are not phrased in

terms of the disability. 42 U.S.C. § 12112(c)(2)(B). For example, an employer may explain the job-related functions and then ask whether the applicant is capable of performing those functions with or without reasonable accommodation.

**22b.** Charles Svazas ( white male out of shape weight 300 pound or more stating how can the duties be performed with a vehicle) he never states that any of the job functions can be performed without a vehicle or with and without reasonable accommodations/alternative work methods as I could walk to perform the majority the duties as well as using a bike to travel all distances in a timely manner which all them can along with the fact he stated several duties that were not the duties of the Stickney Pant TPO 1 midnight shift as falsely state that I was required to leave the plant. Charles Svazas only phrased his inquiries in terms of my disability as my suspended drivers license and a inability to drive until a restricted permit is approved by the secretary of State and work permit is approved by the employer is a direct result of my disability of alcoholism as I was receiving supervised treatment prior to recommendation for my termination and the employer perceived has having a disability which qualifies me as a qualified individual with a disability of alcoholism.:

**22c.**

I have concerns with the situation happening on Midnights with Mr. Freeman losing his license, If he can not drive in plant how does he:

1) deliver samples to the lab by midnight (13 samples WSRAW, OUTFALL, NGTH, TARP are all 5 gallon carboys)? **(Alternative work method: I could use a elective bike with a trailer attached as 10 of the 11 samples and the in house lab are in a 300 hundred yard radius as the highest speed limit on the plant is 20 miles per hour which is comparable to a bike ( average speed of 12 miles per hour and Electric Bike can travel up to 20 and 28 miles per hour):**



Picking up/Delivery of Samples
with or Without Accommodations

Orange- 5 gal
White- 2 gal
Rectangle Shape - 1 Gal

Alternative Work Methods
Never were discussed with
Me by Stickney Plant
Management or Employer

I was t
given to r
Supervisor
Paul Donnel
of TPO 1 N
Stickney Pl

I was not told prior to my
termination to perform delivery

**23)   8/18/15  8:50pm:**  Venuso sent an email to Cummings and Svazas stating that h he agrees with Svazas's concerns. Venuso stated he would consider a TPO 1 who is unable to drive a vehicle as one who can fulfill the job duties as a TPO .

**23a.**   Anthony Venuso Afternoon Shift TPO 3 Supervisor ( I worked on the midnight shift. Anthony Venuso committed the **4th** violation of the : **ADA INTERFERENCE PROVISION:** The ADA prohibits not just retaliation, but also "interference" with the exercise or enjoyment of ADA rights. The interference provision is broader than the anti-retaliation provision, protecting any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights. He is in clear coercion with Charles Svazas and Joseph Cummings.

**4rd Violation:**        **Sec. 4.21.** No person or officer shall wilfully or corruptly by himself, or in cooperation with one or more persons, defeat, deceive or obstruct any person in respect to his or her right of examination and employment hereunder; or corruptly or falsely mark, grade, estimate or report upon the examination or proper standing of any person examined hereunder or aid in so doing; or wilfully or corruptly threaten to dismiss, transfer or bring charges against any employee in the classified civil service; or wilfully or corruptly make any false representation concerning the examination or concerning the person examined; or wilfully or corruptly furnish to any person any special or secret information for the purpose of either improving or injuring the prospects or chances of any persons so examined, or to be examined, being appointed, employed or promoted.

**23b.**    2nd **violation of Protected Inquiries by Anthony Venuso as part of the coercion:**

**Protected Inquiries**
An employer may ask about the ability to perform job related functions with or without a reasonable accommodation, as long as the inquiries are not phrased in terms of the disability. 42 U.S.C. § 12112(c)(2)(B). For example, an employer may explain the job-related functions and then ask whether the applicant is capable of performing those functions with or without reasonable accommodation.

**23c.**

> From:   "Venuso, Anthony"
>
> To:   "Cummings, Joseph" <CummingsJ@mwrd.org>
>
> Date:  8/18/2015 8:50:15 PM
>
> Subject:  RE: Freeman

d\plainJoe, d\plain d\plain I fully agree with Mr. Svazas' assessment of the pending 6 month situation on 11-7 shift beginning Aug 26th. d\plain d\plainAs shift supervisor I would not consider a TPO1 who is unable to drive a motor vehicle in the plant as one who can fulfill the duties (see list in below email) of the TPO1 slot. It would be irresponsible on my part to consider the shift properly staffed as such. The

From: "Venuso, Anthony"

To: "Cummings, Joseph" <CummingsJ@mwrd.org>

Date:

Subject: RE: Freeman Termination 091815

responsibility to properly staff the shift rests on the shift TPO3. To take on a shift staffed in such a way
is staging oneself for failure and therefore taking on unreasonable liability.
d\plain d\plainI am requesting that The TPO3 who is responsible for staffing his shift not be
placed in this situation without some reasonable remedy.
d\plain

called the CCR at 3:43pm. I took the call. He began discussing his situation. I politely interrupted him to tell him that I am under direct orders to not have a discussion with him as is typical orders given for such circumstances. I then offered him Ms. Roxanne Bonner's phone number. He then asked if I would make a statement about how Chuck and I recommended him for our shift and if I would answer honestly if asked about him and his ability to do his job. He stated that he is trying to get his job back. I told him that I have to end the call and asked if he has Ms. Bonner's phone number and he said that he does. He then thanked me and said that he apologizes if he has made me feel uncomfortable.

From: Cummings, Joseph
Sent: Friday, September 18, 2015 12:32 PM
To: Donnelly, Paul; Halaska, Anthony; Stinson, Derrick; Svazas, Charles; Venuso, Anthony; White,
William
Cc: Dring, Reed; Garelli, Brett; Bonner, Roxanne
Subject: Freeman Termination 091815
Importance: High

**24)** **8/19/15 4: 28pm:** Joseph Cummings-Stickney Plant Management and Brian Dietz-HR, and Reed Dring-Stickney Plant Operations Manager committed the **5th** **violation** of the : **ADA INTERFERENCE PROVISION:** The ADA prohibits not just retaliation, but also "interference" with the exercise or enjoyment of ADA rights. The interference provision is broader than the anti-retaliation provision, protecting any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights.

**5th Violation:**      Sec. 4.21. No person or officer shall wilfully or corruptly by himself, or in cooperation with one or more persons, defeat, deceive or obstruct any person in respect to his or her right of examination and employment hereunder; or corruptly or falsely mark, grade, estimate or report upon the examination or proper standing of any person examined hereunder or aid in so doing; or wilfully or corruptly threaten to dismiss, transfer or bring charges against any employee in the classified civil service; or wilfully or corruptly make any false representation concerning the examination or concerning the person examined; or wilfully or corruptly furnish to any person any special or secret information for the purpose of either improving or injuring the prospects or chances of any persons so examined, or to be examined, being appointed, employed or promoted.

**24a.** **3rd** **violation of Protected Inquiries by Joseph Cummings as part of the coercion:** My suspended drivers license and being unable to drive is a result of being a qualified individual with a disability of Alcoholism and only phrases that I am unable to perform my duties without reasonable accommodations but the duties could be performed with normal terms and conditions of employment and alternative work methods as there not a Interactive process conducted under ADA Act and with reasonable accommodations.

**Protected Inquiries**
An employer may ask about the ability to perform job related functions with or without a reasonable accommodation, as long as the inquiries are not phrased in terms of the disability. 42 U.S.C. § 12112(c)(2)(B). For example, an employer may explain the job-related functions and then ask whether the applicant is capable of performing those functions with or without reasonable accommodation.

**24b.** Cummings sent an email to Dring and Deitz stating that if Freeman is able to get permission from the State to drive his personal car with a breathalyzer, then that will be the only car he can drive. Cummings also added that if Freeman is unable to drive, then it is doubtful that he will be able to fulfill his job requirements as a TPO 1.

**24c.** **8/19/15 4:28pm Joseph Cummings Email to Reed Dring, Brian Deitz:**

" As I understand it, if he gets permission from the State to drive his personal car because he's installed a breathalyzer then that will be the only vehicle he will be permitted to drive in the plant. No District cars, carts, or Gators. He will have to drive he personal car to perform all of his job duties, including but not limited to those listed below.

27

If he is not permitted by the State to drive his personal vehicle then it is doubtful that he will be able to fulfill his job requirements, and we should not be assigning someone else to pick up the slack.

**24d.**                                                                      **625ILCS5/11-1426.1)**
**Sec. 11-1426.1. Operation of non-highway vehicles on streets, roads, and highways.**

(d) A municipality, township, county, or other unit of local government may authorize, by ordinance or resolution, the operation of non-highway vehicles on roadways under its jurisdiction if the unit of local government determines that the public safety will not be jeopardized. The Department may authorize the operation of non-highway vehicles on the roadways under its jurisdiction if the Department determines that the public safety will not be jeopardized.

**24e.**

**IDES Administrative Law Judge's Decision: 12/14/15:**

**Conclusion:** "The claimants job description did not require him to have a drivers license. He brought a bike, to work, so he could perform duties around the plant. The claimant did not leave his position voluntarily. He was discharged. He did not deliberately violate his employers Rules or policies. He did not set out to harm his employer.

No disqualification is imposed under Section 601-A or Section 602-A of the Act.

**Decision:** The local Office Determination is Set Aside. Pursuant to 820 ILCS 405/601A, the claimant is eligible for benefits, as to this issue only, from 09/27/2015.

Frank S. Kaitis, Administrative Law Judge
Appeals-Chicago
Fax: 312-338-0327"

**24f.**

**Failure to Make Reasonable Accommodations:**
**1. Standard:** It is unlawful to fail or refuse to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability, unless the employer shows that the accommodation would impose an undue hardship on the operation of its business. 42 U.S.C. § 12112(b)(5). An accommodation is any change in the work environment or the way things are usually done that enables an individual with a disability to enjoy equal employment opportunities. 29 C.F.R. pt. 1630 app.; § 1630.2(o). There is no burdenshifting formulation under the duty to accommodate: when the employee demonstrates that the employer has failed to provide a reasonable accommodation, the employer is liable. *Lenker v. Methodist Hosp.*, 210

28

F.3d 792 (7th Cir. 2000).

**Reasonable Accommodations:** Reasonable accommodations include: (1) Modifications or adjustments to the job application and testing process that enable persons with disabilities to be considered for jobs; (2) Modifications or adjustments to the work environment or the manner or circumstances in which the job is customarily performed that enable persons with disabilities to perform the essential functions of the job; and (3) Modifications or adjustments that enable persons with disabilities to enjoy equal benefits and privileges of employment as are enjoyed by similarly situated employees without disabilities. 42 U.S.C. § 12111(9); 29 C.F.R. §§ 1630 2(o) and 1630.9.

**24g.** The TPO 1 does not require a valid drivers license for employment and driving duties are not part of the essential job functions as stated in the official job functions as stated prior to eligibility examination as well.

**8/26/15- 7:08 am Emal-Timeline of Events:** "Finally, Dring stated that Freeman purchased a bicycle to get around the plant and also purchased a cooler with wheels to transport samples around the batteries. However, there is still an issue with WS sample, but the midnight crew can work around this issue until Freeman obtains the employment exemption.

**24h.** A job function may be considered essential because: (1) the position exists to perform that function; (2) performance of the function can be distributed to only a limited number of employees; or (3) the incumbent is hired for her expertise or ability to perform the function or the consequences of not performing the function are significant to the business. TECHNICAL MANUAL § 2.3(a)(1) *et seq.* The employer's view of what constitutes an essential function of the job in question is considered by the court, but is not determinative. 42 U.S.C. § 12111(8). For any full time job, an essential element is that the plaintiff be able to work full time, at least gradually. *Devito v. Chi. Park Dist.*, 270 F.3d 532 (7th Cir.2001).

**24I.** From: Bonner, Roxanne
Sent: Monday, August 24, 2015 4:26 pm
To: Korcal, Denice; Kosowski, Thaddeus; Sanders, Beverly
Subject: FW: Mr. Freeman Driver's License 0801815

"Mr. Freeman began his employment as a TPO 1 on May 13, 2015. Although the DL is not an absolute requirement for TPOs, it is convenient for a TPO to get around the plant using a District vehicle. Mr. Freeman is being barred from using District vehicles and must find a way to get around to his work assignments without them."

**25)** **8/24/15 3:55** Joseph Cummings-Stickney Plant Management email sent to all of the TPO 3 supervisors on all 3 shifts: Paul Donnelly-Midnight Shift, Anthony Halaska-Day Shift, Derrick Stinson-Midnight Shift, Charles Svazas-Afternoon Shift, Anthony Venuso-Afternoon Shift, William White-Day Shift

and Brian Dietz-HR, and Reed Dring-Stickney Plant Operations Manager committed the **6th violation** of the : **ADA INTERFERENCE PROVISION:** The ADA prohibits not just retaliation, but also "interference" with the exercise or enjoyment of ADA rights. The interference provision is broader than the anti-retaliation provision, protecting any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights.

## 6th violation of the MWRD ACT IL State Law:

```
Sec. 4.21. No person or officer shall wilfully or corruptly by himself, or in
cooperation with one or more persons, defeat, deceive or obstruct any person
in respect to his or her right of examination and employment hereunder; or
corruptly or falsely mark, grade, estimate or report upon the examination or
proper standing of any person examined hereunder or aid in so doing; or
wilfully or corruptly threaten to dismiss, transfer or bring charges against
any employee in the classified civil service; or wilfully or corruptly make
any false representation concerning the examination or concerning the person
examined; or wilfully or corruptly furnish to any person any special or
secret information for the purpose of either improving or injuring the
prospects or chances of any persons so examined, or to be examined, being
appointed, employed or promoted.
```

**25a.** Along with denial of reasonable accommodations/normal terms and conditions of employment ( being able to work in a team work environment that was not told to me prior to termination:

Metropolitan Water Reclamation District of Greater Chicago

2015 Strategic Business Plan Recovering Resources, Transforming Water For the 2015 Budget Cycle, the Executive Team reviewed the prior strategic plan and determined that the goals and strategies had been significantly advanced. The vision to "Improve Our Environment" in the areas of Finance, Employee, Public and Natural Environments has served the District well over the past four years. Although it remains important to keep our eyes focused on these areas to ensure that we continue to maintain excellence, the team felt it was time to set new goals for the next five years:

Respect

*We create an atmosphere of open communication that rewards commitment and performance and is responsive to the needs of our employees and our communities.* Respect is measured by how we treat each other, by the contributions that flow from our diversity, by the productivity of our relationships, and by a job well done, no matter what the job. To meet our goals, we depend on the integrity,

knowledge, skill, diversity, and teamwork of our employees. Creating a respectful, courteous, and fair workplace will lead to improved communication, heightened levels of workplace participation, and in-novation due to diverse thinking."

**25b.   8/24/15  3:55**   Joseph Cummings Email: "Reminder that Shaka will not be permitted to drive an vehicle ( personal or District-owned; Whether car, cart, Gator...) on plant grounds effective midnight 8/26/15. If he has paperwork or documentation regarding his driving status for the District to consider he should provide it immediately. He is still responsible for doing all of his normal duties and no accommodation will be made whereby his duties are shifted to another staff member.

**26:    8/24/15   4:26pm:  4th violation of Protected inquire:**

**Protected Inquiries**
An employer may ask about the ability to perform job related functions with or without a reasonable accommodation, as long as the inquiries are not phrased in terms of the disability. 42 U.S.C. § 12112(c)(2)(B). For example, an employer may explain the job-related functions and then ask whether the applicant is capable of performing those functions with or without reasonable accommodation.

**26a.   8/24/15   4:26pm:**

Roxanne Bonner (Human Resources Manager) sent an email to Denice Korcal ( Director of Human Resources), Ted Kosowski (Assistant Director of Human Resources) and Beverly Sanders (Assistant Director of Human Resources) informing them that a driver's license is not an absolute requirement for Treatment Plant Operators. Bonner added that since Freeman is barred from using District vehicles, Freeman must find a way to get around to his work assignments without a vehicle.

**27)    8/24/15   5:10pm:**

**7th violation of the : ADA INTERFERENCE PROVISION:** The ADA prohibits not just retaliation, but also "interference" with the exercise or enjoyment of ADA rights. The interference provision is broader than the anti-retaliation provision, protecting any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights.

**7 th violation of the MWRD ACT IL State Law:**

**Sec. 4.21.** No person or officer shall wilfully or corruptly by himself, or in cooperation with one or more persons, defeat, deceive or obstruct any person in respect to his or her right of examination and employment hereunder; or corruptly or falsely mark, grade, estimate or report upon the examination or proper standing of any person examined hereunder or aid in so doing; or wilfully or corruptly threaten to dismiss, transfer or bring charges against any employee in the classified civil service; or wilfully or corruptly make any false representation concerning the examination or concerning the person examined; or wilfully or corruptly furnish to any person any special or secret information for the purpose of either improving or injuring the prospects or chances of any persons so examined, or to be examined, being appointed, employed or promoted.

**27a.    5th Violation of:**

**Protected Inquiries**
An employer may ask about the ability to perform job related functions with or without a reasonable accommodation, as long as the inquiries are not phrased in terms of the disability. 42 U.S.C. § 12112(c)(2)(B). For example, an employer may explain the job-related functions and then ask whether the applicant is capable of performing those functions with or without reasonable accommodation.

**27b.    8/24/15   5:10pm: Email From Roxanne Bonner-Employment Relations Manager:**

Bonner followed up with another email to Korcal, Kosowski and Sanders. Bonner expressed concerns about Freeman's situation after a conversation she had with Cummings. Bonner stated that Freeman is a new employee and the only TPO 1 working midnights. Bonner added that Freeman is required to collect samples every night and pack them in ice or a cooler and deliver them to the M & R department. If a cooler isn't used, the sample must be delivered immediately to the lab, as samples must be delivered within a certain temperature and time range. Bonner also stated in her email that M & O has directed staff to provide no accommodations and Freeman may be applying for a restricted driving permit, but does not know when he would get a driving permit since his license was suspended for 6 months. Bonner further added that in the previous year, the District terminated an employee from an Engineering Technician V to and Engineering Technician IV because he could not drive to inspect construction sites. The Engineering Technician ultimately got a restricted driving permit, but after he was terminated from probation.

### 27c. 8/24/15: Unlawfully issued and or back dated policy Anti-discrimination, Anti-Harassment, Anti-Retaliation Policy:

**(70 ILCS 2605/4.6) (from Ch. 42, par. 323.6)**
    **Sec. 4.6.** All rules made as herein provided and all changes therein shall forthwith be printed for distribution by the Director and it shall give notice of the places where said rules may be obtained, by publication in one or more daily newspapers published in the county in which said sanitary district is situated and in each such publication shall specify the date not less than ten days subsequent to the date of such publication, when said rules shall go into operation.
(Source: Laws 1963, p. 2477.)

I and other employees was not given a printed copy of the version 2 copy nor were other employees and nor was it published in one or more daily newspapers where said rules may be obtained and Sec 4.6 policy was not followed and was created to shift the liability away from Ted Koswoski as I presented direct evidence of unlawful acts by HR department as it was Ted Kosowski's job to make a report and investigate my complaints of whistleblower violations, IL ethics violations, disparate treatment, and disparate impact treatment pattern and practice systematic disproportionate negative treatment toward those in protected classes but not limited to as complaints of violations of the anti-discrimination, anti-retaliation and anti-harassment policies were ignored by Ted Kosowski (Thaddeous.)

**Roxanne Bonner-**Employment Relations Manager at the time of my employment:

Anti-Harassment, Anti-Discrimination, Anti-Retaliation, Anti-Retaliation version2 ( policy was submitted to eeoc investigator) that was illegally administered and was not unilaterally made known to all employees states that the Employment Relations Manager is the only person who can authorize the investigation of discrimination complaints refused to investigate my complaints and referred me to outside agencies and by doing so intentionally discriminated against me. Every time I called with my complaints after my termination I was referred strictly to Roxanne Bonner also segregating my employment.

**MWRDGC Administrative Procedures Manual**

**Subject: Anti-Harassment, Anti-Discrimination and Anti-Retaliation Policies and Reporting Procedures Version 2 – 8/14/15:**

A. Internal Reporting Procedures

2. Managers or Supervisors who learn (directly or indirectly of any behavior that appears to violate this policy must contact the Employee Relations Section at 312-751-4443 as soon as practicable to discuss the perceived violation, and the Employee Relations Section will notify the appropriate chain of command. Such reports or manager thinks the behavior is a violation of this policy, regardless of whether any employee complained about the behavior and regardless of whether an employee want the report made.:

**B.  Inquires and Investigations**

1. Only members of the Employee Relations section or their designee shall conduct inquiries and investigations into allegations of violations of this policy. Inquiries or investigations are permitted by other supervisory staff only after they are designated to do so by a member of the employee Relations Section.

2. Reports complaints and allegations of violations of this policy will be addressed as promptly as practicable. Inquiries are conducted when there is reason to believe that a policy violation might have taken place. Investigations are initiated when more information is needed to make that determination. Inquiries and investigations will be initiated with or without an employee's consent.

3. Every attempt will be made to maintain employee confidentiality on a need to know basis only however, there should be no expectation of complete privacy.

**E)**  Have Zero tolerance for violation of the Anti-Discrimination, Anti-Retaliation, Anti-Harassment policies and investigate all complaints in a transparent manner.

**28)  8/25/15 7:22pm:**  Korcal sent an email to Bonner directing Bonner to terminate Freeman's probation.

**28a.**  Denice Korcal-HR Director and the employer ( Final policy making authorities) already decided to terminate my employment prior to my suspended drivers license on 8/26/15 and the time from 18/18/15 to 9/18/15 clear ADA interference, Coercion and Retaliation was taking place as it did not matter how I performed my duties, whether or not I received reasonable accommodations or was able to perform my duties with or without assistance or reasonable accommodations.

**29)   8/25/16 1:56 pm:**   Reed Dring Sent an Email that was forward by Joseph Cummings to: Police Chief- Kay Keidenreich, Brian Deitz, Reed Dring:

**8th  violation** of the : **ADA INTERFERENCE PROVISION:** The ADA prohibits not just retaliation, but also "interference" with the exercise or enjoyment of ADA rights. The interference provision is broader than the anti-retaliation provision, protecting any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights.

**8th  violation** of the **MWRD ACT IL State Law:**

**Sec. 4.21.** No person or officer shall wilfully or corruptly by himself, or in cooperation with one or more persons, defeat, deceive or obstruct any person in respect to his or her right of examination and employment hereunder; or corruptly or falsely mark, grade, estimate or report upon the examination or proper standing of any person examined hereunder or aid in so doing; or wilfully or corruptly threaten to dismiss, transfer or bring charges against any employee in the classified civil service; or wilfully or corruptly make any false representation concerning the examination or concerning the person examined; or wilfully or corruptly furnish to any person any special or secret information for the purpose of either improving or injuring the prospects or chances of any persons so examined, or to be examined, being appointed, employed or promoted.

**29a.    6th Violation of:**

**Protected Inquiries**
An employer may ask about the ability to perform job related functions with or without a reasonable accommodation, as long as the inquiries are not phrased in terms of the disability. 42 U.S.C. § 12112(c)(2)(B). For example, an employer may explain the job-related functions and then ask whether the applicant is capable of performing those functions with or without reasonable accommodation.

**29b.    8/25/15 1:56pm:**   Dring sent an email stating that if Freeman comes to work on Wednesday, 8/26/15, and his vehicle is equipped with a breathalyzer, then Freeman can drive his own vehicle around. Dring Added that Freeman is not allowed to drive a District vehicle. Dring also stated that if Freeman does not have a breathalyzer device on his own vehicle, then Freeman will not be able to fulfill all the duties of his position. Dring notes that someone else would have to either pick up the samples or drive Freeman to get the samples.

**29c.    8/25/16 1:56 pm:**   Reed Dring Sent an Email that was forward by Joseph Cummings to: Police Chief- Kay Keidenreich, Brian Deitz, Reed Dring:

"If Mr. Freeman comes to work Wednesday night and his vehicle is equipped with the breathalyzer, he can drive HIS vehicle around the plant to grab samples. He is not allowed to us a District car or Gator/Cushman. If he doesn't have the breathalyzer installed he will not be able to fulfill all the duties of the position. Someone would have to either pickup the WS samples or drive him over to get the samples. In either scenario, he can't drive a District vehicle.

I will be in early on Thursday and would like to speak to him regarding this situation. His response may be that he will have the breathalyzer installed within the week or not. The "or not" may have serious consequences."

**30)    8/25/15:**   Bonner had a telephone conversation with Reed Dring (Engineer of Treatment Plant Operations 1) about Korcal's recommendation to terminate Freeman's probation.

**31)    8/26/15 7:08am:**   Dring sent an email to Deitz and Bonner information informing them that he discussed the situation with Freeman. Dring stated Freeman is eligible for the Secretary of State's Monitoring Driving Permit which entails the installation of a Breath Alcohol Ignition Interlock Device. Dring added that there is a provision to obtain driving privileges

during work hours and employment verification is needed prior to an exemption being granted. Finally, Dring stated that Freeman purchased a bicycle to get around the plant and also purchased a cooler with wheels to transport samples around the batteries. However, there is still an issue with the WS sample, but the midnight crew can work around this issue until Freeman obtains the employment exemption.

**32)    8/26/15 8:27am:**    Joseph Cummings is making pretext statements and ADA interference and along with statements including inquiries stating performance of duties in terms of my disability of Alcoholism/suspended drivers license inability to drive a vehicle and making false claims employees will have to work double shifts due to being perceived to have a disability by the employer and being a qualified individual with a disability of Alcoholism due to receiving supervised treatment through the employers EAP program:

**32a.    9th violation** of the : **ADA INTERFERENCE PROVISION:** The ADA prohibits not just retaliation, but also "interference" with the exercise or enjoyment of ADA rights. The interference provision is broader than the anti-retaliation provision, protecting any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights.

**9th violation of the MWRD ACT IL State Law:**

**Sec. 4.21.** No person or officer shall wilfully or corruptly by himself, or in cooperation with one or more persons, defeat, deceive or obstruct any person in respect to his or her right of examination and employment hereunder; or corruptly or falsely mark, grade, estimate or report upon the examination or proper standing of any person examined hereunder or aid in so doing; or wilfully or corruptly threaten to dismiss, transfer or bring charges against any employee in the classified civil service; or wilfully or corruptly make any false representation concerning the examination or concerning the person examined; or wilfully or corruptly furnish to any person any special or secret information for the purpose of either improving or injuring the prospects or chances of any persons so examined, or to be examined, being appointed, employed or promoted.

**32b.    7 th Violation of:**

### Protected Inquiries

An employer may ask about the ability to perform job related functions with or without a reasonable accommodation, as long as the inquiries are not phrased in terms of the disability. 42 U.S.C. § 12112(c)(2)(B). For example, an employer may explain the job-related functions and then ask whether the applicant is capable of performing those functions with or without reasonable accommodation.

**32c.    8/26/15 8:27am:**    Cummings sent an email to Dring, Deitz, Bonner, Heidenreich and Brett Garelli ( Deputy Director of M & O ) stating that Cummings has not received any paperwork since he was first notified 10 days ago. Cummings added that there are more timeliness issues than just the WS samples and Freeman should be tasked to do all his duties independently, which is the nature of the job. Cummings added that employees will be assigned to additional duties and some TPO IIIs would be stuck working double shifts when the midnight TPO IIIs call during storms.

**33)**   **8/26/15   6:25pm:**   Korcal sent Bonner an email asking why the District (Final Policy Making Authorities) is treating Freeman different from other employees ( who have had their driver's licenses suspended/revoked while on probation).

**33a.**   **8/26/15   6:25pm:**   From: Denice Korcal, Sent: Wednesday, August 26, 2015 6:25pm; To: Roxanne Bonner:

"Why are we treating him differently than other employees?"

- **33b.**   **8/26/15:**   The Hr Director had a clear difference of opinion with reference to such findings or recommendations with the officer, or authority in charge of an office or department for my recommendations for termination therefore by statute my constitutional harm was caused by the Board of Commissioners but not limited to other final policy making authorities **(9/18/15 3:02 email From Joseph Cummings:   " I stated there isn't a person who terminated him, he has been terminated by his employer. He looked surprised so I repeated that there isn't a person that terminated him, he was terminated by the MWRD.")**

-

(70 ILCS 2605/4.16) (from Ch. 42, par. 323.16)
    Sec. 4.16. The Director shall investigate the efficiency of all officers and employees and of all groups of officers and employees in the classified service and shall report to each officer, board or other authority in charge of any office or department of the sanitary district its findings and recommendations relative to increasing efficiency and economy therein. **In case the recommendations made by the Director are not carried into effect within a reasonable time, or in case of a difference of opinion with reference to such findings or recommendations between the Director and the officer, or authority in charge of an office or department concerned in any such findings or recommendations,** *(the report, accompanied by a note of the relevant facts shall be transmitted to the board of trustees (Board of Commissioners) for its final decision.)*

**34)**   **8/31/15:**   **10th** **violation** of the : **ADA INTERFERENCE PROVISION:** The ADA prohibits not just retaliation, but also "interference" with the exercise or enjoyment of ADA rights. The interference provision is broader than the anti-retaliation provision, protecting any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights.

**10th  violation of the MWRD ACT IL State Law:**

**Sec. 4.21.** No person or officer shall wilfully or corruptly by himself, or in cooperation with one or more persons, defeat, deceive or obstruct any person in respect to his or her right of examination and employment hereunder; or corruptly or falsely mark, grade, estimate or report upon the examination or proper standing of any person examined hereunder or aid in so doing; or wilfully or corruptly threaten to dismiss, transfer or bring charges against any employee in the classified civil service; or wilfully or corruptly make any false representation concerning the examination or concerning the person examined; or wilfully or corruptly furnish to any person any special or secret information for the purpose of either improving or injuring the prospects or chances of any persons so examined, or to be examined, being appointed, employed or promoted.

**34a.**   **8/31/15   6:54pm:**   Stickney Plant Afternoon Shift TPO III Anthony Venuso sent email to Donnelly, Stinson and Svazas asking them if Freeman has needed assistance getting samples. Venuso

wanted to know if Freeman did need assistance, how they were handling the situation and whether a MLAS or TPO was assisting him.

**35)** **9/2/15 2:37 am:** Stinson sent an email to Adams, William Lockett (Treatment Plant Operator II) and Donnelly directing them to make a decision at the beginning of the Shift as to who would be assisting Freeman in transporting samples.

**35a.** The assistance was not at my request and was for only 30 minutes out of a 8 hour shift and was typical team as stated in the following policy and presented no undue hardship upon staff and employer:

**Metropolitan Water Reclamation District of Greater Chicago**

**2015 Strategic Business Plan** Recovering Resources, Transforming Water For the 2015 Budget Cycle, the Executive Team reviewed the prior strategic plan and determined that the goals and strategies had been significantly advanced. The vision to "Improve Our Environment" in the areas of Finance, Employee, Public and Natural Environments has served the District well over the past four years. Although it remains important to keep our eyes focused on these areas to ensure that we continue to maintain excellence, the team felt it was time to set new goals for the next five years:

**Respect**

*We create an atmosphere of open communication that rewards commitment and performance and is responsive to the needs of our employees and our communities.* Respect is measured by how we treat each other, by the contributions that flow from our diversity, by the productivity of our relationships, and by a job well done, no matter what the job. To meet our goals, we depend on the integrity,

knowledge, skill, diversity, and teamwork of our employees. Creating a respectful, courteous, and fair workplace will lead to improved communication, heightened levels of workplace participation, and innovation due to diverse thinking."

**35b.**

| | |
|---|---|
| From: | "Stinson, Derrick" |
| To: | "Adams, Ramone" <AdamsR2@mwrd.org> |
| | "Lockett, William" <LockettW@mwrd.org> |
| Date: | 9/2/2015 1:37:07 AM |
| Subject: | Delivering Composite Samples |

d\plainTo avoid any further written complaints about the conditions of the composite samples by the Lab, make the decision at the very beginning of the shift who is going to assist Mr. Freeman in transporting the samples, and make sure the samples are delivered in a timely manner without fail. Also advise Mr. Freeman of arrangements, and the TPO3 on duty must be informed immediately if any problems occur.
d\plain d\plainThank you for your
cooperation!
d\plain

**d\plainDerrick David Stinson**
**d\plainTreatment Plant Operator 3**
**d\plain11-7 Shift Supervisor d\plainSWRP**
d\plain

**35c.**    Ramone Adams ( **Stickney Plant-Midnight Shift-Probationary employee TPO 2** 1/2015 to 1/2016, African American, did not have a disability or perceived to have a disability and used the company's vehicle to deliver the samples and routinely failed to deliver the 24 hour composite grab samples to the in house lab ( **in a satisfactory manner as stated by the Grab Sample Chain of Custody Forms)** and store them in the refrigerated cooler by the required time 12:00am midnight as to preserve the samples and was the reasons for all of the complaints from the Monitoring and Research ( Lab Department and he never received any discipline or was told he was unsatisfactory performance and was not terminated of probation even though his performance warranted it:

```
Chain of Custody Forms:
```

```
Composite 12 Grab Samples Delivery        Mixed Liquor Samples Delivery
Unsatisfactory Performance
Delivering the Grab Samples:

1)   1/21/15-0053am  1/22              1/22/15-0104am
2)   1/22/15-0055am  1/23              1/23/15-0125am
3)   1/23/15-0023am  1/24              1/24/15-0135am
4)   1/24/15-0109am  1/25              1/25/15-0122am
5)   2/10/15-0132am  2/11              2/11/15-0115am
6)   2/13/15-0104am  2/14              2/14/15-0109am
7)   2/14/15-0107am  2/15              2/15/15-0118am
8)   2/19/15-0055am  2/20              2/20/15-0055am
9)   2/22/15-0100am  2/23              2/23/15-0116am
10)  2/25/15-0120am  2/26              2/26/15-0120am
11)  2/26/15-0056am  2/27              2/27/15-0056am
12)  3/9/15-0138am   3/10              3/10/15-0138am
13)  3/10/15-0036am  3/11              3/11/15-0132am
14)  3/15/15-0030am  3/15              3/16/15-0120am
15)  3/16/15-0048am  3/17              3/17/15-0043am
16)  3/19/15-0055am  3/20              3/20/15-0140am
17)  3/22/15-0024am  3/23              3/23/15-0129am
18)  3/25/15-0149am  3/26              3/26/15-0149am
19)  3/28/15-0249am  3/29              3/29/15-0249am
20)  4/3/15-0221am   4/4               4/4/15-0221am
21)  4/4/15-0102am   4/5               4/5/15-0102am
22)  4/9/15-0151am   4/10              4/10/15-0151am
```

```
23) 4/10/15-0340am 4/11              4/11/15-0340am
24) 4/12/15-0141am 4/13              4/13/15-0141am
25) 4/16/15-0254am 4/17              4/17/15-0254am
26) 4/21/15-0140am 4/22              4/22/15-0140am
27) 4/22/15-0118am 4/23              4/23/15-0140am
28) 4/27/15-0124am 4/28              4/28/15-0124am
29) 4/28/15-0111am 4/29              4/29/15-0111am
30) 5/3/15-1:21am  5/4               5/4/15- Failed to Properly Fill
out
31) 5/4/15-0154am  5/5               5/5/15-0154am
32) 5/8/15-0312am  5/9               5/9/15-0104am
33) 5/10/15-0200am 5/11              5/11/15-0200am
34) 5/16/15-0136am 5/17              5/17/15-0136am
35) 5/29/15-0144am 5/30              5/30/15-0144am
36) 6/9/15-0126am  6/10              6/10/15-0126am
37) 6/10/15-0111am 6/11              6/11/15-0111am
38) 6/15/15-0052am 6/16              6/16/15-0125am
39) 6/16/15-0255am 6/17              6/17/15-0255am
40) 6/21/15-0217am 6/22              6/22/15-0217am
41) 6/22/15-0032am 6/23              6/23/15-0126am
42) 7/10/15-0037am 7/11              7/11/15-0205am
43) 7/16/15-0138am 7/17              7/17/15-0138am
44) 7/28/15-0130am 7/29              7/29/15-0215am
45) 7/29/15-0105am 7/30              7/30/15-0130am
46) 8/3/15-0202am  8/4/              8/4/15-0202am
47) 8/4/15-0121am  8/5/              8/5/15-0140am
48) 8/9/15-0207am  8/10              8/10/15-0200am
49) 8/10/15-0152am 8/11              8/11/15-0217am
50) 8/28/15-0126am 8/29              8/29/15-0126am
51) 8/29/15-0039am 8/30              8/30/15-0136am
52) 9/3/15-0041am  9/4               9/4/15- 0135am
53) 9/4/15-0038am  9/5          9/5/15- 0145am
54) 9/14/15-0005am 9/15 Interferred with my job 9/15/15-0150am-
55) 9/19/15-0034am 9/20              9/20/15-0120am
56) 9/22/15-0031am 9/23              9/23/15-0144am
57) 9/28/15-0240am 9/29              9/29/15-0208am
58) 10/7/15-0106am 10/8              10/8/15-0138am
59) 10/9/15-0037am 10/10               10/10/15-0144am
60) 10/13/15-0048am 10/14            10/14/15-0117am
61) 10/16/15-0024am 10/17            10/17/15-0142am
62) 10/17/15-0050am 10/18            10/18/15-0147am
63) 11/4/15-0056am  11/5             11/5/15-0148am
64) 11/9/15-0025am 11/10             11/10/15-0133am
65) 11/15/15-0037am 11/16            11/16/15-0105am
66) 11/16/15-0040am 11/17            11/17/15-0144am
67) 11/22/15-0026am 11/23            11/23/15-0320am
68) 12/5/15-0032am  12/6/15          12/6/15-0152am
69) 12/7/15-0040am  12/8/15          12/8/15-0150am
70) 12/10/15-0025am 12/11            12/11/15-0145am
71) 12/11/15-0035am 12/12            12/12/15-0105am
72) 12/13/15-0145am 12/14            12/14/15-0145am
73) 12/16/15-0122am 12/17            12/17/15-0122am
74) 12/17/15-0038am 12/18            12/18/15-0148am
75) 12/22/15-0118am 12/23            12/23/15-0125am
76) 12/23/15-0055am 12/24            12/24/15-0125am
77) 12/28/15-0211am 12/29            12/29/15-0230am
78) 1/3/16-0102am   1/4/16           1/4/16-0136am
```

39

```
79) 1/4/16-0107am    1/5              1/5/16-0107am
80) 1/22/16-0026am   1/23            1/23/16-0109am
81) 1/28/16-0107am   1/29/16         1/29/16-0148am
82) 1/29/16-0033am   1/30            1/30/16-0133am
```

**36)   9/2/15  10:59pm:**
**11th  violation** of the : **ADA INTERFERENCE PROVISION:** The ADA prohibits not just retaliation, but also "interference" with the exercise or enjoyment of ADA rights. The interference provision is broader than the anti-retaliation provision, protecting any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights.

**11th  violation of the MWRD ACT IL State Law:**

**Sec. 4.21.** No person or officer shall wilfully or corruptly by himself, or in cooperation with one or more persons, defeat, deceive or obstruct any person in respect to his or her right of examination and employment hereunder; or corruptly or falsely mark, grade, estimate or report upon the examination or proper standing of any person examined hereunder or aid in so doing; or wilfully or corruptly threaten to dismiss, transfer or bring charges against any employee in the classified civil service; or wilfully or corruptly make any false representation concerning the examination or concerning the person examined; or wilfully or corruptly furnish to any person any special or secret information for the purpose of either improving or injuring the prospects or chances of any persons so examined, or to be examined, being appointed, employed or promoted.

**8 th Violation of:**

**Protected Inquiries**
An employer may ask about the ability to perform job related functions with or without a reasonable accommodation, as long as the inquiries are not phrased in terms of the disability. 42 U.S.C. § 12112(c)(2)(B). For example, an employer may explain the job-related functions and then ask whether the applicant is capable of performing those functions with or without reasonable accommodation.

**36a.   9/2/15  10:59 pm:**     Donnelly sent an email to Venuso, Stinson and Svazas informing them that they have been pulling a labor away from the laborer's normally assigned duties to drive Freeman around.

**37)   9/4/15  4:29pm:**   I was denied the employers performance management program and interactive process regarding alternative work methods and as the rights afforded from the employers performance management program and also was denied Interactive Process in regards to my enrollment in the EAP program for my 3rd DUI and Alcohol Abuse under ADA rights, I was denied normal terms of conditions ( work permit approved by employer, BAIID restricted permit, use of the Gator according to motor vehicle laws for municipality) of employment under ADAA when my employment was Recommended for termination by the Human Resource Department along with 12th violations of the ADA Interference Provision, and 4.21 MWRD Statute:

**12th  violation** of the : **ADA INTERFERENCE PROVISION:** The ADA prohibits not just retaliation, but also "interference" with the exercise or enjoyment of ADA rights. The interference provision is broader than

the anti-retaliation provision, protecting any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights.

**12th violation of the MWRD ACT IL State Law:**

**Sec. 4.21.** No person or officer shall wilfully or corruptly by himself, or in cooperation with one or more persons, defeat, deceive or obstruct any person in respect to his or her right of examination and employment hereunder; or corruptly or falsely mark, grade, estimate or report upon the examination or proper standing of any person examined hereunder or aid in so doing; or wilfully or corruptly threaten to dismiss, transfer or bring charges against any employee in the classified civil service; or wilfully or corruptly make any false representation concerning the examination or concerning the person examined; or wilfully or corruptly furnish to any person any special or secret information for the purpose of either improving or injuring the prospects or chances of any persons so examined, or to be examined, being appointed, employed or promoted.

**37a.  9/4/15  4:29pm:**  Bonner sent an email to Dring, Garelli, Cummings and Manju Sharma (Director of Maintenance & Operations) informing them the Human Resources Department recommends the termination of Freeman's probation due to his inability to perform his full range of duties while on probation.

**38)  9/4/15  4:42 pm:**  M & O prepares a draft memo to terminate Freeman.

**39)  9/9/15  2:28am:**  Paul Donnelly made pretext false statements that Ramone Adams was driving me around to fulfill my duties when it was strictly for picking up the samples and delivering the samples for 30 minutes out of the 8 hour shift, and making false claims that he is understaffed when the shift is staffed with 3 TPO 3's and 3 Laborers in direct opposite of pretext statements by Paul Donnelly as the Monthly printed schedule stored in the system would show, also made false claims extra staffed is needed while working double shifts to perform my duties while I am work as all the other duties except the picking up of the samples and deliver of them was done with the use of a bike, cooler after my drivers license was suspended, Paul Donnelly also makes inquiries in terms of my disability as well as ADA Interference, coercion and violations of Sec. 4.21:

**9/9/15 2:28am:**  Donnelly sent Cummings an email expressing his concerns about providing extra staffing to accommodate for Freeman's inability to drive. Donnelly also stated in his email that Ramone Adams (Treatment Plant Operator II) drive Freeman around to fulfill Freeman's duties. In the email, it is noted that Freeman complained to Donnelly that Adams's attitude toward Freeman was negative and demeaning.

**39a.  9/9/15  8:05am:**  Joseph Cummings violates ADA Interference Provision and 4.21 policy and Protected Inquiry under ADA Act as well.

**9/9/15  8:05am:**  Cummings sent email to Dring asking Dring for direction on how Freeman's duties are to be completed. Cummings was also looking for direction on whether to regularly assign an extra Treatment Plant Operator I to accommodate for Freeman's inability to drive. :

**13th, 14th  violation** of the : **ADA INTERFERENCE PROVISION:**  The ADA prohibits not just retaliation, but also "interference" with the exercise or enjoyment of ADA rights. The interference provision is broader

than the anti-retaliation provision, protecting any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights.

## 13th, 14th violation of the MWRD ACT IL State Law:

**Sec. 4.21.** No person or officer shall wilfully or corruptly by himself, or in cooperation with one or more persons, defeat, deceive or obstruct any person in respect to his or her right of examination and employment hereunder; or corruptly or falsely mark, grade, estimate or report upon the examination or proper standing of any person examined hereunder or aid in so doing; or wilfully or corruptly threaten to dismiss, transfer or bring charges against any employee in the classified civil service; or wilfully or corruptly make any false representation concerning the examination or concerning the person examined; or wilfully or corruptly furnish to any person any special or secret information for the purpose of either improving or injuring the prospects or chances of any persons so examined, or to be examined, being appointed, employed or promoted.

## 9 th, 10th Violation of:

## Protected Inquiries
An employer may ask about the ability to perform job related functions with or without a reasonable accommodation, as long as the inquiries are not phrased in terms of the disability. 42 U.S.C. § 12112(c)(2)(B). For example, an employer may explain the job-related functions and then ask whether the applicant is capable of performing those functions with or without reasonable accommodation.

## 39b.

| | |
|---|---|
| From: | "Cummings, Joseph" |
| To: | "Dring, Reed" <DringR1@mwrd.org> |
| Date: | 9/9/2015 8:04:59 AM |
| Subject: | RE: Freeman/Adams incident |

d\plainBefore I instruct them how to proceed I need you know your decision on how Shaka's duties are to be completed. d\plain- Shaka does all his duties without extra assistance. This was my instruction. d\plain- Shaka is assisted with scheduled staff, as determined by his supervisors. This is the interpretatation MIDS has employed based on your e-mail (and verbal instructions?).

d\plain- Shaka is assisted with a TPO 1 on OT on 3-TPO days. This is what Paul is requesting. d\plain d\plainSvazas and Venuso have asked about this frequently because of their expectation that they will get stuck on doubles. I've given my approval that they require Shaka to do all his duties without extra assistance and my approval to hold someone over, when necessary, when they know it will be too busy to shoulder someone who can't drive the full plant at a moment's notice or leave the plant for an odor complaint. Paul's request takes the judgement call out of it and assigns a TPO 1 on OT by default on specific days. d\plain

**d\plainFrom:** Donnelly, Paul
**Sent:** Wednesday, September 09, 2015 2:28 AM
**To:** Cummings, Joseph
**Cc:** Dring, Reed; Stinson, Derrick **Subject:** Freeman/Adams incident d\plain d\plainAt 12:10am, 9/9/15, I was approached by Mr. Shaka Freeman complaining about Mr. Ramone Adams attitude toward him as being negative and demeaning. Normally a matter like this is dealt with by the shift TPOIII's, without upper managerial involvement. Unfortunately due to the nature of Mr. Freeman's current situation, some clarity, as to what and what is not acceptable in regards to job duties, is needed. Derrick Stinson and myself have delegated the TPOII on duty to assign driving arrangements for Mr. Freeman, TPOI, to fulfill his duties. d\plainOn this evening Mr. Adams was driving Shaka around the plant to pick-up samples, make rounds, etc. Mr. Freeman felt Mr. Adams was treating him with a demeaning and insulting manner. I spoke to Ramone about these accusations. He said that he was just telling him about job related problems and solutions as if he was training him. I believe this will be resolved without further problems by Derrick and I.

d\plainThe problem I have is that on a night where I am stepping this plant down after a significant rainstorm, I am staffed with essentially 1 TPOI, and 2 laborers. Therefore, in the absence of any other solution, I would like to hold a TPOI over to work the TPOI job, as a rule. d\plainDerrick is off tonight and tomorrow. Therefore this e-mail is without his input for the time being.

d\plain d\plainThanks Paul Donnelly
TPOIII.

40)      9/9/15:      Inter-Office memo prepared and transmitted from Sharma to David St. Pierre ( Executive Director) regarding recommendation for Freeman's termination of probation.

40a.    9/9/15:      Manju Sharma and the Department of Maintenance & Operations committed the following violations as stated in the letter of recommendation of termination sent secretive letter as I was not notified of its contents, perceived disability (liability), denial of working in a teamwork environment, claims that I could not perform my duties without the use of a vehicle, restrictions in how I performed my duties, denial of approvals for work exemption ( approval required by the employer) and restricted permit ( on personal vehicle with a monitoring device) prior to my request of my personal file 10/2015 and the denial of work exemption along with the interference and retaliation I was denied to opportunity for alternative work methods as the duties of the TPO 1 could be performed without the use of a vehicle and I could walk, use a bike to perform all of the duties satisfactory :

43

**15th violation** of the : **ADA INTERFERENCE PROVISION:** The ADA prohibits not just retaliation, but also "interference" with the exercise or enjoyment of ADA rights. The interference provision is broader than the anti-retaliation provision, protecting any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights.

**15th violation of the MWRD ACT IL State Law:**

**Sec. 4.21.** No person or officer shall wilfully or corruptly by himself, or in cooperation with one or more persons, defeat, deceive or obstruct any person in respect to his or her right of examination and employment hereunder; or corruptly or falsely mark, grade, estimate or report upon the examination or proper standing of any person examined hereunder or aid in so doing; or wilfully or corruptly threaten to dismiss, transfer or bring charges against any employee in the classified civil service; or wilfully or corruptly make any false representation concerning the examination or concerning the person examined; or wilfully or corruptly furnish to any person any special or secret information for the purpose of either improving or injuring the prospects or chances of any persons so examined, or to be examined, being appointed, employed or promoted.

**11th Violation of:**

**Protected Inquiries**
An employer may ask about the ability to perform job related functions with or without a reasonable accommodation, as long as the inquiries are not phrased in terms of the disability. 42 U.S.C. § 12112(c)(2)(B). For example, an employer may explain the job-related functions and then ask whether the applicant is capable of performing those functions with or without reasonable accommodation

**40b. 9/9/15 Letter:** Manju Sharma and the Maintenance and Operations Department have committed violations of the ADDA Act and was denied normal conditions of employment including normal teamwork and was denied the MDDP permit 30 day waiting period allowing me to drive during the suspension but only after serving 30 days with no drivng privileges as given to Mark Williams) and denied my request for an employer's exemption ( normal term and conditions of employment as given to numerous employees Stephen Cook, Robert Barnett, Ron Prior, but not limited to :

"Therefore, the District will not approve his request for an employer's exemption."

And I was also denied normal terms and conditions of employment to work in a teamwork environment as stated in the 2015 Business Strategy along with denial of the employers Performance Management Program, and Interactive process regarding my enrollment in the employers EAP program (supervised treatment for my 3rd DUI and Alcohol abuse (qualifying me as a individual with a disability along with the employer perceiving me as person with a disability ) and denial of a interactive process regarding the ability to pick of the samples and deliver them without the use of a vehicle which could be done along with performing all of the rest of my duties without a vehicle and with and without reasonable accommodations and unlawful qualifications standards unequally administered and given to me ( defacto requirement to drive a vehicle) and the denial of reasonable accommodations and all rights allowed under ADA and ADAA and the denial of all normal terms and conditions of employment as a qualified individual with a Disability (Alcoholism) interactive process, reasonable accommodations but not limited to and also I was denied normal terms and conditions when the Drug and Alcohol Policy was not used and afforded to me which protects the employees and public from liability.

44

ADAAA. "A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006).

**40c.   9/9/15 Letter:**   Manju Sharma and Maintenance and Operations/Employer (Final Policy Making Athorities) denied normal conditions of employment and perceived me that have a physical and or mental disability (Alcoholism):

" In addition, the MDDP Employment Verification form from the Secretary of State submitted by Mr. Freeman asks it the employer will agree to allow the employee to drive employer-owned vehicles on work time without a Breath Alcohol Ignition Interlock Device installed. **Given the nature of his offense, allowing him to drive an unmonitored District vehicle would expose the District to unacceptable liability. Therefore, the District will not approve his request for an employer's exemption."**

**40d.   9/9/15:**   I was performing my duties in a satisfactory manner and performed my duties in the manner ordered by Lead TPO 3 Derrick Stinson Midnight shift Stickney Plant that was not at my request as I did not violate any company policies and did not have any attendance problems and was not warned or given notice of any performance problems.

**41)   9/14/15 12:05am:**   Ramone Adams ( Probationary TPO 2) violated orders by Lead Supervisor TPO 3 Derrick Stinson when he refused to assigned a driver or him to assist me with picking up the samples and deliver them to the lab as stated in the 9/2/15 email and intentionally refused to pick me up and he went and picked up the samples and delivered them to the in house lab and signed off on the **Chain of Custody Forms**, and **time sheets** show I was at work **intentionally interfering** (ADA interference) with my performance ( as the employer will say that it takes two people to perform my duties which it did not) as these duties are the sole responsibility of the midnight shift TPO 1 Stickney Plant and I made a verbal complaint to Paul Donnelly which was my 3rd complaint against Ramone Adam in a 3 week time span and Derrick Stinson, and Paul Donnelly, Joseph Cummings **failed to report my complaints** of harassment, same race discrimination, intentional job interference to the appropriate staff EEO Coordinator and or Employment Relations manager as they are the only ones who can investigate as policy states.:

# Metropolitan Water Reclamation District of Greater Chicago

## Custody Transfer Record for Plant Grab Samples

### (STFORMPLT)

9/15/'15 AM12:05 MWRD IMAL

To: Stickney Analytical Lab

Year: 2015

From: Stickney WRP

Sample Date: 09-14-15

| Date | Time (Military) | By | Composite Sample Type | LIMS ID | Container Size | Container Type | Temperature | Proper Container | Proper Label | Adequate Volume | Comments |
|------|------|------|------|------|------|------|------|------|------|------|------|
| 9/14/2015 | 23:48 | RR | Southwest Raw Sewage, S | 7480580 | 2 1/2 gal | Plastic | 6.8 | | | | |
| 9/14/2015 | 23:52 | RR | Southwest Raw Sewage, N | 7480580 | 2 1/2 gal | Plastic | 7.4 | | | | |
| 9/14/2015 | 23:58 | RR | West Side Raw Sewage | 7480587 | 5 gal | Plastic | 5.7 | | | | |
| No | Sample | | TARP Pumpback | No Sample | 2 1/2 gal | Plastic | — | — | — | — | |
| 9/14/2015 | 23:30 | RR | Southwest Prel Effluent | 7480577 | 2 1/2 gal | Plastic | 6.6 | | | | |
| 9/14/2015 | 23:27 | RR | West Side Prel Effluent | 7480586 | 5 gal | Plastic | 8.0 | | | | |
| 9/14/2015 | 23:35 | RR | Battery A Effluent | 7480529 | 2 1/2 gal | Plastic | 5.9 | | | | |
| 9/14/2015 | 23:21 | RR | Battery B Effluent | 7480530 | 2 1/2 gal | Plastic | 6.0 | | | | |
| 9/14/2015 | 23:39 | RR | Battery C Effluent | 7480531 | 2 1/2 gal | Plastic | 6.0 | | | | |
| 9/14/2015 | 23:16 | RR | Battery D Effluent | 7480532 | 2 1/2 gal | Plastic | 7.1 | | | | |
| 9/14/2015 | 23:49 | RR | Southwest Outfall | 7480538 | 5 gal | Plastic | 7.1 | | | | |
| 9/14/2015 | 23:52 | RR | Primary Sludge North | 7480578 | 1 gal | Plastic | 6.8 | | | | |
| 9/14/2015 | 23:48 | RR | Primary Sludge South | 7480579 | 1 gal | Plastic | 6.6 | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

For Lab Use Only
IR Gun:

Lab:Initial & Date: RR 9/15/15 6:46

Samples stored at 4±2°C immediately after collection: Y / N ___Y___

In Custody of TPO I: ___RR___

11-7 shift, date: 9/14/2015

7-3 shift, date: _____

Day TPO, date: _____

| Relinquished By | Date | Time | Received By | Date | Time |
|------|------|------|------|------|------|
| RR | 9/15/2015 | 00:05 | Araceli Schumacher | 9/15/15 | 6:46 |

**42)**    **9/17/15 8:26am:**    Bonner sent an email to Korcal and Liane Talkington (Secretary to Officer) informing them the M & O needs the termination letter For Freeman so M & O can terminate him the next morning (9/18/15).:

**42a.**

|   |   |
|---|---|
| From: | "Talkington, Liane" |
| To: | "Bonner, Roxanne" <BonnerR@mwrd.org> |
| Date: | 9/17/2015 8:29:15 AM |
| Subject: | RE: Freeman |

d\plainRenona didn't have a chance to look on the ED's desk to see if it was there. d\plainI will prepare another letter for him to sign, but I do not have all the backup that traveled with the letter. d\plainThe ED is here today and getting his signature shouldn't be a problem.
d\plain d\plain
d\plain

**d\plainFrom:** Bonner, Roxanne
**Sent:** Thursday, September 17, 2015 8:26 AM
**To:** Korcal, Denice; Talkington, Liane
**Subject:** Freeman
d\plain
d\plainI just spoke with M&O and they need the letter today for Freeman so that they can come in tomorrow morning at 6:00 am and terminate him. I hope we can get it signed by Dave today!

**42b.**    Denice Korcal- HR Director did not give approval for my termination as stated in Section 4.11 of the MWRD Act:    **30)**    **8/26/15  6:25pm:**    Korcal sent Bonner an email asking why the District (Final Policy Making Authorities) is treating Freeman different from other employees ( who have had their driver's licenses suspended/revoked while on probation.

**8/26/15  6:25pm:**    From: Denice Korcal, Sent: Wednesday, August 26, 2015  6:25pm; To: Roxanne Bonner:

"Why are we treating him differently than other employees?"

**42c.**    **Section 4.11 of the MWRD Act :**

At any time during the period of probation, the Executive Director with the approval of the Director may terminate a probationary appointee and shall notify the civil service board in writing of the termination; however, the Executive Director's termination of a probationary appointee shall be final and not subject to review. If a probationary appointee is not terminated, his or her appointment shall be deemed complete 70 ILCS 2605/4.11

**42d.    Shaka Freeman Civil Service Board Appeal of Termination 11/18/15:**

Shaka Freeman:

"So from that 4.1, I have the
21 right to be heard from Civil Service Board.
22 Also, in my termination, the executive
23 director did not get the proper approval from
24 Denise Korcal. I mean, if you look at the
Page 98
Veritext Legal Solutions
www.veritext.com 800-567-8658
1 pertinent signature paper, personnel action paper,
2 I was terminated in a fraudulent manner, so that
3 gives me right to be heard in Civil Service Board.
4 Executive director email from Lynn
5 Tuckerton clearly shows that the executive director
6 did not get it from Denise Korcal. She drew up the
7 paperwork, said there was no supporting documents,
8 so Lynn Tuckerton is not the human resource
9 director, so the executive director signed off on
10 my termination based on the -- based on
11 word-of-mouth from Lynn Tuckerton, who is not the
12 human resources director; therefore, I have rights
13 to be heard, really actually reinstated, so
14 technically I was not terminated in a -- by the
15 rules to say approval of HR.
16 And if the executive director didn't
17 even look at any investigation and just took an
18 employee's word, I should be reinstated. I'm --
19 technically I'm not terminated because Denise
20 Korcal has not signed off any paperwork, and my
21 termination letter said the department head
22 recommended me for termination. Department head is
23 not the director of human resources."

**42e.**

MR. KENDALL: The Civil Service Board
19 has discussed this matter, and pursuant to Section
20 4.11 of the MWRD act, which states in its pertinent
21 part, quote/unquote: At any time during the period
22 of probation, the executive director, with the
23 approval of the director, may terminate a
24 probationary appointee and shall notify the Civil
Page 102

48

Veritext Legal Solutions
www.veritext.com 800-567-8658
1 Service Board in writing of their termination.
2 However, the executive director's termination of
3 the probationary appointee shall be final and not
4 subject to review.
5 Further, pursuant to Section 4.11, the
6 discharge of a probation appointee during the
7 period of probation is within the authority of the
8 executive director and is not subject to review.
**9 My question is: Was the termination of**
**10 Mr. Freeman's employment, probationary employment,**
**11 was that done with the authority and direction of**
**12 the executive director?**
**13 MR. COOK: Yes, sir.**
**14 MR. KENDALL: Having said that, we have**
**15 no other choice but to grant the district's motion**
**16 to dismiss your appeal.**

**42f.**     Denice Korcal did not give approval, and Joseph Cook/Law Department made pretext and false claims that my termination was done with the Direction of the Executive Director ( no direction given as he signed off blindly due to the orders from other final policy making authorities ( Department Head-Manju Sharma, HR-Director-Denice Korcal and others in coercion as the timeline of events shows and Denice Korcal did not give approval, and my termination and claims of unsatisfactory performance was done without the necessary interactive process including ( Performance Management Program as required was not followed unlawfully, and 4.11 policy was unlawfully corruptly administered as part of the ADA interference Provision and violations of 4.21 MWRD Act Statutes as well as my Motion for reinstatement and errors in laws ( was not given notice of motion to dismiss and motion was not properly labeled causing prejudice in my appeals hearing before the hearing along with the employer not sticking strictly to their motion to dismiss clearly prejudicing my hearing along with the coercion and intentional prejudice by the Civil Service Board Members and Chairman John Kendall and my amended complaints were unlawfully ignored pursuant to Illinois Code of Procedure in regards to the following as unlawful acts of the following and my complaints of discrimination which are the only exception to the 4.11 policy that was used by the employer to dismiss my appeal ( my complaints of discrimination were unlawful referred to outside agencies by the employer and Civil Service Board ) :

**16th     violation** of the : **ADA INTERFERENCE PROVISION:**  The ADA prohibits not just retaliation, but also "interference" with the exercise or enjoyment of ADA rights. The interference provision is broader than the anti-retaliation provision, protecting any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights.

**16th     violation of the MWRD ACT IL State Law:**

**Sec. 4.21.** No person or officer shall wilfully or corruptly by himself, or in cooperation with one or more persons, defeat, deceive or obstruct any person in respect to his or her right of examination and employment hereunder; or corruptly or falsely mark, grade, estimate or report upon the examination or

49

proper standing of any person examined hereunder or aid in so doing; or wilfully or corruptly threaten to dismiss, transfer or bring charges against any employee in the classified civil service; or wilfully or corruptly make any false representation concerning the examination or concerning the person examined; or wilfully or corruptly furnish to any person any special or secret information for the purpose of either improving or injuring the prospects or chances of any persons so examined, or to be examined, being appointed, employed or promoted.

**43)** **9/18/15:** Freeman terminated from District employment. Freeman was presented a letter at his employment termination meeting informing him that his services during his probationary period have not been satisfactory. It should be noted that prior to Freeman's termination on 9/18/15, **Anthony Halaska notified Cummings that it took Freeman 20 minutes on a bike to get over to the West Side in an emergency situation to open a gate.**

**43a.** **9/18/15**: I was terminated without warning ( And given a letter from the Department Head Manju Sharma recommending my termination with the Executive Director stating he concurs without the recommendation to terminate my employment neither of them ever met with me or talked with me ) or failing to violate any company policy and I never failed to perform my duties in a satisfactory manner. I was not allowed the normal terms and Conditions of the Performance Management Program and all interactive process afforded under ADA, and ADAA but not limited to

**44.** **9/18/15:** Anthony Halaska Stickney Plant TPO 1 Day shift TPO 3 ( Who does not work on the midnight shift) made second hand pretext false corrupt claims which have double meaning that I failed to travel to the westside in a satisfactory manner after I was terminated as part of the:

**17th** **violation** of the : **ADA INTERFERENCE PROVISION:** The ADA prohibits not just retaliation, but also "interference" with the exercise or enjoyment of ADA rights. The interference provision is broader than the anti-retaliation provision, protecting any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights.

**17th** **violation of the MWRD ACT IL State Law:**

**Sec. 4.21.** No person or officer shall wilfully or corruptly by himself, or in cooperation with one or more persons, defeat, deceive or obstruct any person in respect to his or her right of examination and employment hereunder; or corruptly or falsely mark, grade, estimate or report upon the examination or proper standing of any person examined hereunder or aid in so doing; or wilfully or corruptly threaten to dismiss, transfer or bring charges against any employee in the classified civil service; or wilfully or corruptly make any false representation concerning the examination or concerning the person examined; or wilfully or corruptly furnish to any person any special or secret information for the purpose of either improving or injuring the prospects or chances of any persons so examined, or to be examined, being appointed, employed or promoted.

**45)** **9/18/15  9:20 am:** Bonner sent email to Heidenreich and other staff informing them that Freeman was terminated and based on feedback received from Cummings, it was a contentious termination meeting.

**46)** **9/18/15  9:58 am:** Melinda Williams sent notification email to District staff informing them of Freeman's separation from the District.

**47)** **9/18/15 12:32pm:** Cummings sent email to staff informing them the Freeman was terminated that morning. Cummings stated that Freeman insisted on the names and phone numbers of employees present at his termination meeting. Cummings provided names only along with the phone number to Bonner. Cummings instructed Freeman to contact Bonner regarding his termination.

**48)** **9/18/15 3:02 pm:** **Cummings sent email to Bonner, Heidenreich, Korcal, Sharma and Eileen McElligott (Administrative Services Manager)** speaking for himself and in second person for Reed Dring, and Anthony Halaska made pretext, corrupt, false statements as part of the :

**18th** **violation** of the : **ADA INTERFERENCE PROVISION:** The ADA prohibits not just retaliation, but also "interference" with the exercise or enjoyment of ADA rights. The interference provision is broader than the anti-retaliation provision, protecting any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights.

**18th** **violation of the MWRD ACT IL State Law:**

**Sec. 4.21.** No person or officer shall wilfully or corruptly by himself, or in cooperation with one or more persons, defeat, deceive or obstruct any person in respect to his or her right of examination and employment hereunder; or corruptly or falsely mark, grade, estimate or report upon the examination or proper standing of any person examined hereunder or aid in so doing; or wilfully or corruptly threaten to dismiss, transfer or bring charges against any employee in the classified civil service; or wilfully or corruptly make any false representation concerning the examination or concerning the person examined; or wilfully or corruptly furnish to any person any special or secret information for the purpose of either improving or injuring the prospects or chances of any persons so examined, or to be examined, being appointed, employed or promoted.

**12th Violation of:**

## Protected Inquiries
An employer may ask about the ability to perform job related functions with or without a reasonable accommodation, as long as the inquiries are not phrased in terms of the disability. 42 U.S.C. § 12112(c)(2)(B). For example, an employer may explain the job-related functions and then ask whether the applicant is capable of performing those functions with or without reasonable accommodation

**48a.** **9/18/15 3:02 pm:** Cummings sent an email to Bonner, Heidenreich, Korcal, Sharma and Eileen McElligot ( Administrative Services Manager) highlighting moments from the termination meeting with Freeman. During the termination meeting. Freeman said that he was going to get a breathalyzer; stated he can perform his duties; mentioned discrimination several times; insisted on getting names and phone numbers of people in the meeting; accused the District of making up stories on the spot since they had no reason to fire him; insisted that nobody can prove Freeman cannot do his job; stated other employees have DUI convictions and did not lose their jobs; and wanted to know who fired him.

**48b.** **9/18/15 3:02pm:** From: Joseph Cummings, Sent: 9/18/15 3:02pm, To: Roxanne Bonner, Kaye Heidenreich, Eileen McElligott, Denice Korcal, Manju Sharma, Brett Garelli, Reed Dring, Thomas Soukup, Suzanne Boswick:

" Some highlights from the meeting. All of these topics weaved back and forth repeatedly as Freeman kept trying to argue the same points and place blame on others. I don't think that he was out of bounds with his conduct but he did get progressively louder and angrier over the 35 minute meeting.

- When he was told of the termination he started by saying that he's going to get the breathalyzer, get approval from the District to drive, and do all his duties normally. Reed stated the District will not agree to all him to drive with a suspended license. He insisted that it was going to happen. I stated several different times that the District will not sign off on it. He eventually argued that I delayed the paperwork, then Reed did the same when he received it, then unnamed people Downtown delayed it. I stated that I scanned it and sent it to HR as soon as I received it so it was never delayed. I added that regardless of when HR received it, the District will not sign off.
- He stated that he can perform his duties. Reed stated that he can't do them without assistance and that requires two people to do the job of one. As an example, Reed asked how he can respond to an odor complaint at 31st and Austin if he can't drive. Freeman responded that the surveys are done on Afternoon Shift because he mistakenly thought we were asking about the routine surveys. We repeated a few times that we are talking about complaints, which can happen any time. Freeman responded that we can't use that as a reason because in three months there hasn't been an odor complaint on Midnight Shift and nobody told him that this was is responsibility.
- He mentioned discrimination several times.
- He told me that I don't need to threaten him, possibly in response to one of the times that I told him that this is a difficult situation but he needs to understand that the decision has been made and he's been terminated, effective immediately.
- He insisted on getting the names of the people in the meeting (Garelli, Dring, Cummings) and their phone numbers.
- We wrote the names down but did not leave our phone numbers. Roxanne Bonner's name and number were provided.
- He stated that we made up three different stories on the spot because we have no reason to fire him. I assume the was referring to when he told him that he can't perform his duties, can't respond to odor complaints, and the District won't allow him to drive.
- He insisted that he can do his job and nobody can prove that he can't. Reed stated he has only been able to do his job because other people have been assisting him by driving him from location to location. Freeman stated that he did his own job, that nobody did his job for him, that them driving him was because we're all on a team just like when Reed and Joe drive together when they are in the plant, and that Stinson (TPO3) said he would take care of him and look after him.
- He further stated that Stinson and other employees said that District employees have had Felony convictions or DUI's and they never lost their jobs. I stated that we don't know the circumstances for those employees but there are employees that have lost their positions for not being able to drive.
- He wanted to know the person who fired him and ruled out that it was the ED because Freeman dismissed the credibility of the termination letter for not listing the violations. He said he can't be fired without being provided a summary of all the things he did wrong and again wanted to know who fired him. **I stated there isn't a person who terminated him, he has been terminated by his employer. He looked surprised so I repeated that there isn't a person that terminated him, he was terminated by the MWRD.**

After the meeting I called the Day shift TPO 3 on duty into my office to tell him of the termination. He then stated that he heard from Midnight shift last night that it took Freeman 20 minutes to get to the West Side to adjust the relief gates during the storm, a responsibility that is routinely complete within five minutes.

49)    9/18/15 3:24pm:    Heidenreich sent an email to her staff informing them of Freeman's termination and advised them that the was given the District some cause for concern.

50)    9/18/15 4:56pm:    HR Director Denice Korcal sent email to Roxanne Bonner-Employment Relations manager in regards to Discrimination complaints:

> From:    "Korcal, Denice"
>
> To:    "Bonner, Roxanne" <BonnerR@mwrd.org>
>
> Date:    9/18/2015 4:56:22 PM
>
> Subject:    Mr. Freeman

d\plainI spoke to him this afternoon. He stated that his termination was discrimination. No one ever told him he was on probation. Employees are telling lies about him. He did not lose his license. Has had no trouble performing his job without assistance. His supervisor believes he is a great employee. This information about not performing his job just came out of the blue. Wants to know who is saying what about him.
d\plain d\plainHe will take further steps as
necessary.
d\plain
d\plainDenice E. Korcal
d\plainDirector of Human Resources
d\plainMWRDGC
d\plain100 E. Erie St.
d\plainChicago, IL 60611
d\plain312-751-5180
d\plain312-894-1113 fax
d\plain

51)    9/19/15 4:33am:    Heidenreich forwarded Bonner an email from Sergeant Linder explaining that Freeman began calling Donnelly and Freeman indicated that Donnelly was probably the reason for Freeman's termination.

**51a.** **9/19/15** emails showing I called Paul Donnelly, Charles Svazas, and Anthony Venuso:

| | |
|---|---|
| From: | "Bonner, Roxanne" |
| To: | "Korcal, Denice" <KorcalD@mwrd.org> |
| | "Kosowski, Thaddeus" <KosowskiT@mwrd.org> |
| | "Sanders, Beverly" <SandersB@mwrd.org> |
| Date: | 9/21/2015 9:45:15 AM |
| Subject: | FW: Shaka Freeman |

d\plainFYI d\plain

**d\plainFrom:** Svazas, Charles
**Sent:** Saturday, September 19, 2015 2:37 PM
**To:** Cummings, Joseph; Dring, Reed; Garelli, Brett; Bonner, Roxanne
**Subject:** Shaka Freeman d\plain d\plainI received a phone call from Mr. Freeman on my personal cell phone at 11:10am on September 19, 2015. He was very upset and was telling me how he was terminated and he did not understand how because he had it worked out with Mr. Dring and Mr. Stinson that he was getting help from laborers. He went into how he had been given a DUI and at that point I cut him off and told him that I was on afternoons and he was on midnights and I have nothing to do with him and his situation. He said ok and thanked me for my time. I did not have a copy of the email regarding his termination with me at home, I gave no names or numbers of anyone during this call. On September 19, 2015 he called at ~4:30pm looking to talk to Reed and I tried transferring him to Reed's office, and I texted him from my cell phone to give him Reed Dring's office number which is how he got my cell phone number.
d\plainChuck

**51b.**

called the CCR at 3:43pm. I took the call. He began discussing his situation. I politely interrupted him to tell him that I am under direct orders to not have a discussion with him as is typical orders given for such circumstances. I then offered him Ms. Roxanne Bonner's phone number. He then asked if I would make a statement about how Chuck and I recommended him for our shift and if I would answer honestly if asked about him and his ability to do his job. He stated that he is trying to get his job back. I told him that I have to end the call and asked if he has Ms. Bonner's phone number and he said that

54

From: "Venuso, Anthony"

To: "Cummings, Joseph" <CummingsJ@mwrd.org>

Date:

Subject: RE: Freeman Termination 091815

he does. He then thanked me and said that he apologizes if he has made me feel uncomfortable.

From: Cummings, Joseph

Sent: Friday, September 18, 2015 12:32 PM

To: Donnelly, Paul; Halaska, Anthony; Stinson, Derrick; Svazas, Charles; Venuso, Anthony; White,

William

Cc: Dring, Reed; Garelli, Brett; Bonner, Roxanne

Subject: Freeman Termination 091815

Importance: High


**51c.**

From: "Donnelly, Paul"

To: "Cummings, Joseph" <CummingsJ@mwrd.org>

Date: 9/21/2015 2:36:42 AM

Subject: Mr. Freeman

d\plainOn Friday night, 9/18, I received a call from Mr. Freeman on my cell phone while at home, 6:00pm. He basically was asking me to fight for his reinstatement of employment, by agreeing to say that he is able to do his job without a vehicle. His pleas continued on, until I had to dismiss him and hung up. He continued to call me twice again, but I did not respond. Later that evening just before work, he called again. I answered him in which he referred to an e-mail I sent "downtown" stating that," he cannot perform his job duties". He then said that he is certain that the major reason he was fired, was due to my e-mail to downtown. I told him, I never sent an email downtown. He repeated this belief until I dismissed him again. Upon my arrival to work I expressed my concerns to the district sergeant.

55

**51d.**

**plainFrom:** Donnelly, Paul

**Sent:** Wednesday, September 09, 2015 2:28 AM

**To:** Cummings, Joseph

**Cc:** Dring, Reed; Stinson, Derrick **Subject:** Freeman/Adams incident d\plain d\plainAt 12:10am, 9/9/15, I was approached by Mr. Shaka Freeman complaining about Mr. Ramone Adams attitude toward him as being negative and demeaning. **Normally a matter like this is dealt with by the shift TPOIII's, without upper managerial involvement.**

**52)** **9/25/15:** Freeman was sent a letter from Korcal explaining why his employment was terminated.

**52a.** **9/25/15:** HR Director-Denice Korcal, employer ( final policy making authorities) perceived me to have a disability of Alcoholism along with the letter violating ADA interference, and violating protected inquires and denial of reasonable accommodations along with the letter showing the employer ( denied normal terms and conditions of employment) never gave me a Formal interview, or interactive process under ADA, ADAA and never followed the performance management program prior to making the adverse action of termination/Separation and unlawful qualification standards were used as stated in the unemployment IDES documents 11/4/15 and the Denice Korcal Letter 9/25/15 stating a drivers license is a defacto requirement when the TPO 1 position does not require a valid drivers license and driving duties are not part of the essential job functions of the TPO 1 (see job description) and as stated by Roxanne Bonner-Employment Relations manager ( timeline of events 8/24/15 4:26pm) along with me being grant unemployment benefits on 12/14/15 by IDES:

**52b.** **Denice Korcal 9/25/15 Letter:**

"The large scale of the SWRP requires the TPO 1s to traverse long distances through out the shift, often at a moment's notice and during weather events, thereby making the ability to drive a vehicle a necessary requirement for satisfactory performance of the job."

"You asked the District to complete an MDDP Employment Verification form from the Secretary of State, which asks if the employer will agree to allow the employee to drive employer-owned vehicles on work time without a Breath Alcohol Ignition Interlock Device installed. This device would be required on your personal vehicle when your driver's license is reinstated."

"Given your DUI conviction, permitting you to drive an unmonitored District vehicle would expose the District to unacceptable liability"

"The accommodations required for you to perform your job satisfactory are not in the best interests of the District"

**53)** **9/25/15:** Denice Korcal, EEO Coordinator (Assistant HR Director)-Ted Kosowski, Roxanne Bonner-Employment Relations Manager committed violated my normal terms and conditions of employment under ADA, ADAA and committed Municipal Liability by numerous

final policy making authorities in coercion when my complaints of Discrimination and Harassment were unlawfully referred to outside agencies ( prejudicing my appeal hearing and reinstatement motion ) and were not promptly and properly investigated pursuant to policy as specified in the only exception to the 4.11 probation policy :

**Human Resource Director Letter From Denice Korcal to Me 9/25/15 :**

" You have contacted many officials and employees of the District, claiming that you have been falsely accused and unfairly terminated"

" Whether you agree or disagree with your termination, you have the right to file a complaint with one or more of the following external regulatory agencies: The Equal Employment Opportunity Commission, the Illinois Department of Human Rights, the Cook County Commission on Human Relations, or the Chicago Commission on Human Rights in accordance with the rules and regulations of the respective agency. If you wish to pursue this matter further, you may contact these agencies."

**54)    10/21/15:**    Freeman appealed his termination of probation to the Civil Service Board. Freeman's case was continued to 11/18/15, for status.:

**54a.   10/21/15:**

The following was presented by the employer in the motion to dismiss the appeal of Shaka Freeman case No. 15-13 point's 8., 9.:

8.    In the case of In the Matter of Mary Patricia O'Donnell, Case No. 03-06, (October 23, 2003), the Civil Service Board granted the District's motion to dismiss Ms. O'Donnell's appeal because her termination of probation was not subject to review by the Civil Service Board pursuant to Section 4.11 of the MWRD Act.

9.    Mr. Freeman's appeal presents the same issue as O'Donnell and warrants the same result pursuant to both the MWRD Act and Personnel Rules which expressly provided that the Executive Director's termination of a probationary appointee shall be final and not subject to review.

**Mary O'Donnell Case No. 03-06 MWRD Civil Service Board Case 2009** ( Appeal the Districts termination of her probationary status)

The District has filed a motion to dismiss Ms. O'Donnell's appeal on the ground that the District's decision to terminate Ms. O'Donnell's probationary status as a POSS is not subject to review by this Board. The District cites section 4.11 of the District's Enabling Act ('Act') (70 ILCS 2605/4.11) as authority for this proposition. :

**Page 4 -** "The only exception that we have recognized to this general rule is where an employee has asserted that the District has terminated the employee's probationary status for an unlawful reason ( i.e., because of his or her race, color, sex, creed or national origin).:

**54b.    Unlawful Act:**

failed or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin; or

Segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individuals protected classes race, national origin-Culture, gender( sex), disability,

**54c.    Unlawful Act:**

**Municipal Liability: Widespread policy and practice of depriving (African-American), of their constitutional rights municipal liability: Revised Part 2**

**Under Federal Laws-** 42 U.S.C. § 1983.**42 U.S.C. § 1983 .Section 1983 was enacted on April 20, 1871 as part of the Civil Rights Act of 1871.**

Government entities cannot be held liable under § 1983 unless an official policy or custom caused the deprivation of constitutional rights. Kujawski v. Bd. of Comm'rs. of Bartholomew County, Indiana, 183 F.3d 734, 737 (7th Cir. 1999). An unconstitutional policy or custom can be: 1) an express policy that causes a constitutional deprivation; 2) a widespread practice that is so well-settled that it constitutes a "custom" with the force of law even though it is not authorized by an express policy or written law; or 3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

## SPECIAL DISTRICTS
## (70 ILCS 2605/) Metropolitan Water Reclamation District Act.

70 ILCS 2605/4) (from Ch. 42, par. 323)

The **board of commissioners** has full power to pass all necessary ordinances, orders, rules, resolutions and regulations for the proper management and conduct of the business of the board of commissioners and the corporation and for carrying into effect the object for which the sanitary district is formed. All ordinances, orders, rules, resolutions and regulations passed by the board of commissioners must, before they take effect, be approved by the president of the board of commissioners.

3) an allegation that the constitutional injury was caused by a person with final policymaking authority:

Based on said stated policies, procedures, and statutes **the Board of Commissioners, Civil Service Board, Director of Human Resource, Department Heads, District Management** all share **equally** in **establishing** the policies of the District.

MWRD Act 4.16 gives the HR Director and Civil Service Board jurisdiction to investigate complaints of violations of the Anti-Harassment, Anti-Discrimination, Anti-Retaliation policies as the IL statutes supersede personal rules.

```
70 ILCS 2605/4.2a) (from Ch. 42, par. 323.2a)
    Sec. 4.2a. There is created a Department of Human Resources for the
district, the executive officer of which is the Director of Human Resources,
hereinafter in this Act called the Director. Any person appointed as the
Director shall have previously served in a responsible executive capacity
requiring knowledge of and experience in human resources management to a
degree commensurate with that required in the human resources administration
of the district.
(Source: P.A. 95-923, eff. 1-1-09.)
```

```
(70 ILCS 2605/4.16) (from Ch. 42, par. 323.16)
    Sec. 4.16. The Director shall investigate the efficiency of all officers
and employees and of all groups of officers and employees in the classified
service and shall report to each officer, board or other authority in charge
of any office or department of the sanitary district its findings and
recommendations relative to increasing efficiency and economy therein.
```

```
In the course of such investigation the Civil Service Board shall have power
to administer oaths and to secure by subpoena both the attendance and
testimony of witnesses and the production of books and papers.
(Source: Laws 1963, p. 2477.)
```

```
The Civil Service Board shall investigate the enforcement of this Act and the
rules adopted pursuant to this Act of the conduct of the appointees in the
classified service and the methods of administration therein, and may
investigate the nature, tenure and compensation of all offices and places in
the civil service of the sanitary district. In the course of such
investigation the Civil Service Board shall have power to administer oaths
and to secure by subpoena both the attendance and testimony of witnesses and
the production of books and papers.
(Source: Laws 1963, p. 2477.)
```

**54d.    Policies causing constitutional harm:**

1)        MWRD Employee Handbook Page 6-2, 6-3:
C. Anti-Harassment, Anti- Discrimination, and Anti-Retaliation Policies and Reporting Procedures

"All reports, complaints or allegations of suspected violations of this policy must be made to the District's EEO Coordinator 312-751-4443 immediately. **No inquiries or investigation are permitted by any other employee or local departmental staff.**"

2)        Employment Handbook- Personnel Rules- page 12-1 RULE 12    **HEARINGS AND APPEALS** [Entire Rule Revised by Amendment No. 406, 10/15/09] **12.01 Complaints to the Director of Human Resources: Excluding suspensions and denials of leave requests under Rules 9.021 and 9.05,** any employee or candidate for employment may challenge any adverse decision affecting his or her employment by filing a written complaint with the Director of Human Resources stating all reasons and facts in support of the complaint.

Employees of the Human Resources Department **may bypass the requirements of this Rule and appeal directly to the Civil Service Board under Rule 12.02,** provided they have already received an adverse decision from the Director of Human Resources pursuant to any other Rule contained herein.

Policy allows your complaints to be ignored and forced to a Civil Service Board who states they do not have jurisdiction for racial discrimination and equal employment violations.

3)     **B. Complaint Procedure, MWRD Employee Handbook page 7-6, 7-7, :**

The complaint procedure is for non-represented employee to use in resolving problems associated with their employment. **Items excluded from this procedure are performance evaluation, health, life and/or dental insurance claims, and pension matters.**

Employee Handbook Personnel Rules page 11-3 **11.042 Suspension:** The Executive Director may suspend employees for any violation of District work rules or for any one or combination of the causes specified in Rule 11.041.
The Executive Director shall notify employee of the suspension and the suspension notice shall set forth the grounds for suspension.

A suspension may be for any period of time not in excess of thirty (30) days; however, if charges are filed against a suspended employee, the suspension shall be extended until the Civil Service Board enters its finding and decision regarding the charges, unless, prior to this time, the Board enters an order approving an agreement between the District and the employee that the suspension should terminate at an earlier date.

An employee who is suspended shall be returned to employment at the expiration of the suspension period, unless charges are filed in accordance with Rule 11.051.
An employee may appeal a suspension pursuant to Rule 12.02; however, if termination charges are filed against an employee for the causes set forth in the suspension, the employee shall not have the right to a hearing on any appeal from a disciplinary suspension separate from the hearing provided on the charges supporting discharge.

4)               **MWRD Act (70 ILCS 2605/4.14) (from Ch. 42, par. 323.14)**
        **Sec. 4.14.**
Nothing in this Act shall limit the power of any officer to suspend a subordinate for a reasonable period not exceeding thirty days; however, if charges are filed against a suspended employee, the suspension shall be extended until the civil service board enters its finding and decision regarding the charges unless prior to this time the board enters an order approving an agreement between the sanitary district and the employee that the suspension should terminate at an earlier date. Every such suspension shall be without pay: Provided, however, that the civil service board shall have authority to investigate every such suspension and, in case of its disapproval thereof, it shall have power to restore pay to the employee so suspended. For discharge actions, if the civil service board enters a finding and decision denying discharge, the employee shall be returned to the classification held at the time charges were filed. For involuntary demotion actions, if the civil service board enters a finding and decision granting an

involuntary demotion, the employee shall be demoted to the employee's most recent former classification. In the course of any investigation provided for in this Act, each member of the civil service board and any officer appointed by it shall have the power to administer oaths and shall have power to secure by its subpoena both the attendance and testimony of witnesses and the production of books and papers.

5) **Sec. 4.11.** At any time during the period of probation, the Executive Director with the approval of the Director may terminate a probationary appointee and shall notify the civil service board in writing of the termination; however, the Executive Director's termination of a probationary appointee shall be final and not subject to review.

6) **Personnel Rule 8.062 Termination of Probationary Appointee:** [Amendment No. 16, 11/16/68] [Amendment No. 425, 6/20/12] At any time during the period of probation, the Executive Director, with the approval of the Director of Human Resources, may terminate a probationary appointee and shall notify the Civil Service Board in writing of the termination; however, the Executive Director's termination of a probationary appointee shall be final and not subject to review. [Amendment No. 425, 6/20/12]

7) **MWRDGC Administrative Procedures Manual- 10.5.0 Human Resources Version 1 – 3/8/2010- Subject:** Anti-Harassment, Anti-Discrimination, and Anti-Retaliation Policies and Reporting Procedures:

**3.** An individual supervisory employee can be held personally liable by a court for conduct that violates this policy when the supervisory employee knows of misconduct and facilitates it, approves it, condones it, or turns a blind eye to the misconduct.

**IV. Internal Reporting Procedures**

**A. Internal Reporting**

**1.** Employees who believe they have experienced or witnessed any behavior that appears to violate this policy must contact the District's EEO Coordinator at 312-751-4443 immediately. Such reports can be made verbally in person or by phone, or in writing by electronic mail, handwritten correspondence or typed correspondence.

**2.** Managers or supervisors who learn (directly or indirectly) of any behavior that may in violation of this policy must report the behavior to the District's EEO Coordinator at 312-751-4443 immediately. Such reports must be made regardless of whether the supervisor or manager thinks the behavior is a violation of this policy and regardless of whether the employee complained about the behavior or wants the report to be made.

8) **MWRDGC Administrative Procedures Manual**

**Subject:** Anti-Harassment, Anti-Discrimination and Anti-Retaliation Policies and Reporting Procedures Version 2 – 8/14/15:
A. Internal Reporting Procedures

2. Managers or Supervisors who learn (directly or indirectly of any behavior that appears to violate this policy must contact the Employee Relations Section at 312-751-4443 as soon as practicable to discuss

61

the perceived violation, and the Employee Relations Section will notify the appropriate chain of command. Such reports or manager thinks the behavior is a violation of this policy, regardless of whether any employee complained about the behavior and regardless of whether an employee want the report made.:

**B. Inquires and Investigations**

1. Only members of the Employee Relations section or their designee shall conduct inquiries and investigations into allegations of violations of this policy. Inquiries or investigations are permitted by other supervisory staff only after they are designated to do so by a member of the employee Relations Section.

2. Reports complaints and allegations of violations of this policy will be addressed as promptly as practicable. Inquiries are conducted when there is reason to believe that a policy violation might have taken place. Investigations are initiated when more information is needed to make that determination. Inquiries and investigations will be initiated with or without an employee's consent.

3. Every attempt will be made to maintain employee confidentiality on a need to know basis only however, there should be no expectation of complete privacy.

**E)** Have Zero tolerance for violation of the Anti-Discrimination, Anti-Retaliation, Anti-Harassment policies and investigate all complaints in a transparent manner.


**55)     10/9/15:**    I made requests to file complaints of discrimination and harassment on the proper forms and the person who answered the phone for the EEO coordinator as listed in the employee handbook in Anti-Harassment, Anti-Discrimination, Anti-Retaliation policy 312-751-4443 was not the EEO Coordinator as I was denied the identity and had to request over a year later through FOIA who the EEO Coordinator was:

I requested through FOIA 11/2016: Response TO FOIA 16-419 as the employer refused to give the identity of the EEO Coordinator:

"The EEO coordinator from May 31, 2015 to January 2016 has been Mr. Kosowski(Thaddeous)"

"Roxanne Bonner was the Human Resources Manager in the Employee Relations section from January 1, 2014 through June 5, 2016" (Employment Relations Manager)


**55a.**

**Shaka Freeman** <topnotchgogetter12@gmail.com>                    Fri, Oct 9, 2015 at 11:45 AM
To: Suzanne.Boswick@mwrd.org,  Roxanne.Bonner@mwrd.org

   Att: EEO Coordinator Susan Boswick, Roxanne Bonner   10/9/15

   I have emailed this request.

   From Shaka Freeman

62

7119 S. Rhodes Ave.
Chicago IL 60619
topnotchgogetter12@gmail.com

I talked to you over the phone and requested an opportunity to place a complaint of discrimination and harassment but you denied me and referred me to Roxanne Bonner Employment Relations Manager.

I am requesting the form that I can file my complaint of discrimination and harassment be emailed to me immediately and a fair investigation launched.

Thanks

Shaka Freeman

**56)** **10/12/15 11:30am:** My complaints of discrimination and harassment were referred to outside agencies as stated in Denice Korcal-Hr Director 9/25/15 Letter violating normal terms and conditions of employment and segregating my employment:

**Bonner, Roxanne** <BonnerR@mwrd.org>                           Mon, Oct 12, 2015 at 11:30 AM
To: Shaka Freeman <topnotchgogetter12@gmail.com>
Cc: "Boswick, Suzanne" <BoswickS@mwrd.org>

Mr. Freeman,

In regard to your complaint about your termination of probation, please refer to the enclosed letter sent to you from the Director of Human Resources on September 25, 2015. You were advised that you may file a complaint with one or more external agencies and the agencies are listed in the letter. Additionally, your appeal regarding your termination of probation was placed on the Civil Service Board agenda and you have been notified when to appear.

Roxanne Bonner

Human Resources Manager

**56a.**

# GAGE v. METROPOLITAN WATER RECLAMATION DIST. OF GR.
## CHICAGO United States District Court, N.D. Illinois, Eastern Division
August 17, 2004.

**CHERRIE L. GAGE, Plaintiff,**
**v.**
**METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO, Defendant.**

The opinion of the court was delivered by: MARVIN ASPEN, Chief Judge, District

63

"According to Equal Employment Officer Wilkins, if an employee raises an issue of discrimination, she counsels them, provides them with a complaint form, and will conduct an investigation only if the forms are completed. Wilkins testified that she does not document complaints of discrimination before the employee fills out the complaint form, nor does she take any action if no form is filled out by the employee. The District states that unless an employee fills out a discrimination form, the employee's concerns are not considered a formal complaint. If an employee files a complaint but does not fill out the form, the employee must specifically request an investigation"

**57) 10/15/15- Cetified Next day mail, 10/16/15-**Hand Delivered:           To Brian Deitz-HR
ADA Interference, Coercion and Retaliation:

( Brian Deitz Email 8/24/15 to Joseph Cummings, Reed Dring, Roxanne Bonner: " Joe, If Mr. Freeman submits any documentation from the State to his supervisors to receive a work related driving exemption, please forward the documentation to HR for completion. The Frontline supervisors should not complete the documentation. Brian"

**Adjusted Amended Appeal of my Termination/Separation on 9/18/15 ( Motion for Reinstatement):** The employer was notified of my **complaints of discrimination** including but not limited to: qualified acts of a qualified individual with a disability of receiving supervised treatment making me a qualified individual with a disability and the employer knew about me being a **qualified individual with a disability**, and the employer and Civil Service Board new about my **drivers license had become valid** ( as stated in my adjusted amended appeal/complaints on 10/15/15 and 10/16/15) and they routine run a background checks as stated in the Stephen Cook Interoffice Memorandum-Formal Interview:
"On September 8, 2014 a LEADS check of your driver's license revealed that your license was suspended on or before September 8, 2014 but after September 5, 2014."

**Adjusted, Amended Appeal (Motion to Reinstate):**    "

I am filing an appeal of termination of probation for unsatisfactory performance with the Civil Service Board first. And after exercising all filing with internal investigations with MWRD I intend to file complaints with the EEOC, Illinois Human Rights Department, and Civil Rights Bureau Office of the Attorney General.

**I am requesting to be reinstated** with back pay due the fact the defendants can't prove that I was not discriminated against and I was terminated due to pretext to hide discrimination.

I am filing this appeal, complaints, suits, claiming race discrimination, and hostile work environment in violation of Title VII. I also allege municipal liability under 42 U.S.C S 1983. **Count 1** I allege discrimination in the terms and conditions of my employment in the form of a racially hostile work environment in violation of Title VII. In **Count II**, I allege discriminatory wrongful termination of Probation, **Count III** Using an arrest report and or conviction unrelated to my employment to terminate my employment solely due to a arrest report and discriminating against me, **Count IV**, Shaka Freeman alleges Policy Makers- Board of Commissioners, the Executive Director, and District Management reserve the right to add, amend, change or eliminate the practices and policies referred to in this handbook under Employee Handbook Disclaimer and Metropolitan Water Reclamation Act aided and abetted a widespread policy and practice of depriving African-American employee of their constitutional rights. **Count V Violations of Employment Policies**  Policy Makers, Board of Commissioners, Civil Service Board, Executive Director, District Management, Human Resources Department have discriminated,

harassed and deprived me of my constitutional rights by intentionally refusing to follow rules, laws, policies all powers granted, either expressly or by necessary implication, by this Act or any other Illinois statute to the District that are designed to ensure fair consideration in all aspects of employment, fair and equitable rates of compensation, and proper recognition of performance. See introduction of Employee Handbook. **Count VI** violated their own Voluntary Affirmative Action Act because not only was I highly qualified, I also was a EEO Recommendation and by wrongful terminating me me the District have violated their on Affirmative Action Act.

I never participated in any unapproved work practices during my employment either and all work duties and the way performed were approved and ordered and at their request by the Stickney Plant immediate supervisors including Senior night shift TPO3 Derrick Stinson or Safety operators, or plant or operations managers respectfully. Nor was I warned prior to my termination of any unapproved work practices.

The TPO 1 position does not mandatory require a valid driver's license for hire nor is there a mandatory requirement for my position to drive a vehicle to perform my duties. My requirement for my position is that I am able to perform my job in timely manner I am able, and have done this with or without assistance.

I performed my duties with approval of my immediate supervisors in a satisfactory manner during this period of 8/26/15 to my termination last date of work 9/18/15 without error.

I was not warned by my immediate supervisors Derrick Stinson and Paul Donnelly or any supervisor prior to my termination nor did I fail to perform my job in a unsatisfactory manner. There are not any adverse actions in my personal file prior to my termination.

Manju P. Sharma Director of Maintenance and Operations who I never met or talked to wrote a suspicious letter recommending for Termination of Probation on 9/9/15. I was denied as to who the person was that terminated me and the details by Denise Korcal Human Resource Director. I had to request my personal file and did not receive that until 10/13/15 when I was able to see the letter from Manju P. Sharma the person who recommended my termination.

In the letter stated by Manju Sharma is pretext for discrimination for my termination. The following are pretext to hide discrimination and are not any District personnel laws statutes or facts contained, or in Job minimum requirements or job descriptions that support these pretexts:

" Some of the SWRP TPO 1 duties (job specification attached) that at least benefit from, and in some cases require, driving a vehicle include delivery of samples to the laboratory, resetting process equipment, adjusting the West Side Relief Gates, responding to odor complaints by conducting an odor survey both in the Plant and at the location of the complaint, making rounds of the plant, and conducting process control analysis of Battery and/or Outfall ammonia. Note that the distance from the Process Control Building at Southwest is approximately one mile from the process areas at the West Side."

65

In Response: There is not a requirement of driving a vehicle, the laboratory is in house on the plant, and I am required only in part according to Job specification to perform my duties in a timely manner which I have been doing from beginning to the termination of my employment. My work environment can not be described as a fast paced work environment due to the fact that the treatment processes are automated and there is a scada monitoring system to monitor equipment in case of malfunction so the work environment is not fast paced at all.

The odor control statements are more pretext to hide discrimination as according to Odor Complaint Response Procedure sheets:

**Odor Control & Monitoring Procedures (I have a copy of):** The Stickney WRP Odor Monitoring Program is performed on the afternoon shift (weather conditions permitting) on every Tuesday, Thursday and Saturday. Either the shift TPO 2 or the shift TPO 1 performs the Odor Patrol. **I work on the night shift so this is not a responsibility of mine nor is it part of my duties to perform.**

See: **Odor Complaint Response Procedures ( I have a copy of) :** b) If the call to the plant has been received during non-working hours, give the completed complaint form to the day shift TPO III who will forward all pertinent information to the appropriate location for handling as soon as possible.

**"Business hours** are the hours during the day in which business is commonly conducted. Typical business hours vary widely by country. By observing common informal standards for business hours, workers may communicate with each other more easily and find a convenient divide between work life and home life.

In the United States, United Kingdom and Australia, the hours between 9 am and 5 pm (the traditional "9 to 5") are typically considered to be standard business hours, although in the United States this varies by region due to local tradition and the need to conduct business by telephone with people in other time zones. For instance, business in Chicago is often conducted between 8 am and 4:30 pm, while in New York City, business hours tend to be later—for instance, from 10 am to 6 pm. On Saturdays businesses are usually open from 8 or 9 am to noon or 1 pm."

There is a safety concern approaching someone's house after midnight. My duties of picking up the samples keep me busy until midnight. I have never been asked to take a odor complaint off site. This statement is more non first hand pretext to hide discrimination.

The statement that the South west control Building is 1 mile from the Westide Plant the Westside plant is all self contained on the Stickney Plant these statements are more pretext exagerate to hide discrimination and to paint a picture it being impossible to cover 1mile in timely manner. This is not true and once again the work environment is not fast paced. I am not disabled or handicapped. There are 20 mile per maximum speed limit signs on the plant.

"Mr Freeman stated that he has purchased a bicycle for getting around the plant and a cooler with wheels to transport samples. To date has received assistance from other employees on his shift and has not had to walk/bike the samples over the long distances required nor has he been required to drop what he is doing and adjust the West Side Relief Gates during a storm."

In Response: I performed all of my duties unassisted. I did ride in a vehicle with other co-workers but no one performed my duties for me. Riding in a district vehicle is not a violation of company policy. I rode in district vehicle's other co-workers while performing my duties starting 8/27/15 at the authorization and approval, and request of of Senior TPO 3 Night Derrick Stinson, and all immediate supervisors and under that fact he and I were awaiting the approval from the District to sign paper work that would allow a work permit to allowing me to drive unrestricted a district vehicle immediately. Manju Sharma new that the district would not sign the paper work on 9/9/15 or sooner but never informed me, nor did they request me to stop riding in district vehicles with co-workers while I perform all of my duties are facts showing behavior designed to deprive me of a fair and equal opportunity to perform my duties.

My arrest which I have not been convicted of and was not job related and did not violate the Drug and alcohol policy for non-union employees **and I have a letter from the secretary of the state to show that I have a valid drivers IL license without restriction.**

Employees are strongly encouraged to voluntarily seek assistance from the District's Employee Assistance Program (EAP) provider, ComPsych, The Guidance Resource Company, for any drug, alcohol, substance abuse problem prior to violation of his policy. Enrolling in an EAP program after violation of this policy may not preclude discipline.

**I am not a unacceptable liability this more pretext to hide discrimination because my license suspension is unrelated to my job. I also called the EPA program 1-888-327-5771 went to 3 counseling sessions with Michell D. Williams LCSW, CADC P.C. Licensed Clinical Therapist and Substance Abuse Counselor EAP Reference # 3919944 and I have a card showing my next appointment dated 8/13/15 all sessions prior to 8/26/15 suspension of my license.**

The District did not follow the Performance Evaluation Program regarding the statement for termination of probation for unsatisfactory performance. The District never issued me a performance report, and not any immediate supervisor, Human Resource Director, Plant manager, or Department Head, or Executive Director talk to me, inform me of performance issues prior to termination and are facts that support my claims for discrimination.

The complaint procedure is for non-represented employees to use in resolving problems associated with their employment. Items excluded from this procedure are performance evaluations health, life and/or dental insurance claims, and pension matters.

An employee may appeal decisions affecting his/her employment with his or her immediate supervisor. If the employee is unable to resolve the matter following a discussion with the immediate supervisor, the decision may be appealed through the chain-of-command within the employee's assigned department as follows: I was not given the proper complaint form by the Human Resource Director to make my complaint which is a fact of violation of employment procedures that support case for discrimination.

I was never given the proper complaint form. I made complaints to the Human Resource Director but never was supplied with the proper complaint form.

67

"C. Anti-Harassment, Anti-Discrimination, and Anti-Retaliation Policies and Reporting Procedures. 1st paragraph

It is the policy of the District, its Officers, and Board of Commissioners to provide all employees with a workplace that is free from harassment, discrimination , and retaliation by anyone in the workplace: a supervisor, co-worker, subordinate, contractor, vendor, visitor, etc. Harassment and discrimination based on an individual's race, sex, gender, color, racial group or perceived racial group, disability, age, religion, national origin or ethnicity, sexual orientation, veteran or military discharge status, association with anyone with these characteristics, or any other legally protected characteristic are violations of Title VII of the Civil Rights Act of 1964, as amended, and will not be tolerated.

"C. Anti-Harassment, Anti-Discrimination, and Anti-Retaliation Policies and Reporting Procedures 3rd paragraph.

The District had a zero-tolerance policy for any conduct or behavior by anyone in the workplace found to be in violation of the District's anti-harassment, anti-discrimination, and anti-retaliation policy and will take immediate and appropriate corrective action to eliminate the conduct, regardless of whether the conduct violated any law or was unintentional. Employees found to be in violation of any aspect of this policy shall be subject to disciplinary action up to and including discharge, as directed by the Executive Director.

All reports, complaints, or allegations of suspected violations of this policy must be made to the District's EEO Coordinator at 312-751-4443 immediately. No inquiries or investigations are permitted by any other employee or local departmental staff.

I tried to make several attempts to make complaints of discrimination with the EEO coordinator Susan Bozwick through phone, and email and was denied. When I called her she said I needed to call the Employment Relations manager Roxanne Bonner. Roxanne Bonner sent an email on 10/9/15 showing that she denied me fair and equal investigation regarding discrimination."

**58)** **10/18/15 to 9/18/15 Stickney Plant TPO 1 vacancy:** My TPO 1 position was vacant from 9/18/15 to 10/18/15. **Dev Rijal-Asian ( did not have a disability)** Afternoon Shift TPO 1 Stickney Plant transferred 9/2/15 to a higher pay grade Environmental Specialist position as part of the ADA interference he was transferred back to my open Stickney Plant TPO 1 midnight shift position to prevent me from being reinstated to my position and was later promoted to TPO 2 on 9/5/16. During the vacancy there was an open Stickney Plant Vacation Relief TPO 1 position staffed on the day from 9/21/15 due to transfer of Richard Schackart to regular TPO 1 day shift Stickney Plant. From 9/21/15 to 10/17 there was 1 opening at the Stickney Plant from 9/21/15 to 1/25/16 3 to 4 TPO 1 openings at other plants during my Civil Service Board hearing/termination 9/18/15 to 12/16/15 and beyond.

From 9/18/15 to 10/17/15 2 work days there was only 7 days (overtime which would be the 8 days per month I would be off in a 4 week span) worked that were not worked by a vacation relief TPO 2 Mike Spieles and midnight shift TPO 2 Ramone Adams and William Lockett during regular hours. Out of a 4 week span I would work 20 days leaving the normal 20 days that I would have worked. (The overtime was due to scheduling conflicts and off days, sick days, vacation days by me and others)and not due to the requirement to fulfill the duties of the TPO 1 due to vacancy clearly showing that I could have been by law to allow the 30 day waiting period to allow a monitoring device to be installed in my personal vehicle to drive and the employer also had time to waiting on the approval of the work

permit by the employer ( normal terms and conditions of employment. The Chain of Custody forms and timesheets show all of these facts.

Chain of Custody Forms for the Grab Samples 24 hour composite showing who performed the Duties of the Stickney Plant Midnight Shift TPO1 during the vacancy due my termination: R-Regular time, O-Overtime:

9/18/15-Sheet was not completed, 9/19/15-Ramone Adams- Probationary TPO 2 Midnight Shift-R, **9/20/15-Talbot-Day Shift TPO 2-O,** 9/21/15-Ramone Adams-R, 9/22/15-Ramone Adams-R, 9/23/15-Mike Spieles Vacation Relief TPO 2-R, 9/24/15-M.S.-R, **9/25/15-Miguel Arambura-Afternoon Shift-TPO 1-O,** 9/28/15-Ramone Adams-R, 9/28/15-Ramone Adams-R, 9/29/15-William Lockett-Midnight Shift TPO 2-R, 9/30-W.L.-R, 10/1-R.A.-R, **10/2-M.A.-O, 10/3-M.A-O,** 10/4-R.A.-R, 10/5-W.L.-R, 10/6-W.L.-R, 10/7-R.A.-R, **10/8-M.A.-O,** 10/9-R.A.-R, 10/10-R.A.-R, 10/11-W.L.-R, 10/12-W.L.-R, 10/13-R.A.-R, **10/14-M.A.-O, 10/15-M.A.-O,** 10/16-R.A-R, 10/17-R.A.-R, 10/18-Dev Rijal-TPO 1 midnight shift not vacant.


**58a.**

Shaka Freeman


Re: FOIA 16-446


Dear Mr. Freeman:


Enclosed please find information regarding treatment plant operator positions and vacancies. The MWRD Human Resources Department indicates that the position held by Mr. Dev Rijal was vacated on September 5, 2016 and remained vacant until November 30, 2016, when it was filled by Mr. Colin Reilly. While the position was vacant, it was filled by existing Treatment Plant Operator I personnel through overtime.


**58b.** My Stickney Plant TPO 1 midnight shift position according to the Chain of Custody forms the duties were performed by others not including Colin Reilly from 9/5/16 to 12/11/16 well over 3 months vacancy, the position was open 29 work days from 9/18/15 to 10/17/15, and the vacation relief TPO 1 Stickney Plant position was vacant from 9/21/15 to 1/25/16 due to transfer of Richard Schackart until Afton Butler was hired first day of work on 1/25/16 showing the average time to hire a new employee is 3 months as the duties of the vacancy of my Stickney Plant midnight shift TPO 1 from 9/5/16 to 12/11/16 were covered during majority regular hours and overtime was required due to scheduling conflicts, vacation, sick days through the use of the TPO 1 vacation relief TPO 1 and normally staffed midnight shift TPO's due to the slow paced work environment and clearly pokes holes in the pretext that afternoon shift TPO is needed to work overtime stay over to perform my TPO 1 duties while I am at work ( it takes two people to perform my duties due to me not being able to drive as the pretext buy the employer states). The chain of custody forms and timesheets show this direct evidence as **O=Overtime, and R = Regular hours** worked and the employers premature termination of my employment was due to ADA interference, coercion, retaliation and ADAA normal terms and conditions of employment were violated along with HR and FOIA making false claims that the Treatment Plant Operator 1 was filled through overtime ( attempt to deny normal terms and conditions of employment)

which the evidence says is false claims by the HR staff which supplies the FOIA requests to the FOIA department as part of the ADA interference, Coercion, Retaliation and Denial of ADAA normal terms and conditions of employment:

9/5/16-Mike Spieles-Vacation Relief TPO 2-R, 9/6/16-Afton Butler-Vacation Relief TPO 1-R, 9/7/16-A.B.-R, 9/8/16-A.B.-R, 9/9/16-A.B.-R, 9/10/-A.B.-R, 9/11/-M.S.-R, 9/12-A.B.-R, 9/13-A.B.-R, 9/14-A.B.-R, 9/15-A.B.-R, 9/17-M.S.-R, 9/18-A.B-R, 9/19-William Lockett-Midnight Shift TPO 2-R, 9/20-M.S.-R, 9/21-A.B.-R, 9/22-A.B.-R, 9/23-M.A.-R, 9/24-M.A.-R, 9/25-W.L.-R, 9/26-A.B.-R, 9/27-A.B.-R, 9/28-A.B.-R, 9/29-M.S.-R, 9/30-M.S.-R, 10-1-A.B.-R, 10/2-A.B.-R, 10/3-A.B.-R, 10/4-A.B-R, 10/5-M.S.-R, 10/6-M.S.-R, 10/7-W.L.-R, 10/8-W.L.-R, 10/9-A.B.-R, 10/10-A.B.-R, **10/11-Miquel Arambula-Afternoon Shift TPO 1-O**, 10/13-A.B.-R, 10/14-A.B.-R, 10/15-A.B.-R, 10/16-A.B.-R, **10/17-M.A.-O,** 10/18-W.L.-R, 10/19-A.B.-R, 10/20-A.B.-R, 10/21-A.B.-R, 10/22-A.B.-R, **10/23-M.A.-O,** 10/24-Michael Kavanaugh-Promoted probationary midnight Shift TPO 2 due to transfer of Ramone Adams TPO 2 to Day Shift-R, 10/25-A.B-R, 10/26-M.K.-R, 10/27-A.B.-R, 10/28-A.B.-R, 10/29-A.B.-R, 10/30-M.K.-R, 10/31-A.B.-R,


11/1-A.B.-R, 11/2-A.B.-R, 11/3-A.B.-R, 11/4-A.B.-R, 11/5-M.K.-R, 11/6-M.S.-R, 11/7-A.B.-R, 11/8-A.B.-R, 11/9-A.B.-R, 11/10-A.B.-R, 11/12-M.K.-R, 11/13-W.L.-R, 11/14-M.K.-R, **11/15-M.A.-O,** 11/16-M.A.-R, 11/17-M.K.-R, **11/18-Kapak Lee Afternoon Shift TPO 2-O, 11/19-K.L.-O**, 11/20-M.K.-R, 11/21-A.B.-R, 11/22-A.B.-R, 11/23-M.K.-R, 11/24-M.K.-R, 11/25-W.L.-R, 11/26-W.L.-R, 11/27-A.B.-R, 11/28-A.B.-R, 11/29-M.K.-R,

12/1-A.B.-R, 12/2-A.B.-R, 12/3-A.B.-R, 12/4-A.B.-R, 12/5-M.K.-R, 12/6-M.K.-R, 12/7-A.B.-R, 12/8-A.B.-R, 12/9-A.B.-R, 12/11/M.K.-R. **93 days: 6 out of 93 worked through overtime:** these facts shows the vacancy was not worked through overtime showing that a 3 month period of time is normal terms and conditions of employment to have that time to get all driving permits, performance management program followed, interactive process regarding ADA, ADAA, interactive process regarding alternative work methods, FMLA time used and the 3 month could have been used to have a interactive process regarding enrollment in the EAP program for Alcohol Abuse and my 3rd DUI also it shows that two people were not need to perform the duties of the TPO 1 midnight shift due to slow pace other TPO who are staffed to cover for all vacancies, difficulties, vacation, sickness, and absences, scheduling conflicts but not limited to as part of normal terms and conditions of employment.


**59)      10/19/15:**

**Disparate Treatment Discrimination**

**Prima Facie Case:** to establish a prima facie case of disparate treatment, the plaintiff must: (1) be disabled; (2) be qualified for the job; (3) have been fired or have experienced an adverse job action; and (4) plaintiff's position must have remained open and the employer continued to seek applicants or the plaintiff was replaced by another employee, or similarly situated non-disabled employees were treated more favorably:

1) I was regarded as and perceived to have a disability of Alcoholism as well as being a qualified individual under the ADA Act.

2) I was superior qualified for the job.

3) I was terminated.

4) My Stickney Plant midnight shift TPO 1 position stayed open from 9/18/15 to 10/19/15 until filled by another employee. Dev Rijal.

To establish a *prima facie* case of disability discrimination under the ADA or the ADA Amendment Act of 2008, Plaintiff must show that (1) he was a person with a disability within the meaning of the statute; (2) Employer had notice of his disability; (3) he could perform the essential functions of the job with reasonable accommodation; and (4)

The employer refused to make such accommodation. *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 (2d Cir. 2000). If the plaintiff succeeds on the first three elements of his or her claim, a failure to make reasonable accommodation amounts to a discharge "because of" plaintiff's disability. *Id.* (Citing *Ryan Grae & Rybicki, P.C.,* 135 F.3d 867, 870 (2d Cir. 1998)). If Plaintiff establishes the *prima facie* case, the burden shifts to the Defendant to show that the accommodation would result in undue hardship. *Parker*, 204 F.3d at 332.

**60)** **10/20/15:** Adjusted Amended Appeal to Civil Service Board, Motion to Reinstate.

**61)** **10/21/15:** Initial Civil Service Board Hearing Appealing my termination/Separation and was not allowed to talk state why I should be reinstated and my appeal heard. The employer did not give proper notice and had not served me the motion to dismiss prior to Civil Service Board Hearing as stated in my 11/24/15 amended complaints.

**61a.** **10/21/15:** My employment was segregated by labeling my appeal termination of probation when I appealed my Termination/Separation as stated on my personal action form and I appealed the claims of unsatisfactory performance and by not allowing me to appeal the claims of unsatisfactory performance my employment was segregated:

I filed a motion of reinstatement prior to the decision adverse to the objector ( The District). My motion was not heard and addressed by the Civil Service Board and I was denied a continuance to address my motion and objection. Per 735 ILCS 5/2-301 Code of Civil Procedure.

8.   735 ILCS 5/2-612) (from Ch. 110, par. 2-612)
     Sec. 2-612. Insufficient pleadings. (a) If any pleading is
insufficient in substance or form the court may order a fuller
or more particular statement. If the pleadings do not
sufficiently define the issues the court may order other
pleadings prepared.
     (b) No pleading is bad in substance which contains such
information as reasonably informs the opposite party of the
nature of the claim or defense which he or she is called upon to
meet.
     (c) All defects in pleadings, either in form or substance,
not objected to in the trial court are waived.
(Source: P.A. 82-280.)

9.   I objected to Joseph Cooks Insufficient verbal pleadings by
his refusal to give a response on 2 occasions their fore the
board should have ruled in my favor. Their motion was
insufficient pleading because they did not reasonably inform me
of their nature of their claim and motion I was called upon to
meet their fore their motion should have been voided.

10. The motion that was filed against me by the district was a
surprise prior to my initial hearing on 10/21/15 9:20 am and the
hearing was at 10:00am and I did not receive a copy prior to the
hearing giving the opportunity to file a objection and showing
that their motion was not sufficient and should have been voided
and the district did not address the charges that they brought
upon me which is clear Insufficient pleadings because they
should addressed the charges and my appeal and complaints and
the reason why we were present because of my appeal and rights
to be heard in my own defense.

11. See:  (735 ILCS 5/2-613) (from Ch. 110, par. 2-613)
 d) The facts constituting any affirmative defense, such as
payment, release, satisfaction, discharge, license, fraud,
duress, estoppel, laches, statute of frauds, illegality, that
the negligence of a complaining party contributed in whole or in
part to the injury of which he complains, that an instrument or
transaction is either void or voidable in point of law, or
cannot be recovered upon by reason of any statute or by reason
of nondelivery, want or failure of consideration in whole or in
part, and any defense which by other affirmative matter seeks to
avoid the legal effect of or defeat the cause of action set
forth in the complaint, counterclaim, or third-party complaint,
in whole or in part, and any ground or defense, whether
affirmative or not, which, if not expressly stated in the
pleading, would be likely to take the opposite party by

```
surprise, must be plainly set forth in the answer or reply.
(Source: P.A. 84-624.)

12.  The District's non delivery of their motion as the statutes
states was used to avoid the legal effect of or defeat the cause
of action set forth in the complaint, counterclaim, or third-
party complaint, in whole or in part, and any ground or defense.
```

13. I was denied fair amount time to plead my case and response and was only given 3 minutes to verbally respond, while also the typist was interrupting me during my response as well. These are more facts the hearing should be investigated and reheard by a real honest different Civil Service Board.

14. John Kendall, Victoria Almeida, and Donald Storino clearly violated my civil service board rights and aid and abetted the discrimination of my rights and denied me a fair and equal hearing and this is why my hearing needs to be investigated and reheard.

**62)     11/04/15:     IDES- Determination Letter ( unemployment benefits claims Shaka Freeman Claimant ID: 2786082):**     Roxanne Bonner, Joseph Cook-Law Department:

"Issue 007 601A-Voluntary Leaving
Deny Effective 09/27/2015
Did claimant voluntarily leave employment? The evidence shows the claimant voluntarily left Metro Water Rcmtn Dist of Grt Chigo when he did not obtain or maintain the required license. Since the employer did not have the ability to control the conditions or acts the claimant left work voluntarily without good cause attributable to the employer, the claimant is ineligible for benefits from 9/27/15 and will be determined ineligible until he meets the eligibility requirements. "

**63)     11/8/15:     The employer knew about my valid drivers license with no restrictions on 10/16/15 due to my complaints and amended complaints filed:**

Freeman forwards to the District prior to 11/18/15 Civil Service Appeals Hearing and Denial of appeal on 11/18/15 ( a notice/order of Rescind from the State of Illinois regarding the statuary Summary suspension of his drivers license. The document indicates that the statutory summary suspension was removed from his driving record and rescinded on 10/2/15 and Shaka Freemans drivers license was valid with no restrictions.

**64)     11/18/15:**     Freeman addressed the Civil Service Board during public comments and later presented an oral argument. The Civil Service Board granted the District's motion to dismiss.

**64a.     11/18/15:**     The employer/final policy making authorities used in their motion to dismiss a policy 4.11 (Disparate Impact, Municipal Liability) to deprive me of my constitutional rights, failed to properly label their motion to dismiss, and failed to address my motion to reinstate and as a result prejudiced my hearing while :

The fact the employer did not label his motion and Improper labeling of a motion to dismiss under section 2-619 warrants reversal only if the non-moving party is prejudiced by the error. I was prejudiced by the mislabeling as the employer filed a motion for jurisdiction falling under section 2-619 but began to challenge the legal sufficiency of my complaint falling in the scope

of 2-615 by stating the following he guided the Civil Service Board Chairman and prejudiced by error in wrong labeling the motion and failing to state a specific motion prejudicing my hearing

MR. COOK: You know, obviously
23 Mr. Freeman's -- if he wishes to present oral
24 argument on his response to our motion, you know,
Page 34
Veritext Legal Solutions
www.veritext.com 800-567-8658
1 that's Mr. Freeman's prerogative. We don't need to
2 present any further oral argument on our motion.
3 We would ask for a ruling on that motion today.
4 Mr. Freeman's also filed a motion to
5 reinstate. We'd also ask to have -- we have no
6 oral response to that as well, and Mr. Freeman
7 would like to argue that. We have no objection.
8 We'd also ask for a ruling on that today.
9 We are asking for an expedited ruling
10 both on our motion to dismiss and Mr. Freeman's
11 motion to reinstate today, one of the reasons being
12 that we have expressed to Mr. Freeman, both the HR
13 department and myself, that the proper avenues for
14 this, if he feels he's been terminated

**65)  11/18/15:**      The employer/Law Department-Joseph Cook and the Civil Service Board Chairman and Board members unlawfully denied my appeal when the employer did not stay strictly to personal jurisdiction of motion to dismiss and this error opened my appeal to general appearance and due to the intentional discrimination my appeal was unlawfully denied along with unlawfully being escorted by the police at the command of Civil Service Board Chairman John Kendall prejudicing my Civil Service Board hearing :

(motion to dismiss # "7. Pursuant to Section 4.11 of the MWRD Act and Personnel Rule 8.062, the Civil Service Board lacks jurisdiction over Mr. Freeman's appeal regarding the termination of his probationary appointment by the Executive Director.")

  "If you are the defendant and personal jurisdiction is at issue, you must (1) make a special and limited appearance pursuant to section 2-301 and (2) not argue the merits of the plaintiff's complaint. Arguing issues beyond personal jurisdiction turns the appearance into a general appearance and will subject the defendant to personal jurisdiction."

MR. COOK: I have expressed to
16 Mr. Freeman, as well as the HR department, that the
17 proper avenues for his -- if he has a complaint
18 about any sort of discrimination or harassment,
19 that the EEOC and the IDHR are the proper avenues
20 for that and any further continuance of this appeal
21 could potentially harm his ability to file those
22 complaints within the statutory window to file

74

23 those.
24 So, again, we are not asking for any
Page 36
Veritext Legal Solutions
www.veritext.com 800-567-8658
1 further oral argument on our motion or
2 Mr. Freeman's motion. We are stressing that we
3 would like a ruling today on our motion to dismiss,
4 as well as Mr. Freeman's motion to reinstate.

**66)     11/23/15, 11/24/15:**      I filed amended complaints, and motions to reinstate and objection complaints as error in laws were committed I filed a motion of reinstatement prior to the decision adverse to the objector ( The District). My motion was not heard and addressed by the Civil Service Board and I was denied a continuance to address my motion and objection. Per 735 ILCS 5/2-301 Code of Civil Procedure.

**67)     12/9/15:**      I have filed numerous amended complaints of discrimination to the Civil Service Board.

**68)     12/14/15:     IDES ( employment benefits) - Administrative Law Judges' Decision Letter:**

Conclusion: Section 601A provides that an individual shall be ineligible for benefits for the weeks in which he has let work voluntarily without good cause attributable to the employing unit.

The claimant was discharged for a variety of reasons. At first, he was told that he was being let go due to his poor performance. Later the employer claimed he was discharged due to failure to maintain a driver's license.

The claimants job description did not require him to have a drivers license. He brought a bike, to work, so he could perform duties around the plant.

The claimant did not leave his position voluntarily. He was discharged. He did not deliberately violate his employers Rule or Policies. He did not set out to harm his employer.

No disqualification is imposed under Section 601-A or Section 602-A of the Act.

**69)     12/16/15:**      Freeman petitioned the Civil Service Board for rehearing. Freeman addressed the Civil Service Board during public comments and then again regarding the matter of his petition for rehearing. Freeman's petition for rehearing was denied by the Civil Service Board.

**70)     12/16/15:**      The Civil Service Board unlawfully denied (investigation pursuant to MWRD Act 4.16 which gives the Civil Service Board jurisdiction along with the HR Director to investigate all aspects and tenure of employees) my original discrimination complaints and amended complaints of discrimination and falsely state the complaints were not part of the original hearing. As stated in the 2009 Civil Service Board Mary O'Donnell case the only exception to the 4.11 probation policy ( unlawful acts ) clearly acts of retaliation, ADA Interference, coercion, and denial of ADAA rights normal terms and conditions of employment but not limited to. I was unlawfully escorted out of the hearing by MWRD police at the command of Civil Service Board Chairman- John Kendall prejudicing my hearing and denying my equal employment rights.

12-16-15 Civil Service Board Hearing- Chairman-John Kendall, Vice-Chairman-Victoria C. Almeida, Secretary-Donald Storino:

```
 MR. KENDALL: Let the reflect that
15 Mr. Freeman is not here. He was earlier removed
16 from the court, and it's our assumption that he has
17 left the premises. We have reviewed the appeal and
18 because there was no new evidence presented to the
19 Civil Service Board, neither were there any
20 theories of law or any arguments or how we
21 misapplied the law, we have denied his request for
22 rehearing. We think it's important to state that
23 the documents substantially relate with respect to
24 the appeal with discrimination based on race of
Page 43
```

```
1 many, many, many, paragraphs addressing that which
2 was not a part of the original hearing as well as
3 civil service -- I'm sorry, civil rights
4 violations, other things that were not a part of
5 the initial hearing, one. And then, two, those are
6 not things that we, as a Civil Service Board, are
7 empowered to hear.
```

**71)**   **2/9/16:**      Letter From Executive Director David St. Pierre stating he would actively look into the concerns I raised in emails and a whistleblower report you submitted to Lighthouse Service Inc. Report # TC64814842, # TC 65076803, # TC65085980.


**72)**   **2/18/16:**   **Session Four Supervised Treatment for Alcohol Abuse and 3rd DUI.**

**73)**   **2/25/16:**   **Session Five Supervised Treatment for Alcohol Abuse and 3rd DUI.**

Michelle Williams Licensed substance abuse counselor state:

"Addressed with Mr. Freeman the Alcoholism is the culprit for past present DUI's. Pt. Given treatment referrals to Gateway and Healthcare Alternative Systems."

**74)**   **3/3/16:**    Session Six Supervised Treatment for Alcohol Abuse and 3rd DUI.

**75)**   **3/4/16:**    **Letter From Executive Director David St. Pierre:**

committing ADA interference, violating my protective Inquiry under ADA, ADAA normal terms and conditions of employment false claims of failing to perform my duties required for my position. Stating my driver's license negatively impacted my ability to satisfactory perform my TPO 1 duties including duties that were not assigned to me. The employer segregates my employment by titling my termination/separation ( Termination of Probationary Appointment as to compare me to those who were terminated of probation but were not separated from the employer as several probationary employees and not permanent employees 19 out of 21 including 3 probationary employees not including myself all who had a suspended drivers license and needed a valid drivers license for satisfactory performance of their job not only were not Terminated/Separated from the employer but also were not told they were unsatisfactory performance even after violating numerous major and intolerable offenses and along with denial of restricted permit to drive personal vehicle with a monitoring device and also a work permit with the approval of the employer that was granted to others as normal terms and conditions of employment.:

"Although you claim unfair treatment by referencing other District employees who have remained employed despite having driver's license restrictions, these employees are not comparable to your

situation because their restrictions arose after they passed probation and attained civil service status in their job classification. When other probationary employees were unable to fulfill their job requirements due to driver's license restrictions, we have terminated their probationary appointments.""

**76)**  **3/7/16:**  Started Intensive Outpatient Treatment for Substance Abuse at Gateway.

**77)**  **3/15/6:**  I filed my EEOC Charges in a timely manner ( Race, Retaliation, Disability).

**78)**  **3/17/16:**  Session Seven Supervised Treatment for Alcohol Abuse and 3rd DUI.

**79)**  **3/24/16:**  Last EAP Session Eight with Mr. Freeman. We reviewed his progress and he was praised for his fortitude to follow up with the treatment program and his resilience in his life to survive. The stress @ the DUI has been resolved and future therapeutic needs were suggested i.e. family of origin concerns. Other concerns needed was employment, medical insurance and continued treatment for alcohol. Mr. Freeman can follow up with the local mental health center, i.e. Bobby Wright, Dept. of Human Services 10 S. Kedzie and Lawndale Community Health for services and continue with Gateway for treatment. EAP case closed.

**80)**  **4/12/16:**  Interview with EEOC Investigator charges filed and stamped.

**81)**  **5/5/16:**  **Intensive Outpatient Treatment Substance Abuse at Gateway:** Shaka has successfully completed this episode of treatment and will transition to lower level of care. Shaka has attended 35 group sessions since he began IOP TX on 3/7/16.

**82)**  **5/10/16:**  I made complaints based on discrimination on the basis of disability to the 1) U.S. Department of Justice Civil Rights Division-Disability Rights Section and 2) Civil Rights Division Coordination and Review Section-NWB and 3) Office for Civil Rights Office of Justice Programs U.S. Department of Justice Mailed 5/10/16.

**83)**  **5/20/16:**  Linda A. Garrett Civil Rights Program Specialist Disability Rights Section U.S. Department of Justice chose not to investigate my charges and complaints as I submitted to them on 3 different forms. Instead referred my complaints to Martin Ebel, Director Field Management Programs-U.S. Equal Employment Opportunity Commission.

Dear Mr. Ebel:  5/20/16

I am referring the enclosed correspondence concerning the employment provisions of the Americans with Disabilities Act of 1990 to you for review and disposition as appropriate. The complainant alleges actions that may constitute discrimination on the basis of disability by the Metropolitan Water Reclamation District of Greater Chicago. We are sending the complainant a copy of this letter so that the complainant will know how to contact you. By copying the complainant, we are advising him/her that future inquiries about this complaint should be made to your office at 202-663-4935.

Sincerely,

Linda A. Garrett
Civil Rights Program Specialist
Disability Rights Section

**84)  6/21/16:  EEOC Right To Sue Letter:**  District Director Julianne Bowman, Michael Solomon Investigator issues right to sue letter and states (the information obtained does not establish violations of the Statutes.

**85)  6/30/16:**  I competed Supervised Treatment Alcoholism at IOP at Gateway lower level treatment 16 group session for a total of 51 Group sessions.

**86)  8/9/16:**

# Request for Services - Equip for Equality

1 message

---

**MeganS Sorey** <MeganS@equipforequality.org>                          Tue, Aug 9, 2016 at 11:38 AM
To: Shaka Freeman <topnotchgogetter12@gmail.com>

Dear Shaka,

You recently contacted Equip for Equality to request representation in federal court with the goal of getting reinstated to your position at the Metropolitan Water Reclamation District. We have carefully reviewed all of the documentation that you provided to us. Unfortunately, our office will not be able to represent you in this matter. I hope this email is helpful in explaining the reason for our decision.

**87)  8/19/16:  EEOC- ISA- Donald Marvin 8/19/16 email:**

"As we discussed earlier today by telephone, attached below are all documents in your investigative file available for your review, including the notes of your Intake Interview conducted on April 12, 2016,"

"also informed you that there were no documents in the file from Respondent employer"

**88)  8/22/16:**

Martin Ebel Response to my complaints 8/22/16:
"As I explained to you on the phone, there is no requirement for us to provide a full or more complete investigation to you. There is also no requirement that we require a Respondent to provide a response to every charge of discrimination."

"I also explained to you that if you would like us to reconsider our decision, the appropriate way to seek it is to ask the Director of the Chicago District Office, Ms. Julianne Bowman, to reconsider the case. I explained that you should provide how we had made either errors of fact or of law in making our decision and that you should provide any evidence that you had to support your contention that we had made an error of fact or law. In response to this, you suggested that we made an error of law in not making a fuller investigation and an error of law in not requiring the employer to provide a position statement. Because neither of these are an error of law, I recommend that you provide some other justification for Director Bowman to consider when she gets your request for reconsideration.

I hope you find this helpful.

Martin S. Ebel
Director, Field Management Programs

**88a.** The 2015 Memorandum agreement between the EEOC and Department of Justice Civil Rights Division clear state that EEOC and CRT have a common interest in ensuring that allegations of discrimination in violation of ADA, Title VII are effectively investigated and, where a violation is found, appropriate remedies are obtained. The EEOC and Department Justice Civil Rights Division/Disability do not adhere to laws and do not effectively investigate discrimination complaints.

**89)** **9/2/16:** My case was reopened and the right to sue letter was rescinded by the EEOC Office of Programs due to errors in laws and failure to investigate the employer due to conflict of interest as the EEOC District Manager John Rowe has a son/immediate ( Steven J. Rowe) family member working as a operations engineer at the same Stickney Plant I worked and this is the reason why the EEOC Chicago District Office refuses to state there is a cause to believe that violations have occurred and then a conciliation meeting between me the employer has to take place and if there is not a agreement the investigation is forwarded to the U.S. Department of Justice as stated in the 2015 MOU.

**90)** **10/20/16:** **Respondent: Metropolitan Water Reclamation District of Greater Chicago, EEOC Charge No. 440-2016-00064. Position Statement** from the employer regarding my original un-amended, charges filed 4/2016 of discrimination race, disability, retaliation:

The respondents/final policy making authorities uses polices 4.11 but not limited to ( disparate impact, municipal liability) to deprive me of my constitutional rights.

The make false claims that I required assistance from other employees on my shift in order to complete his duties. For example laborers, and TPOs were pulled from their normal duties to assist Mr. Freeman in transporting samples by driving him to the laboratory.

I participating in protected activity ( as the facts show) as the assistance was ordered by Derrick Stinson ( 9/2/15 email) and Paul Donnelly and others and the assistance was approved by the Stickney Plant Operations Manger Reed Dring (8/26/15 email) until I received approval for the work permit from the employer and until the 30 day waiting period expired to receive the monitoring device installed on my personal vehicle to drive.

The respondents make false claims that a prima facie case of discrimination cannot be made and the were not aware of my disability, and I did not state what my disability was, and they were not aware of me requesting reasonable accommodations or what reasonable accommodations might be .

" Mr. Freeman claims that he was also subjected to different terms and conditions of employment, including but not limited to, harsher scrutiny"

( I was told driving a vehicle as a defacto requirement when the TPO 1 positions does not require a valid driver license and driving duties are not part of my essential job functions and the duties can be performed without the use of a vehicle as using a vehicle would be only more convenient as stated by Roxanne Bonner. I was denied a restricted permit to drive my personal vehicle with a monitoring device and (Mark Williams) and denied a work permit ( Ron Prior, Robert Barnett, and several others).

79

John Webb II Treatment Plant Operator 1 was allowed to show he could complete the duties of his position by the Civil Service Board with his substance abuse problem.

I was denied reinstatement requests and motions by the Civil Service Board after my drivers license was reinstated on 10/2/15 with not restrictions after the employer knew on 10/16/15 and received documentation on 11/8/15 ( Stephen Cook, Robert Barnett).

"Mr. Freeman has attempted to support his claim of unfair treatment by referencing other District Employees who have remained employed despite having driver's license restrictions. However, these employees and the discipline they received are not comparable to his situation because their restrictions arose after they passed probation and attained civil service status in their job classification. It has been established by the Courts that probationary employees are not deemed to be similarly situated to non-probationary employees. See Steinhauer v. DeGollier, 359. When other probationary employees were unable to perform their responsibilities due to driver's license restrictions, the District has terminated their probationary appointments."

My employment was segregated when the employer labels my Termination/Separation ( as stated on my personal action form) as Termination of Probation and the employer fails to acknowledge that 4 probationary employees George Lemon, Sasha Powell ( new employee), Ron Prior ( license revoked for 17 years), Anthony Rendon were not Terminated/Separated from the employer and except for Anthony Rendon they were not labeled unsatisfactory performance when their jobs required a vali d drivers license as a mandatory reqirement as I was.

George Lemon, Sasha Powell, Ron Prior, were not terminated/separated or told they were unsatisfactory performance due to a suspended drivers license which was a mandatory requirement of their positions along with a total of 19 out 21 similar situated events were not terminated/separated for a suspended drivers license and I am the only person out of 20 ( not including Anthony Rendon) terminated/separated and told I was unsatisfactory performance. ( as stated by documentation)

**91)    11/7/16:    Letter from EEOC Office of Field Programs** ( Martin S. Ebel, Director Field Mangement Programs and Wesley Katahira), Washington D.C.:

IN response to your recent email, dated October 1, 2016, which you sent to the White House to complain about EEOC's investigation and dismissal of a charge of employment discrimination you filed with EEOC against the Metropolitan Water Reclamation District of Chicago (EEOC Charge No. 440-2016-00064). We not you also complain about the response you received from the U.S. Department of Justice to your inquires with that Agency.

"Under our procedures, you may request a copy of the Position Statement to assist you in providing evidence which rebuts the Respondent's defenses. Once you have been given an opportunity to provide evidence which rebuts the Respondent's defenses. Once you have been given an opportunity to provide rebuttal evidence, the Investigator will review the evidence obtained in the investigation and make a proposed determination. The investigator's supervisor and senior managers in the EEOC Chicago District Office will review the Investigator's recommendation and the evidence EEOC obtained before making a final determination regarding the merits of your charge. "

" The reason we reopened you charge was because we determined we did not have sufficient evidence, at that time, to conclude your charge lacked merit. When this office reviewed your charge, file, we

80

determined you provided sufficient evidence to continue our investigation and for EEOC to request a Position Statement from Respondent. In other words we determined there was insufficient evidence regarding key facts necessary to prove your allegations and, thus, it was premature to dismiss your charge. As you know, EEOC previously dismissed your charge before requesting a Position Statement from Respondent. As we noted earlier, a final determination regarding the merits of your charge will be made at a later time once you have been given an opportunity to respond to Respondent's Position Statement."

"Under both Title VII and the ADA, EEOC investigates charges of employment discrimination against state and local government employers, although EEOC lacks statutory authority to bring a lawsuit against such employers. The Respondent, the Metropolitan Water Reclamation District of Chicago, is such an employer under Title VII and the ADA."

2015 Memorandum MOU Agreement between the EEOC and Department of Justice Civil Rights Division:

"Under the statutory requirements of Title VII and the ADA, if EEOC finds reasonable cause to believe the allegations of such a charge are true, EEOC issues a Determination to the parties finding reasonable cause and invites the employer to engage in conciliation in an attempt to resolve the matter voluntarily. If EEOC determines conciliation efforts fail, EEOC issues a notice to both parties and forwards the charge file to the Department of Justice for it to consider filing a lawsuit on behalf of the charging party." ( also further investigation)

92)     1/6/17:     **EEOC Investigator ensuring me that I will have a thorough investigation:**

**JANEL SMITH** <JANEL.SMITH@eeoc.gov>                                    Jan 6

to
me

Mr. Freeman,

The Commission is making every effort to thoroughly investigate your charge given its limited resources. The Commission is a <u>neutral</u> agency that investigates complaints of discrimination, and we are on the side of the law. I understand your frustration with the process. I was assigned to this charge to make sure that a thorough investigation is done, your rights are protected, your evidence is reviewed and considered, and that your charge is investigated without bias. I disagreed with your charge being dismissed early on. I agreed that an investigation should be completed. I would like to continue to work with you in a positive manner to complete this investigation. Although I am accused of sabotaging the investigation, I am committed to the investigation of your charge and the protection of your rights.

Thank you again for your continued participation by providing evidence to support your allegations of discrimination. As stated above, I will continue to conduct an unbiased investigation of your charge.

**93)    1/25/17:**



Mr. Freeman, In order to move forward, we need to have the amended charge that you intend to file.

>>> Shaka Freeman <topnotchgogetter12@gmail.com> 1/25/2017 4:11 PM >>>

**94)    1/27/17:**



You have to keep in mind that not all individuals are as educated as you are. Once you file your amended charge that includes ancestry, I can ask questions as whether they were aware of your ancestry.

>>> Shaka Freeman <topnotchgogetter12@gmail.com> 1/27/2017 4:41 PM >>>

**95)    1/30/17:**    I filed my amended charges with EEOC Investigator Janel Smith including earliest date of discrimination 11/5/13, Discrimination based on: National Origin-Culture-First and last name, Perception, Physical Characteristics, Race- Two races African American, American Indian, Disability-(Alcoholism ADA interference and Coercion), Sex-Gender-Male, Retaliation, other: Disparate Impact-Test Score, policy (Municipal liability), Segregation of employment ( Termination/Separation unlawfully labeled Termination of Probation), Denied normal terms and conditions of employment Title VII, ADA but not limited to, Denied Equal Protection Clause Rights 14 Amendment, Unlawful hiring, promotion, recruitment, Harassing Conduct as Retaliation, Harassment under Title VII and ADA Act, Discipline/Termination discrimination and intersectional overlapping intentional discrimination under Title VII, and ADA act but not limited to. Janel Smith failed to provide the proper EEOC Form 5 to process my Amended charges and denied my request for the proper form to be signed off on.

82

**96)      2/2/17:**      I sent email requesting the opportunity to respond to the position statement from the respondent to my amended charges prior to a final eeoc decision is made as stated by EEOC procedures and Janel Smith responded with a yes to my request:

| Shaka Freeman <topnotchgogetter12@gmail.com> | Feb 2 |
|---|---|

to

Janel.Smith

Att: Janel Smith

I would like a opportunity to respond back to the Response statement by the employer to my amended charges prior to a final eeoc decision made if that is even necessary

Thanks

Shaka Freeman

| JANEL SMITH <JANEL.SMITH@eeoc.gov> | Feb 2 |
|---|---|

to

me

Granted.

>>> Shaka Freeman <topnotchgogetter12@gmail.com> 2/2/2017 2:30 PM >>>

83

**97)      2/16/17      Sent Amended charges email to investigator Janel Smith while also requesting the proper EEOC Form to sign off on.**

**Att:** EEOC Investigator Janel Smith 2/16/17:

**RE:** EEOC Form 5: **Please attach this letter with the EEOC Form 5** as part of my particulars along with my EEOC Amended Charges 1 through 9. Please submit, mail, email, scan the EEOC Form 5 so I can signed off on my Amended charges that I have already submitted also including sex (gender Male) as I have been requesting the EEOC Form 5 for over 15 days.

Amended 440-2016-00064

Shaka A. Freeman          (404) 580-2433              Date of Birth: 04/26/1975
1827 S. St. Louis Ave. Chicago, IL 60623

Metropolitan Water Reclamation District of Greater Chicago      500 +      (708) 588-4079
Stickney Plant: 6001 W. Pershing Road, Cicero, IL 60804;
MWRD Headquarters: 100 East Erie Street, Chicago, IL 60611              (312) 751-5000

**See attached multiple Respondents:** ( Final Policy Making Authorities but not limited to) under particulars below:

Discrimination Based on: Race, Retaliation, Color, Disability, **Sex (Gender Male) - Please include**, National Origin, Other: Ancestry & Culture but not limited to

I am including **sex (gender Male)** as part of my amended charges as well as I was treated differently and subjected to different terms and conditions of employment than Sasha Powell - ( Probationary) for the same actions( suspended drivers license) along with my other overlapping protected classes and overlapping Disparate Impact/Disparate Treatment and intersectional discrimination.

**Date(s) Discrimination Took Place:**

**Earliest:** 11/5/2013      **Terminated:** 09/18/15      **Latest:** 12/16/2015      **Continued: Yes**

**The Particulars Are ( If additional paper is needed, attach extra sheet(s):**

Pattern & Practice of intentional violations of Civil Rights against me and an entire class ( those with my protected classes) in regards to subjecting me and a class of people (those in my protected classes) to different terms and conditions of employment, and limiting, segregating and depriving employment opportunities in all aspects of employment: hiring, recruitment, promotion, inaccurate, fraudulent, negative performance evaluations ( used as pretext to hide discrimination), refusal to investigate complaints of violations of the Anti-Harassment, Anti-Discrimination, Anti-Retaliation while also referring your complaints to outside agencies, use of employment practices, test scores that causes (Disparate Impact), unlawful Seniority Systems that are not bona fide that are used to deny promotions along with the use of unlawful occupational qualification standards and fraudulent duties stated as pretext that are not bona-fide causing intersectional discrimination and overlapping Disparate Impact/Disparate Treatment and EEOC prohibited employment practices overlapping into intentional intersectional discrimination but not limited to:
**SEE ATTACHED:**

84

**98)   3/27/15:**      I first received email notice of right to sue letter and the EEOC deny any violations of Statues by the Respondent. I was not mailed the Right to Sue Letter signed off on 3/20/17. Janel Smith and Julianne Bonner could have emailed me the Right to Sue Letter but chose to prejudice my EEOC Investigation. The EEOC Chicago District unlawfully stated there were not no violations to avoid a conciliation meeting with the Respondent and further investigation by the U.S. Department of Justice as stated in EEOC procedures and 2015 MOU Agreement and also made the same errors in laws by failing to get Position statement from the Respondent regarding my amended charges and I was denied my legal rights to respond to the position statement that was never given and or given to me as I had requested to respond to prior to a final decision is made by the EEOC prejudicing my investigation and the same acts done that caused my EEOC case to be reopened the first time has happened again due to conflict of interest of EEOC Chicago District Manager John Rowe's son/immediate family member Steven J. Rowe working as a operational engineer at the same Stickney Plant as I worked.

**99)   3/27/15:      Email response by Nanisa Pereles to my complaints:** I was denied the proper EEOC Form 5 and was denied a position statement request from the employer to my amended charges and I did not have the opportunity to respond prior to a final decision being made as these errors in laws prejudice my investigation and future lawsuit and the Right to Sue letter was not mailed to my current address.

## NANISA PERELES <NANISA.PERELES@eeoc.gov> Mar 28

to me, WESLEY

Mr. Freeman,

This is in response to your inquiry dated March 27, 2017 concerning the charge of employment discrimination you filed with the Equal Employment Opportunity Commission (EEOC) against the Metropolitan Water Reclamation District of Greater Chicago (EEOC Charge No. 440-2016-00064, Amended). I am responding on behalf of Martin Ebel, Director of Field Management Programs.

Our records indicate that Investigator Janel Smith was in communication with you on numerous occasions via email regarding the signing of the amended charge which was served on the employer, that you submitted additional information regarding your allegations for investigative consideration, and that the Investigator sent the Dismissal and Notice of Rights to your attention.

We recognize that you are dissatisfied with the results of the processing of the charge. The EEOC is an impartial law enforcement agency which must issue determinations based on our interpretations of the relevant evidence and the laws we enforce. The information obtained during the processing of the charge was not sufficient to support your allegations of employment discrimination. Therefore, the final determination issued on **March 20, 2017** concluded the administrative processing of the charge and described your right to pursue the matter in court.

We have responded to several inquiries concerning the charge and have attempted to be fully

responsive to the concerns which were presented. In view of these efforts and your continued strong views in the matter, we do not believe it is possible to offer any further information to convince you that the charge was properly processed and that our final decision is supported by the available evidence.

Under these circumstances and in view of our limited resources, we do not believe that our further response to additional inquiries in this matter would serve any useful purpose.

We hope this information is helpful to you but regret there is nothing further the EEOC can do to assist you in this particular matter.

Nanisa S. Pereles
Enforcement Supervisor
US EEOC
Chicago District Office
500 W. Madison St.
Suite 2000
Chicago, IL 60661
312-869-8137

**100)  4/15/17:**  I sent emails complaints to Commissioner Feldblum, Inspector General, Ms. Julianne Bowman, the Director of the Chicago District Office, and several other EEOC officials requesting reconsideration of EEOC's dismissal of Charge No. 440-2016-00064:

 requesting for my case to be reopened and the right to sue letter rescinded due to errors in law and I stated I was unlawfully denied an opportunity to responded to the position statement from the Respondent to my amended charges prior to a final decision being made and or the EEOC did not request a position statement to my amended charges making clear errors in laws and these same laws were violated prior as to my case was reopened and the Right to Sue letter was rescinded for the same acts before pursuant Notice of Intent to Reconsider Letter on 9/7/16.

**101)  4/17/17:  Letter from EEOC Office of Programs-Martin Ebel- Director Field Management Programs, and Wesley Katahira in response to**:  Emails in Response to my Complaints dated 4/15/17 ( to reopen my case and rescind the right to sue letter for the same reasons as before errors in law refusing to request a response from the Respondent to my amended charges and deny my request for the position statement from the Respondent to my amended charges prejudicing my eeoc investigation.

"Pursuant to EEOC's procedural regulations, a charging party may request reconsideration of the dismissal of his charge to the director of the field office which dismissed it. The decision to reconsider a final finding rests with the office's director which issued the notice of right to sue. EEOC has no obligation to reconsider the final finding we have issued on a charge. EEOC directors, therefore, may deny a request to reconsider an EEOC final finding unless the charging party was presents substantial new and relevant evidence, or a persuasive argument EEOC's prior decision was contrary to law or the facts.

We not you sent both April 15th emails directly to Ms. Bowman.

Ms. Bowman will review your submission and advise you directly regarding her decision on your request.

**101a.** Julianne Bowman-Director of the EEOC Chicago District Office has never responded directly to my complaints, and or requests.

**102)** **5/9/17:** I filed written complaints of Disability Discrimination with the U.S. Department of Justice Civil Rights Division Disability Rights Section:

Att: Tom Wheeler, Rebecca Bond, Linda Garret    5/9/17

U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Civil Rights Division
Disability Rights Section- 142NYAV
Washington, D.C. 20530

**103)** **5/17/17:** **Letter Response From EEOC Office of Field Programs**-Martin S. Ebel, Director Field Management Programs and Wesley Katahira.

"This is in response to your email and letter, both dated 5/5/17, which you sent to Julianne Bowman, Director of the EEOC Chicago District Office, myself, and Wesley Katahira, an Attorney Advisor-Sr. Program Analyst on his staff:

I did not have the right to a administrative hearing as it is reserved for Federal employees. But they refused to address my complaints of the denying me the opportunity to respond to the position statement to my amended charges from the employer prior to a final decision is made and I was denied a request for a copy of the position statement ( these are clear errors in laws as stated by previous facts). for my amended charges specifically Disability of Alcoholism, Segregating my employment opportunities and the difference in treatment of similar situated probationary employees and difference in treatment to John Webb II-Treatment Plant Operator 1 who held the same position as I did and had a similar situation ( substance abuse problem) but was not terminated.

"This office will not respond to your request for reconsideration because, under EEOC's procedures, the Chicago District Office has previously denied it. See email from Nanisa Pereles, Enforcement Supervisor, Chicago District Office, to Shaka Freeman dated March 28, 2017, attached, as Attachment 1. For you information, while EEOC's procedural regulations provide charging parties an opportunity to seek reconsideration of the dismissal of their charges, EEOC has not obligation to reconsider the final finding we have issued on a charge. The decision to reconsider a final finding rests with the office's director which issued on a charge. The decision to reconsider a final finding rests with the office's director which issued the notice of right to sue. EEOC office directors, therefore may deny a request to reconsider an EEOC final finding unless the charging party presents substantial new and relevant evidence, or a persuasive argument EEOC's prior decision was contrary to law or the facts. The field office's consideration of a charging party's request for reconsideration is the last formal step in EEOC's process for a charging party to have the dismissal of his charge reviewed by the Agency."

"Because you requested reconsideration of the dismissal of your charge and the Chicago District Office denied you request, you have now exhausted all avenues of review within EEOC regarding the dismissal of your charge.

87

Indeed, our investigations are guided strictly by the weight and persuasiveness of the evidence. Our responsibility is to process the charges filed with us in a fair and objective manner to determine whether the laws we enforce have been violated.

Under our statutes, EEOC does not have the statutory authority to make the final determination as to whether discrimination occurred. Rather, Congress vested the federal courts with exclusive authority to make that determination and allowed charging parties to bring their own private lawsuits in federal court, even after EEOC dismisses their charges."

**104)    5/25/17:**    Response Letter from U.S. Department of Justice Civil Rights Division - Disability Rights Section:

"We have examined your request to review a determination made, or an investigation undertaken by another Federal or State agency. The Department does not serve as a reviewing authority for the decisions of other Federal or State agencies following their investigations of complaints about discrimination. Therefore, we are taking no further action with respect to your correspondence."

Professionally

*Shaka Freeman* 6/12/17

Shaka Freeman 6/5/17

88

 **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Chicago District Office**

500 W. Madison St., Suite 2000
Chicago, IL 60661
Fax: (312) 869-8220
Website: www.eeoc.gov

Shaka A. Freeman
1827 S. St. Louis
Chicago, IL 60623

RE:     Shaka A. Freeman v. Metropolitan Water Reclamation District of Greater Chicago
        EEOC Charge No.: 440-2016-00064 Amended

Dear Mr. Freeman:

This letter is to advise you that your charge has been dismissed and you have been issued a notice of right to sue. The enclosed document entitled "Dismissal and Notice of Rights" explains that, should you wish to pursue the matter in court, you must file suit within 90 days.

It is our judgment that the evidence gathered to date is unlikely to establish a violation of the statutes we enforce. Further, this evidence, given our limited resources, does not warrant a continued investigation.

An information sheet is enclosed which describes how you can obtain a copy of your EEOC file and how you can file a lawsuit, should you wish to pursue your claim in court.

If you have any questions and/or concerns, please do not hesitate to contact me.

                                        Sincerely,

_3/20/17_
Date                                    Jane Smith, Investigator
                                        Fax: (312) 869-8220
                                        E-mail: janel.smith@eeoc.gov

EEOC Form 161 (11/09)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To: **Shaka A. Freeman**<br>**1827 South St. Louis**<br>**Chicago, Illinois 60623** | From: **Chicago District Office**<br>**500 W. Madison St.**<br>**Suite 2000**<br>**Chicago, IL 60661** |

☐  *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)*

| EEOC Charge No. | EEOC Representative | Telephone No.: |
|---|---|---|
| **440-2016-00064 Amended** | **Janel Smith, Investigator** | **(312) 869-8136** |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☒  The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐  Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of **your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Julianne Bowman*  —  **3/20/17**

**Julianne Bowman, District Director**  (Date Mailed)

Enclosure(s)

cc:  **METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO**

C/O  **Joseph D. Cook, Senior Attorney**
**Employment Division/Law Department**
**Metropolitan Water Reclamation District of Greater Chicago**
**100 East Erie Street**
**Chicago, Illinois 60611**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Chicago District Office**

500 West Madison Street, Suite 2000
Chicago, IL 60661
PH: (312) 869-8000
TTY: (312) 869-8001
FILE REVIEWS FAX: (312) 869-8220        ENFORCEMENT FAX: (312) 869-8220
MEDIATION: (312) 869-8060               STATE & LOCAL FAX: (312) 869-8077
HEARINGS FAX: (312) 869-8125            LEGAL FAX: (312) 869-8124

# NOTICE OF DISCLOSURE RIGHTS

Parties to an EEOC charge are entitled to review and obtain copies of documents contained in their investigative file. Requests must be made in writing to **Sylvia Bustos** and either mailed to the address above, faxed to **(312) 869-8220** or sent via email to sylvia.bustos@eeoc.gov (please chose only one method, no duplicate requests). ***Be sure to include your name, address, phone number and EEOC charge number with your request***.

If you are the Charging Party and a RIGHT TO SUE has been issued, you may be granted access to your file:

\*        **Before filing a lawsuit, but within 90 days of your receipt of the Right to Sue, or**

\*        **After your lawsuit has been filed. If more than 90 days have elapsed since your receipt of the Right to Sue, include with your request a copy of the entire court complaint (with court stamped docket number) or enough pages to determine whether it was filed based on the EEOC charge.**

If you are the ***Respondent*** you may be granted access to the file ***only after*** a lawsuit has been filed. Include with your request a copy of the entire court complaint that includes an official court stamped docket number.

Pursuant to federal statutes, certain documents, such as those which reflect the agency's deliberative process, will not be disclosed to either party.

You must sign an Agreement of Nondisclosure **before** you are granted access to the file, which will be sent to you after receipt of your written request. (Statutes enforced by the EEOC prohibit the agency from making investigative information public.)

The process for access to the file will begin no later than ten (10) days following receipt of your request.

When the file becomes available for review, you will be contacted. You may review the file in our offices and/or request that a copy of the file be sent to you. Files may not be removed from the office.

Your file will be copied by **Aloha Print Group, 60 East Van Buren, Suite 1502, Chicago, IL 60605, (312) 542-1300.** You are responsible for the copying costs and must sign an agreement to pay these costs before the file will be sent to the copy service. Therefore, **it is recommended that you first review your file** to determine what documents, if any, you want copied. EEOC will not review your file or provide a count of the pages contained in it. If you choose not to review your file, it will be sent **in its entirety** to the copy service, **and you will be responsible for the cost.** Payment must be made directly to **Aloha Print Group**, which charges 15 cents per page.

(Revised 04/2

# FILING SUIT IN COURT OF COMPETENT JURISDICTION

**PRIVATE SUIT RIGHTS**

The issuance of this *Notice of Right to Sue* or *Dismissal and Notice of Rights* ends the EEOC process with respect to your Charge. You may file a lawsuit against the Respondent within 90 days from the date you receive this Notice. Therefore, you should keep a record of the date. Once the 90 day period is over, your right to sue is lost. If you intend to consult an attorney, you should do so as soon as possible. Furthermore, in order to avoid any question that you did not act in a timely manner, if you intend to sue on your own behalf, your suit should be filed well in advance of the expiration of the 90 day period.

You may file your lawsuit in a court of competent jurisdiction. Filing this Notice is not sufficient. A court complaint must contain a short Statement of the facts of your case which shows that you are entitled to relief. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the Respondent has its main office.

You may contact the EEOC if you have any questions about your rights, including advice on which court can hear your case, or if you need to inspect and copy information contained in the case file.

**IF THE FIRST THREE CHARACTERS OF YOUR EEOC CHARGE NUMBER ARE "21B" AND YOUR CHARGE WAS INVESTIGATED BY THE ILLINOIS DEPARTMENT OF HUMAN RIGHTS (IDHR), REQUEST FOR REVIEWING AND COPYING DOCUMENTS FROM YOUR FILE MUST BE DIRECTED TO IDHR.**

A lawsuit against a private employer is generally filed in the U.S. District Court.

A lawsuit under Title VII of the Civil Rights Act of 1964, as amended, against a State agency or a political subdivision of the State is also generally filed in the U.S. District Court.

However, a lawsuit under the Age Discrimination in Employment of the American with Disabilities Act or, probably, the Equal Pay Act against a State instrumentality (an agency directly funded and controlled by the State) can only be filed in a State court.

A lawsuit under the Age Discrimination in Employment Act or the American with Disabilities Act or the Equal Pay Act against a political subdivision of a State, such as municipalities and counties, may be filed in the U.S. District Court.

For a list of the U.S. District Courts, please see the reverse side.

**ATTORNEY REPRESENTATION**

If you cannot afford an attorney, or have been unable to obtain an attorney to represent you, the court having jurisdiction in your case may assist you in obtaining a lawyer. If you plan to ask the court to help you obtain a lawyer, you must make this request of the court in the form and manner it requires. Your request to the court should be made well in advance of the 90 day period mentioned above. A request for representation does not relieve you of the obligation to file a lawsuit within the 90-day period.

**DESTRUCTION OF FILE**

If you file suit, you or your attorney should forward a copy of your court complaint to this office. Your file will then be preserved. Unless you have notified us that you have filed suit, your Charge file could be destroyed as early as six months after the date of the Notice of Right to Sue.

**IF YOU FILE SUIT, YOU OR YOUR ATTORNEY SHOULD NOTIFY THIS OFFICE WHEN THE LAWSUIT IS RESOLVED.**

# INFORMATION ON WHERE TO FILE SUIT

You have been notified of your right to sue in Federal District Court. Suit is ordinarily filed in the District having jurisdiction of the county in which the employer, against whom you filed a Charge of employment discrimination, is located. The telephone number listed for each District is that of the Clerk of the Court.

| U.S. DISTRICT COURT | | U.S. DISTRICT COURT | |
|---|---|---|---|
| Northern District of Illinois | | Central District of Illinois | |
| **Eastern Division at Chicago** | | **Urbana Division** | |
| 219 South Dearborn Street | | 201 South Vine | |
| Chicago, IL 60604 | | Urbana, IL 61801 | |
| 312-435-5670 | | 217-373-5830 | |
| **Counties** | | **Counties** | |
| Cook | Kendall | Champaign | Kankakee |
| DuPage | Lake | Coles | Macon |
| Grundy | LaSalle | Douglas | Moultrie |
| Kane | Will | Edgar | Piatt |
| | | Ford | Vermillion |
| | | Iroquois | |
| U.S. DISTRICT COURT | | **Peoria Division** | |
| Northern District of Illinois | | | |
| **Western Division at Rockford** | | 100 N.E. Monroe Street | |
| 211 South Court Street | | 135 Federal Building | |
| Federal Building | | Peoria, IL 61602 | |
| Rockford, IL 61101 | | 309-671-7117 | |
| 815-987-4355 | | | |
| **Counties** | | **Counties** | |
| Boone | McHenry | Bureau | McLean |
| Carroll | Ogle | Fulton | Peoria |
| DeKalb | Stephenson | Hancock | Putnam |
| JoDaviess | Whiteside | Knox | Stark |
| Lee | Winnebago | Livingston | Tazewell |
| | | Marshall | Woodford |
| | | McDonough | |
| U.S. DISTRICT COURT | | **Rock Island Division** | |
| **Southern District of Illinois** | | 211 19th Street | |
| 750 Missouri Avenue | | Rock Island, IL 61201 | |
| East St. Louis, IL 62201 | | 309-793-5778 | |
| 618-482-0671 | | | |
| *and* | | | |
| 301 Main Street | | | |
| Benton, IL 62812 | | | |
| 618-438-0671 | | | |
| **Counties** | | **Counties** | |
| Alexander | Johnson | Henderson | Rock Island |
| Bond | Lawrence | Henry | Warren |
| Calhoun | Madison | Mercer | |
| Clark | Marion | **Springfield Division** | |
| Clinton | Monroe | 600 East Monroe Street | |
| Crawford | Perry | Springfield, IL 62701 | |
| Cumberland | Pope | 217-492-4020 | |
| Edwards | Pulaski | | |
| Effingham | Randolph | **Counties** | |
| Fayette | Richland | Adams | Logan |
| Franklin | St. Clair | Brown | Macoupin |
| Gallatin | Saline | Cass | Mason |
| Hamilton | Union | Christian | Menard |
| Hardin | Wabash | DeWitt | Montgomery |
| Jackson | Washington | Green | Morgan |
| Jasper | Wayne | Pike | Schuyler |
| Jefferson | White | Shelby | |
| Jersey | Williamson | | |