**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SHAKA FREEMAN, | |
| Plaintiff, | |
| v. | Case No. 17 C 4409 |
| METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO, | Judge Harry D. Leinenweber |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Shaka Freeman brings this action against his former employer, Defendant Metropolitan Water Reclamation District of Chicago ("MWRDC" or the "District") alleging violations of the Americans with Disabilities Act ("ADA" or the "Act"), 42 U.S.C. §§ 12101 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d. At the center of this case is MWRDC's decision to terminate Freeman's probationary employment in response to the suspension of Freeman's driver's license. MWRDC moved for summary judgment and Freeman cross moved for partial summary judgment. For the reasons stated herein, Plaintiff Freeman's Motion for Partial Summary Judgment (Dkt. No. 165) is denied. Defendant Metropolitan Water Reclamation District of Chicago's Motion for Summary Judgment (Dkt. No. 159) is granted as to Counts III, IV and V and denied as to Count II.

## I. BACKGROUND

The Court draws the following facts from the supporting memoranda, statements of material facts, and underlying evidentiary materials filed by the Parties in accordance with Northern District of Illinois Local Rule 56.1. Local Rule 56.1 was implemented "to make summary-judgment decisionmaking manageable for courts." *Kreg Therapeutics, Inc. v. VitalGo, Inc.,* 919 F.3d 405, 415 (7th Cir. 2019). The Parties' submissions failed to do that here. Both Freeman and MWRDC submitted conclusory facts and injected interpretation and analysis into their Local Rule 56.1 statements. As a result, the responses from both Parties were largely one side objecting to the other's factual spin. These submissions offered little in the way of clearly undisputed facts. As a result, the Court cites to the underlying record and relies on those documents in its recitation of facts.

### A. Freeman's Employment with MWRDC

MWRDC is "the wastewater treatment and stormwater management agency for the City of Chicago and 128 suburban communities throughout Cook County." Water Reclamation Plants, *https://mwrd.org/water-reclamation-plants* (last visited 9/15/21). All stormwater and wastewater from homes and businesses in MWRDC's 882.1 square-mile service area flow through local sewers and into one of seven water reclamation plants in Chicago and the surrounding suburbs. *Id.* MWRDC's Stickney Water Reclamation Plant

- 2 -

(the "Stickney Plant") is one of the largest wastewater treatment facilities in the world, spanning 413 acres. Stickney Water Reclamation Plant Fact Sheet at 1, *https://mwrd.org/sites/default/files/documents/FactSheet_WRPs_Stickney_201219%20%281%29.pdf* (last visited 9/15/21). The Stickney Plant serves 230 million people within Cook County and cleans nearly 700 million gallons of water per day. *Id.*

Freeman holds a Class Three Wastewater Treatment Operator Certificate in the State of Illinois. (Def.'s Resp. to Pl.'s Stmt. of Facts ("DSOF") ¶ 28, Dkt. No. 171.) On May 13, 2015, Freeman began working for MWRDC as a Treatment Plant Operator I ("TPO I") on the midnight shift at the Stickney Plant. (Pl.'s Resp. to Def.'s Stmt. of Facts ("PSOF") ¶ 1, Dkt. No. 166-1.) When his employment began in May 2015, Freeman was on probationary status. (*Id.* ¶ 4.) During his probationary period Freeman could be terminated at any time by the Executive Director of MWRDC. (Employee Handbook at 2-2, Kosowski Rule 30(b)(6) Dep., Ex. 3, Def.'s Stmt. Facts, Ex. I, Dkt. No. 160-10.) Probationary termination decisions are final and not subject to review. (*Id.* at 2-3.) After successful completion of 250 workdays, or approximately one calendar year, probationary employees are eligible for civil service status. (*Id.* at 2-2.) Employees that achieve Civil Service status "can only be discharged for cause by the Civil Service Board." (*Id.* at 2-3.)

Civil Service status only attaches to a particular role. Consequently, employees must undergo a probationary period each time they take on a new role, including promotions. (Korcal Dep. 56:16–57:9, Def.'s Stmt. of Facts, Ex. P, Dkt. No. 160-17.) Once an employee achieves Civil Service status in a particular job title, they retain that status for the remainder of their employment with the District. (*Id.*) Consequently, if the District terminates the employment of a Civil Service employee completing their probationary period in a new role, that employee is not terminated from District entirely. (*Id.*) Instead, the employee is returned to their previously held Civil Service position. (*Id.*)

As a TPO I, Freeman was responsible for "control[ing] and coordinat[ing] the routine sewage treatment process operation" at the Stickney Plant. (TPO I Job Description at 1, Def.'s Stmt. of Facts, Ex. B, Dkt. No. 160-3.) The TPO I job description lists the position's essential functions including, coordinating the wastewater treatment process, touring the facility, conducting firsthand inspection of operating equipment, overseeing the collection of process samples, and reacting in a timely and efficient manner to emergency conditions. (*Id.*) The TPO I job description also lists desirable knowledge and skills including knowledge of the operating equipment used in the sewage treatment process and the ability to do heavy manual labor. (*Id.* at 1–2.) One specific job of the TPO I on midnights was the collection of

11 to 12 composite samples from around the Stickney Plant. (PSOF ¶ 27.) The composite samples were collected in 2.5 gallon or 5-gallon jugs. (*Id.*) All samples needed to be collected and checked into the Stickney Plant's lab by midnight. (*Id.*) From May 2015 to until his license suspension in August 2015, Freeman collected the composite samples using an MWRDC vehicle. (*Id.*)

The TPO I job description does not reference a driver's license as necessary or preferred. (TPO I Job Description at 1–2.) Dev Rijal, a former TPO I at the Stickney Plant, testified that he viewed operating a motor vehicle as necessary for some of the listed essential duties, including the collection and processing of samples, touring the Stickney Plant, inspecting equipment, and responding to emergency conditions. (Rijal Dep. 22:16–23:4, Def.'s Stmt. of Facts, Ex. J, Dkt. No. 160-11.) According to Rijal, he never observed a TPO I complete their job only on foot or by using a bicycle. (*Id.* 29:1–10.) Freeman, however, testified that the use of a vehicle was a convenience, not a necessity. (Freeman Dep. 30:15–31:5, Def.'s Stmt. of Facts, Ex. L, Dkt. No. 160-13.) Freeman explained that when he worked at the Stickney Plant he spent the majority of his shift on foot, walking to various areas of the Stickney Plant. (*Id.* 15:23–16:2, 46:18–20.)

When employed at the Stickney Plant, Freeman's midnight shift began at 10:30 p.m. (PSOF ¶ 27.) In addition to a TPO I, the

Stickney Plant midnight shift was staffed with at least one Treatment Plant Operator II ("TPO II") and one general laborer. (Stinson Dep. 8:19-21, Def.'s Stmt. of Facts, Ex. M, Dkt. No. 160-14.) The midnight crew reported to Derrick Stinson and Paul Donnelly, the Treatment Plant Operator IIIs ("TPO III") on that shift.(Cummings Dep. 24: 3-19, Def.'s Stmt. of Facts, Ex. M, Dkt. No. 160-14.)

On July 26, 2015 Freeman received his three-month probationary progress report. (Freeman 3-Month Progress Report, Pl.'s Stmt. of Facts, Ex. 11, Dkt. No. 164-12.) Freeman received a score of "Meets Standards" for all of the evaluation's listed under "Behaviors/Competencies." (*Id.*) Freeman's overall evaluation was also "Meets Standards." (*Id.*) The evaluation was signed by Freeman and one of his immediate supervisors, Donnelly. (*Id.*)

### B. Freeman's DUI & Treatment

On July 11, 2015, Freeman was arrested and charged with driving under the influence of alcohol ("DUI"). (DSOF ¶ 1.) Sometime after his arrest, Freeman enrolled in the MWRDC Employee Assistance Program ("EAP"). (*Id.* ¶ 2.) On July 30, 2015, Freeman met with Michelle Williams, the licensed a clinical social worker to whom he was referred by the EAP. (EAP Case Notes at 1, Pl.'s Stmt. of Facts, Ex. 2, Dkt. No. 164-3.) Williams characterized Freeman's "[r]eported problem" as "Alcohol DUI and Court Concerns." (*Id.*) During their first meeting, Williams referred

Freeman to Alcoholics Anonymous ("AA") and alcohol treatment facilities. (*Id.*) Freeman met with Williams for a second time on August 13, 2015. (*Id.*) During this meeting, Williams again provided Freeman with "resources for Chicago land [*sic*] AA meetings." (Id.)

On August 18, 2015, Freeman met with Williams again. (*Id.*) The notes from that meeting indicate that the session "focused on [patient] denial of alcohol problems, even with 3 DUIs. [Patient] resistant to alcohol education." (*Id.*) The notes also state that Freeman intended to discontinue his work with Williams, and that "[patient] states he will call for future if needed." (*Id.*) Freeman confirmed that he stopped meeting with his counselor after August 18, 2015. (Freeman Dep. 127:6–9.)

### C. Freeman's Disclosure of the DUI and MWRDC's Response

On August 18, 2015, Freeman met with his supervisors, Stinson and Donnelly, and disclosed his DUI arrest. (DSOF ¶ 7.) During this meeting, Freeman informed Stinson and Donnelly that his driver's license would be suspended for six months as of 12:01 a.m. on August 26, 2015. (*Id.;* Email from Roxanne Bonner to Reed Dring, *et al.* (Sept. 4, 2015) ("Bonner Email") at 3, Def.'s Stmt. of Facts, Ex. D, Dkt. No. 160-5.) Freeman further explained that he was eligible to receive and would be applying for Illinois' Monitoring Device Driving Permit ("Monitoring Permit") and the Employment Exemption. (DSOF ¶ 7.) The Monitoring Permit would allow Freeman to operate his personal vehicle with the installation of

a Breath Alcohol Ignition Interlock Device ("Breathalyzer Device"). (PSOF ¶ 10.) The Monitoring Permit could not, however, be issued immediately. (*Id.*) Instead Freeman had to serve a mandatory 30-day driver's license suspension, beginning on August 26, 2015. (*Id.*) The Employment Exemption is a designation on the Monitoring Permit. (*Id.* ¶ 11.) If granted, the Employment Exemption would allow Freeman to operate employer-owned vehicles without a Breathalyzer Device during work hours. (*Id.*) Freeman could only obtain the Employment Exemption with sign-off from MWRDC. (*Id.*)

The parties agreed that during the August 18 meeting, Stinson referred Freeman to the EAP. (DSOF ¶ 8.) As testified to by Freeman, Freeman then informed Stinson that he had already self-enrolled in the EAP and was getting counseling for his alcohol use disorder ("AUD"). (Freeman Dep. 91:16–21.) According to Freeman, Stinson responded that Freeman should keep the information about his counseling and AUD to himself. (*Id.* 91:22–92:7.) Freeman further testified that Stinson assured him that other District employees had experienced similar problems and did not lose their jobs. (*Id.* 96:22–97:1.) Stinson, however, testified that he did not recall Freeman telling him that he had enrolled in the EAP related to problems with alcohol. (Stinson Dep. 31: 8–12.)

Stinson sent an email summary of the meeting to his direct supervisor, Principal Engineer Joe Cummings, and Cummings'

supervisor, Operations Manager Reed Dring. (DSOF ¶ 9.) Stinson reported Freeman's intention to apply for the Monitoring Permit and the Employment Exemption, and sought clarification regarding whether Freeman could operate MWRDC's John Deere Gators ("Gators") and golf carts while his license was suspended. (*Id.*) As set forth in the email correspondence, Cummings responded by stating that once Freeman's license was suspended, he would "not be permitted to drive any motorized vehicle on plant grounds, including [golf] carts & Gators." (Bonner Email at 2–3.)

In his response to Stinson's email, Cummings also included TPO IIIs from the day and afternoon shifts at the Stickney Plant. (*Id.*) Later that same day, two of those TPO IIIs, Charles Svazas and Anthony Venuso, emailed Cummings to express concerns about Freeman's ability to fulfill his duties without a valid driver's license. (Email from Brian Deitz to Roxanne Bonner (Aug. 20, 2015) ("Deitz Email") at 1–2, Pl.'s Stmt. of Facts, Ex. 6 Dkt. No. 164-7.) Because treatment plant operators often work double shifts, Svazas and Venuso were concerned about the "the liability of working with [a TPO I without a driver's license] if [they] were working a double on midnights." (*Id.*) The email lists a series of tasks that Freeman may be unable to perform, including delivering the composite samples by midnight, resetting equipment, performing odor surveys, and investigating flood calls. (*Id.*) Cummings forwarded these concerns to Dring and Brian Deitz from the MWRDC

Human Resources Department and stated that if Freeman installs a Breathalyzer Device he can drive his own vehicle around the Stickney Plant. (*Id.* at 1.) If the Breathalyzer Device is not installed, however, Cummings stated that "it is doubtful that [Freeman] will be able to fulfill his job requirements and we should not be assigning someone else to pick up the slack." (*Id.*) Deitz forwarded the email to Roxanne Bonner, a colleague in the Human Resources Department, with an "FYI." (*Id.*)

On August 24, 2015, two days before Freeman's suspension went into effect, Cummings reminded MWRDC personnel that Freeman would not be permitted to drive any motorized vehicle on plant grounds. (Bonner Email at 2.) He further stated that Freeman is "responsible for doing all of his normal duties and no accommodation will be made whereby his duties are shifted to another staff member." (*Id.*) Deitz forwarded this email to only Cummings, Dring, and Bonner and reminded Cummings that the paperwork related to the Employment Exemption should be submitted to Human Resources for completion and not completed by the frontline supervisors. (Deitz Email at 3.) Bonner responded and added that while a driver's license is not an "absolute requirement" it is "convenient for a TPO [I] to get around the plant using a District vehicle." (*Id.*) Bonner then forwarded the entire email chain to the MWRDC Human Resources Director Denice Korcal and stated that she is "concerned about this situation." (*Id.*) Bonner's concern focused on Freeman's

ability to collect the composite samples in a timely manner and that Freeman may not be able to quickly respond to flooding. (*Id.*) She further explained that "last year we terminated an employee from an ET4 job down to an ET3 because he could not drive and inspect construction sites." (*Id.*) Korcal responded "Terminate." (*Id.*)

On August 26, 2015, Dring met with Freeman. (Bonner Email at 1.) During that meeting, Freeman again reported that he is eligible for the Monitoring Permit following a statutory summary suspension of his license for 30 days. (*Id.*) According to Dring, during this meeting Freeman stated that the DUI was the result of a "lapse in judgment." (*Id.*) Freeman also informed Dring that he purchased a bicycle and wheeled cooler to get around the plant and collect all necessary samples. (*Id.*) According to Dring, a bicycle would be "allowed in the plant . . . a couple of people brought their own bike to work." (*Id.*) Dring identified that there might an issue with the collection of the "WS sample, but it seems the midnight crew can work around this until he obtains the 'employer exemption.'" (*Id.*) Bonner forwarded this email to Korcal. (Deitz Email at 5.) In response Korcal questioned, "Why are we treating him differently than other employees?" (*Id.*)

### D. Freeman Continues Working During His License Suspension

Following his license suspension Freeman used a bicycle to traverse the Stickney Plant and carry out his duties. (Stinson Dep. 20:17–20.) Stinson testified that during the period Freeman used his bicycle he failed to deliver the composite samples to the lab before midnight on at least one occasion. (*Id.* 20:17–21:11.) Thereafter, Freeman's supervisors assigned other crew members to drive Freeman around the plant to collect the composite samples and deliver them to the lab. (DSOF ¶ 18.) This responsibility typically fell to the TPO II on duty during the midnight shift. (Deitz Email at 25.) Freeman testified that this assistance accounted for thirty minutes of an eight-hour shift and he performed the remainder of his duties on his own. (Freeman Dep. 79:1–6, 114:3–10.)

### E. Freeman's Termination

According to the District, termination typically occurs based on a recommendation from the Human Resources Department with input from the employee's department head and the supervisory chain of command. (Kosowski Rule 30(b)(6) Dep. 72:7–73:5, Def.'s Stmt. of Facts, Ex. I, Dkt. No. 160-10.) On Friday, September 4, 2015, Bonner reported that "the HR Department recommends the termination of Mr. Freeman due to his inability to carry out his full range of duties while on probation." (Bonner Email at 1.) Cummings testified that he was not consulted regarding Freeman's termination. (Cummings Dep. 46:3–9.) Stinson also testified that he did not

have any issues with Freeman's performance and did not know about his termination before it happened. (Stinson 35:8–15.)

In a memorandum dated September 9, 2015, Manju Sharma, MWRDC Director of Maintenance and Operations, recommended to MWRDC Executive Director St. Pierre that Freeman be terminated. (Termination Mem., Pl.'s Stmt. of Facts, Ex. 14, Dkt. No. 164-15.) According to the memo the "vast scale of the [Stickney plant] requires the TPO Is to traverse long distances throughout the shift . . . thereby making the ability to drive a de facto requirement for satisfactory performance of the job." (*Id.* at 1.) The memorandum further states that MWRDC will not approve Freeman's request for the Employment Exemption because "given the nature of the offense allowing him to drive an unmonitored District vehicle would expose the District to unacceptable liability." (*Id.*) At some point thereafter, St, Pierre approved Freeman's termination. In a letter dated September 18, 2015, MWRDC informed Freeman that his services "have not been satisfactory" and it had been recommended that his probationary period as a TPO I be terminated. (Letter from David St. Pierre to Shaka Freeman (Sept. 18, 2015) ("9/18/15 Ltr.") at 1, Def.'s Stmt. of Facts, Ex. C, Dkt. No. 160-4.) Freeman's employment with MWRDC was terminated effective close of business that same day. (*Id.*)

In a second letter dated September 25, 2015, MWRDC further stated that Freeman's DUI and loss of license had impacted his

ability to perform the duties of his job. (Letter from Denice Korcal to Shaka Freeman (Sept. 25, 2015) ("9/25/15 Ltr.") at 1, Def.'s Stmt. of Facts, Ex. A, Dkt. No. 160-2.) Specifically, MWRDC stated that some of the TPO I duties require driving a vehicle, including "delivery of samples to the laboratory, resetting process equipment, adjusting the West Side Relief Gates, responding to odor complaints by conducting an odor survey both in the plant and at the location of the complaint, making rounds of the plant, and conducting process control analysis of battery and/or outfall ammonia." (*Id.*) MWRDC recognized that Freeman purchased a bike in order to carry out his duties but reported that he "still required assistance . . . from other employees" given the large size of the Stickney Plant. (*Id.*) The letter also acknowledged Freeman's request that MWRDC complete Employment Exemption paperwork, which would allow him to drive employer-owned vehicles during his shift. (*Id.* at 1–2.) MWRDC again explained that it declined to do so because following Freeman's DUI conviction, "permitting [him] to drive an unmonitored District vehicle would expose the District to unacceptable liability." (*Id.* at 2.)

### F. Post-Termination

Illinois restored Freeman's driving privileges as of October 2, 2015. (Sec. of State Notice, Pl.'s Stmt. of Facts, Ex. 17, Dkt. No. 164-18.) Freeman was also granted the Monitoring

Permit, which was conditioned on the installation of a Breathalyzer Device. (Monitoring Permit, Pl.'s Stmt. of Facts, Ex. 20, Dkt. No. 164-21.) Freeman testified that he did not install a Breathalyzer Device. (Freeman Dep. 176:9-23.) He explained that he understood that the State of Illinois restored his driving privileges even without the installation of the Breathalyzer Device. (*Id.*) In March 2016 Freeman pled guilty to the July 2015 DUI and his license was revoked. (PSOF ¶ 23.) As of September 23, 2020, Freeman's driving privileges had not been restored. (Freeman Dep. 158:22-159:13.)

Freeman resumed treatment with his EAP Counselor in February 2016. (EAP Case Notes at 2.) Counselor Williams' notes from February 18, 2016, explain that during that session Freeman admitted to problems with alcohol and that he reported being sober for 80 days. (*Id.*) Later in 2016, Freeman received in-patient treatment for alcohol and other drug abuse ("AODA") through the Gateway Foundation. (Gateway Foundation Records, PSOF, Ex. 19, Dkt. No. 164-20.) Freeman was discharged from his in-patient treatment on June 30, 2016. (*Id.* at 5.)

Since his termination from MWRDC, Freeman has not held another position in the wastewater industry. (Freeman Dep. 150:21-151:1.) Freeman testified that he has struggled to find steady employment and has only worked in short term positions. (*Id.* 148:3-149:4.) As of September 2020, Freeman's most recent position was a QA

- 15 -

technician for Ferrara Candy. (*Id.* 153:7–15.) He held that position from September 2019 through February 2020. (*Id.* 154:5–9.)

### G. Procedural Posture

Freeman filed this action in June 2017. (Dkt. No. 1.) Five sprawling complaints later, the Court dismissed the action with prejudice in November 2018. (Dkt. No. 111.) On appeal, the Seventh Circuit vacated the Court's dismissal in part and remanded for further proceedings. *Freeman v. Metro. Water Reclamation Dist. Of Greater Chicago,* 927 F.3d 961, 965–66 (7th Cir. 2019). On remand, the Court granted Freeman leave to file a Fifth Amended Complaint. (Dkt. No. 137.) Freeman filed the Fifth Amended Complaint on October 15, 2019. (Dkt. No. 138.) The Fifth Amended Complaint asserts four claims against the District. The claims omit Count I and are labeled Counts II–V. Count II alleges MWRDC discriminated against Freeman on this basis of his disability, in violation of 42 U.S.C. § 12112(a). Count III alleges MWRDC failed to provide Freeman with a reasonable accommodation for his disability, in violation of 42 U.S.C. § 12112(a). Count IV alleges that Freeman's termination was retaliation for requesting an accommodation under the ADA, in violation of 42 U.S.C. § 12203(a). Count V alleges that MWRDC discriminated against Freeman on the basis of race, in violation of 42 U.S.C. § 2000e-2(a)(2).

On February 26, 2021, MWRDC moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 159.) On

April 3, 2021, Freeman filed a cross motion for partial summary judgment pursuant to Rule 56. (Dkt. No. 165.) Freeman moves as to three issues: (1) whether Freeman was disabled under the ADA; (2) whether MWRDC was aware of Freeman's disability; and (3) MWRDC accommodated Freeman then withdrew the accommodation in violation of the ADA. The Court now decides both motions.

## II. <u>LEGAL STANDARD</u>

Summary judgment is appropriate if there is "no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" when identified by substantive law as affecting the outcome of the suit. *Bunn v. Khoury Enters., Inc.,* 753 F.3d 676, 681 (7th Cir. 2014). An issue is genuine when the evidence presented is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 681–82. When reviewing the record on a summary judgment motion, the Court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris,* 550 U.S. 372, 378 (2007). If, however, the factual record cannot support a rational trier of fact to find for the non-moving party, summary judgment is appropriate. *Bunn,* 753 F.3d at 682. On cross-motions for summary judgment, "[t]he ordinary standards for summary judgment remain unchanged" and the Court construes "all facts and inferences arising from them in favor of

the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.,* 855 F.3d 793, 797 (7th Cir. 2017).

### III. <u>DISCUSSION</u>

### A. The Americans with Disabilities Act

Freeman argues that MWRDC violated the ADA by failing to provide him with reasonable accommodations for his alcohol use disorder and subsequently terminating his probationary employment. A threshold question for each of Freeman's claims is whether he is a "qualified individual with a disability" and thus protected by the ADA. 42 U.S.C. § 12112(a). The Court first addresses whether the ADA applies to Freeman, and then reviews the summary judgment motions applicable to each of the three ADA counts in Freeman's Fifth Amended Complaint.

For the reasons set forth below, Freeman's Motion for Partial Summary Judgment is denied. The District's Motion for Summary Judgment is granted as to Counts III and IV and denied as to Count II.

### *1. Applicability of the ADA*

The ADA prohibits an employer from discriminating against a "qualified individual with a disability" on this basis of that disability. 42 U.S.C. § 12112(a). To succeed on his ADA claims, Freeman must first demonstrate that he falls within the definitions of "disability" and "qualified individual" set out in the Act. For the reasons set forth below, issues of material fact exist as to

whether Freeman falls within the scope of either definition. Summary judgment is therefore not appropriate on either of these grounds.

### a. Disability

Under the ADA "disability" is defined in three ways: "[1] a physical or mental impairment that substantially limits one or more major life activities of such individual; [2] a record of such an impairment; or [3] being regarded as having such an impairment." 42 U.S.C. § 12102(1). Freeman has moved for summary judgment on the issue of whether he falls within ADA's definition of disability. As a result, the Court's analysis of this issue takes the facts in the light most favorable to MWRDC. For the reasons set forth below, Freeman's motion is denied.

For Freeman to fall under the first two prongs of the ADA's definition of "disability," he must first present evidence that he has a physical or mental impairment or a record of such impairment. Freeman's records from the Gateway Foundation evidence that in 2016 he was diagnosed with and sought treatment for alcohol abuse. Alcohol abuse constitutes a mental impairment that may be protected by the ADA. *Ames v. Home Depot U.S.A., Inc.,* 629 F.3d 665, 670 (7th Cir. 2011). While the first record of Freeman's AUD diagnosis post-dates the at-issue conduct, the notes from Freeman's counseling sessions in 2015 indicate that the onset of his AUD predates even his July 11, 2015 DUI. Counselor Williams' proposed

treatment plan, based on Freeman's first session, included alcohol counseling and Freeman attending AA. Later Counselor Williams noted that Freeman is in "denial of alcohol problem." (EAP Notes at 1.) The Court thus concludes that there is sufficient evidence in the record to find that Freeman suffered from an impairment of AUD in July 2015.

An AUD diagnosis is not the end of the analysis with respect to the first two definitions of "disability" under the ADA. Freeman must further show that his impairment "substantially limits one or more major life activities." 42 U.S.C. § 12102(1). A major life activity includes, but is not limited to, "seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). Freeman argues that his AUD caused him to lose his driver's license. His inability to drive has in turn substantially limited his ability to work, a major life activity. *Id.*; *see also Winsley v. Cook Cty.,* 563 F.3d 598, 604 (7th Cir. 2009) (holding that the inability to drive "could create a disability if it caused an impairment of a major life activity"). In response, MWRDC argues that Freeman's inability to drive is a consequence of his DUI and thus any limitation on his ability to work is not caused by his AUD. The Court agrees with MWRDC.

Freeman urges the Court to accept the following causal chain between his AUD and license suspension: AUD caused Freeman to drive while intoxicated, his citation for driving while intoxicated caused his license to be suspended, his license suspension resulted in his need for accommodations to continue working, and instead of the District making those accommodations, it terminated Freeman. The Seventh Circuit has, however, already rejected this tenuous causal chain. *Despears v. Milwaukee,* 63 F.3d 635, 636 (7th Cir. 1995). Driving while intoxicated is not synonymous with an AUD diagnosis. *Id.* As recognized in *Despears,* "alcoholics *are* capable of avoiding driving drunk." *Id.* (emphasis in original). Consequently, it was Freeman's choice to drive while intoxicated that caused him to lose his license, not any compulsion resulting from his AUD. *Id.* As a result, Freeman's major life activity of working was impaired by the consequences of his decision to drive while intoxicated, not his AUD. For this reason, Freeman's ADA claims cannot proceed under prongs 1 and 2 of the Act's definition of "disability."

The third definition of "disability" protects a different set of individuals, those who have been "regarded as" having an impairment. 42 U.S.C. § 12102(1). Freeman is "regarded as" having a disability if he "establishes that he . . . has been subjected to an action prohibited [by the ADA] because of an actual or perceived physical or mental impairment whether or not the

impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3). Freeman argues that MWRDC's refusal to grant him the Employment Exemption or allow him to drive golf carts and Gators while his license was suspended demonstrates that the District regarded him as having a problem with alcohol so severe he was unfit to operate a motor vehicle without a Breathalyzer Device. In response MWRDC argues that its decision to restrict Freeman's driving on MWRDC property was based on his license status and not a belief that he had a problem with alcohol.

The question for the Court is whether there is an issue of material fact as to whether MWRDC perceived Freeman to have an alcohol-related impairment. An immediate consequence of Freeman's DUI charge was a six-month suspension of his license. MWRDC rejected two separate solutions to the issues posed by Freeman's suspended license: (1) allowing him to operate golf carts and Gators (which do not require a driver's license when operated on private property, *see* 625 ILCS 5/11-1426.1(b-5) (requiring a valid driver's license to operate golf carts and Gators on streets, highways, or roadways)) and (2) granting him the Employment Exemption which would allow him to drive District-owned vehicles during work hours. MWRDC's stated reason for these denials was that based on "the nature of the offense allowing [Freeman] to drive an unmonitored District vehicle would expose the District to unacceptable liability." (Termination Mem. at 1.) Instead MWRDC

stated that Freeman could operate his own vehicle on MWRDC property, provided a Breathalyzer Device was installed. This solution, however, could not be implemented until Freeman served the required 30-day suspension, after which time he could be granted the Monitoring Permit and install the Breathalyzer Device.

By its own statement, MWRDC's concern about liability exposure is rooted in the nature of the offense: driving while intoxicated. Specifically, that Freeman might operate a District-owned vehicle while under the influence. The record is not clear, however, whether this liability concern applied to all MWRDC employees that faced a DUI-related license suspension or if there was a specific perception that Freeman's problem with alcohol was likely to impair his ability to drive absent the Breathalyzer Device. For example, when Bonner informed Human Resources Director Korcal of Freeman's situation and expressed concern about his ability to do his job, Korcal immediately recommended termination, Later Korcal questioned why MWRDC was "treating [Freeman] differently than other employees" by attempting to find workarounds for his license suspension. (Deitz Email at 5). These responses from Korcal suggest that termination under these circumstances was a routine practice.

Freeman, however, was given a different impression. Freeman testified that Stinson assured him that his job was not in jeopardy. In addition, none of the conversations with Stinson,

Donnelly, Cummings, or Dring even suggest termination as a possible solution for Freeman's current situation. Instead, Freeman's immediate supervisors implemented temporary solutions to avoid any disruptions on the midnight shift during Freeman's 30-day license suspension. The record also includes evidence of seventeen other MWRDC employees who were disciplined in connection with a driver's license suspension. (Discipline Chart, Pl.'s Stmt. of Facts, Ex. 13, Dkt. No. 164-14.) The limited data presented regarding the District's treatment of these employees reflects that some were granted Employment Exemptions in connection with their Monitoring Permit, while others were not. (*Id.*) These facts suggest that termination was not the District's standard practice for alcohol-related driver's license suspensions.

Based on the current record, there is a question of fact whether MWRDC's treatment of Freeman was consistent with similar alcohol-related license suspensions or based on a perception that Freeman suffered from a serious alcohol-related impairment. Consequently, there is an issue of material fact as to whether MWRDC regarded Freeman as having an alcohol-related impairment, thus placing him within the scope of the "regarded as" definition of "disability" under the ADA. *See EEOC v. Staffmark Inv. LLC,* 67 F.Supp.3d 885, 895 (N.D. Ill. 2014) (finding factual dispute as to whether an employer regarded an employee as having a disability). Freeman's Motion for Summary Judgment on the issue of whether he

is disabled under the ADA is therefore denied. Further proceedings on this matter may, however, focus only on the third prong of the ADA's definition of "disability."

### b. Qualified Individual

Having concluded that there remains a genuine issue of material fact on the issue of whether Freeman meets the third definition of disability under the ADA, the Court turns to whether Freeman is a "qualified individual." The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). To determine whether Freeman falls within this definition the Court undertakes a two-part test. First, the Court considers whether Freeman satisfies the prerequisites for the TPO I position, including "educational background, employment experience, particular skills and licenses." *Rodrigo v. Carle Found. Hosp.,* 879 F.3d 236, 241-42 (7th Cir. 2018) If Freeman satisfies the first prong, the Court will "turn to the question of whether [Freeman] can perform the essential functions of the job with or without reasonable accommodation." *Id.* at 242. It is undisputed that Freeman holds a Class Three Wastewater Treatment Operator certification and satisfies the prerequisites for the TPO I position.

In order to make a determination regarding the second prong, the Court first identifies the essential functions of the TPO I position. *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285 (7th Cir. 2015). Once identified, the Court reviews whether Freeman can perform those essential functions with or without an accommodation. *Id.* at 286. The parties dispute whether driving a motor vehicle is an essential function of the TPO I position. MWRDC argues that driving is an essential function that Freeman is unable to do without a valid driver's license. Freeman argues that driving a motor vehicle is not an essential function, and therefore even without a driver's license he is able to perform the essential functions of the TPO I job.

To determine whether something is an essential function, the ADA instructs that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description . . . this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). This deference to the employer's judgment is an important factor, but it is not dispositive. *Bilinsky v. Am. Airlines, Inc.,* 928 F.3d 565, 570 (7th Cir. 2019). The Court will also consider the amount of time spent on the task, the consequences of the task not being performed, and the employer's actual practices in the workplace. *Id.; Shell v. Smith,* 789 F.3d 715, 718 (7th Cir. 2015).

In this case, the job description does not list a driver's license as a requirement for the TPO I position. The pertinent question is one step further removed: whether the essential functions listed are able to be completed absent a license. The essential functions of the TPO I position are: collection of samples and timely delivery to the laboratory, resetting process equipment, adjusting the West Side relief gates, responding to odor complaints, making rounds of the plant, investigating flood calls, responding to emergency weather events, and conducting control analysis of battery and/or outfall ammonia.

MWRDC argues that driving a vehicle is necessary to carry out each of the agreed upon TPO I essential functions. In support, MWRDC first points out that the job site covers more than 400 acres, and the agreed upon TPO I essential functions span the entire plant. For example, on midnights the TPO I is required to collect 11 to 12 composite samples in 2.5 to 5-gallon jugs. These samples are scattered throughout the plant and need to be returned to the lab by midnight. MWRDC argues that the timely collection of these scattered samples relies on efficient movement throughout the plant, and the weight and size of these samples necessitates using a car. Moreover, in an emergency situation the TPO I is required to arrive in an affected area at a moment's notice. The District notes that the plant was designed with streets intended for car travel up to 20 miles per hour, evidencing the intention

- 27 -

for Stickney Plant employees to traverse the grounds in a motor vehicle. MWRDC also argues that the TPO I's duties are not confined to the Stickney Plant. TPO Is are required to investigate odor complaints made by members of the community served by the Stickney Plant. Responding to an odor complaint could require Freeman to travel up to five miles offsite, a task he would be unable to complete in a timely manner if he was not utilizing a motor vehicle.

The record also includes testimony from another TPO I who stated that his practice, and his observations of others in the same role, was to use a car to travel around the Stickney Plant. As set forth in emails from two Stickney Plant TPO IIIs, some supervisory employees also viewed the ability to drive as vital to successfully performing the duties of a TPO I. Bonner's emails also evidence the District's sincere impression that operating a motor vehicle was necessary for a TPO I. This evidence, MWRDC argues, demonstrates that driving a motor vehicle is the singular means by which a TPO I can successfully carry out each of its essential functions. According to MWRDC, Freeman's license suspension made it so that he was unable to perform this essential function and is therefore not a qualified individual under the ADA.

In response, Freeman argues that he can perform each of the agreed upon essential job functions without using a motor vehicle.

According to Freeman, the essential functions of a TPO I can be accomplished using Gators or golf carts, a bicycle, or on foot. Freeman acknowledged that prior to his license suspension he used a vehicle to pick up composite samples. He testified that when using a motor vehicle this collection accounted for approximately 30 minutes of an eight-hour shift. He conceded that using a bicycle with a cooler would take longer than 30 minutes but testified that the collection could still be accomplished by midnight.

Freeman further testified that even before his license was suspended, after collecting the composite samples he typically spent the majority of his shift on foot, walking the Stickney Plant. Freeman also explained that while responding to an odor complaint may require a TPO I to leave the plant, it is MWRDC's policy to respond to those complaints during business hours. Because he worked the midnight shift this was not part of his typical job responsibilities. He testified that during the four months he was employed, he was never called to respond to an odor survey off the plant grounds. Indeed, the record reflects that in 2015, MWRDC responded to more than 150 odor complaints. (Odor Complaint Paperwork, Pl.'s Stmt. of Facts, Ex. 8, Dkt. No. 164-9.) During that time, only two such complaints were investigated by the crew on the midnight shift. (*Id.* at 71, 74.) The first occurred on July 30, 2015, and the second on August 3, 2015, both while Freeman remained employed by MWRDC and held a valid driver's

license. (*Id.*) Even so, Freeman did not conduct either of these off-site odor inspections. (*Id.*) Finally, Freeman notes MWRDC Human Resources acknowledged that a driver's license is not an "absolute requirement" for a TPO I and instead said it is "convenient for a TPO to get around the plant using a District vehicle." (Deitz Email at 3.)

The evidence presented by Freeman is sufficient to create a question of material fact regarding whether driving is an essential function of the TPO I position. For example, Stinson's solution during Freeman's 30-day suspension was not to assign a colleague to drive him around through the entire shift. Instead, the coworker's assistance was limited to driving Freeman to pick up and drop off the composite samples. Freeman testified that this task encompassed just 30 minutes of an eight-hour shift. In addition, collection of composite samples is just one of the many essential functions of a TPO I. While use of a motor vehicle may be the District's preferred way to carry out that particular aspect of the job that does not mean it is a necessary component of the entire TPO I position. The Court therefore concludes that there remains a question of material fact as to whether driving was an essential function of the TPO I position. *See Gresham-Walls v. Brown,* 2014 WL 6685478, at *8 (N.D. Ill. Nov. 25, 2014) (find a question of fact where there was "some evidence in the record that [the disputed] duties were not necessarily essential functions").

The current record is also insufficient to establish that Freeman was unable to carry out the essential functions, including or excluding driving, with or without reasonable accommodations. MWRDC agreed to allow Freeman to drive his own Breathalyzer Device-equipped vehicle around the Stickney Plant. Accordingly, Freeman was only unable to drive during the 30-day period prior to receiving his Monitoring Permit which allowed him to drive a Breathalyzer Device-equipped vehicle. The Court therefore focuses on Freeman's performance during the 30 days he was completely unable to drive.

If driving is not an essential function, then Freeman must show he is able complete the remaining essential functions with or without a reasonable accommodation. The current record does not establish whether Freeman was able to perform the essential functions of a TPO I without any accommodations.

The record similarly does not establish whether Freeman was able to do the job with reasonable accommodations. Federal Regulations define a reasonable accommodation as "modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(ii). According to the ADA reasonable accommodations can include: "job restructuring, part-

time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices . . . and other similar accommodations[.]" 42 U.S.C. § 12111(9). The record is silent as to whether assigning a coworker to assist Freeman for a period of 30 days is a reasonable accommodation. As a result, the Court is unable to draw a conclusion on this issue.

For all these reasons, the Court concludes that disputed issues of material fact exist as to whether Freeman could carry out the essential functions with or without a reasonable accommodation. Because there are issues of material fact as to both elements of the "qualified individual" analysis, summary judgment on this issue of whether he is a "qualified individual" is not appropriate.

### 2. ADA Claims (Counts II–IV)

Freeman brings three claims under the ADA. The threshold issue for these ADA claims is whether Freeman falls within the scope of the ADA's protections. As discussed above, the ADA only protects Freeman if he is a "qualified individual with a disability" as defined by the Act. Having concluded that questions of material fact exist as to these threshold questions of applicability, the Court now considers whether it may grant the District's Motion for Summary Judgment on the ADA claims, Counts II-IV. For the reasons set forth below, the Court grants the District's Motion for Summary Judgment as to Counts III and IV and denies the Motion as to

Count II. The Court also considers and denies Freeman's Motion for Summary Judgment on the following issues: (1) whether MWRDC was aware of Freeman's disability and (2) MWRDC accommodated Freeman then withdrew the accommodation in violation of the ADA.

*a. Disability Discrimination (Count II)*

Count II of the Fifth Amended Claim alleges that MWRDC discriminated against Freeman on the basis of his disability when it fired him in August 2015. MWRDC has moved for summary judgment on Count II.

To state a claim for disability discrimination, Freeman must prove that (1) he was disabled; (2) he was qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) that his disability was the "but for" cause of the adverse employment action. *See Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020). The first two elements are the threshold issues of whether Freeman is a "qualified individual with a disability." Section III.A.1, *supra,* analyzed these elements, including Freeman's Motion for Summary Judgment on the issue of whether he is disabled under the ADA, and concluded that there are questions of material fact that preclude granting summary judgment on those grounds. This Section focuses on the final element and reviews whether there is sufficient evidence in the record such that a jury could find there was a causal relationship between MWRDC regarding Freeman as having an alcohol-related

- 33 -

impairment and his subsequent termination. The Court views the evidence in the light most favorable to Freeman. For the reasons that follow, MWRDC's motion is denied as to Count II.

The ultimate question for the third element of a disability discrimination claim is whether there is evidence that "would permit a reasonable factfinder to conclude that [Freeman's disability] . . . caused the discharge*." Ortiz v. Werner Enters., Inc.,* 834 F.3d 760, 765 (7th Cir. 2016). Viewing the record in the light most favorable to Freeman, the Court concludes that such evidence exists.

While there is no dipositive evidence, the record reflects sufficient proof that the District's perception of Freeman's mental impairment could be the but-for cause of his later termination. The Court notes there were essentially two discussions regarding Freeman's temporary inability to drive. The first includes his immediate supervisors, Stinson and Donnelly, and their supervisors Cummings and Dring. These four supervisors discussed the practical problems that resulted from Freeman's DUI. From these conversations it is clear that Stinson and Donnelly anticipated Freeman would be unable to drive for only 30 days. After the 30 days, they expected Freeman to have a Breathalyzer Device installed on his personal vehicle and to use that vehicle on the job. Freeman's own testimony also reflects that his supervisors did not find the loss of his license to be a job-

ending situation. This is supported by the fact that Stinson and Donnelly identified a temporary solution and assigned another midnight shift coworker to drive Freeman to pick-up the composite samples. This arrangement was in effect from sometime after August 26, 2015 until Freeman's termination on September 18, 2015.

The second conversation was led by Human Resources, largely Bonner and Deitz. This discussion focused on hypothetical deficiencies in Freeman's work as a result of his license suspension. For example, on August 24, 2015, two days prior to Freeman's license suspension, Bonner expressed her hypothetical concerns in an email to Korcal. In response Korcal recommended termination. This email correspondence continued intermittently throughout Freeman's 30-day suspension, culminating in Human Resources' September 4, 2015 recommendation that Freeman be fired, "due to his inability to carry out his full range of duties while on probation." (Bonner Email at 1.). The record, however, does not evidence that Freeman's immediate supervisors or anyone in his supervisory chain of command was consulted regarding Human Resources' recommendation. To the contrary, Stinson testified that he had no concerns about Freeman's work. And both Stinson and Donnelly testified that they were not consulted regarding the decision to terminate.

Based on the record before this Court, the disconnect between Freeman's actual ability to do his job and the hypothetical

concerns of MWRDC Human Resources could allow a reasonable juror to conclude that the decisionmakers were not aware of any actual performance deficiencies and based their decision solely on their perception of his disability. *See Myers v. Wickes Furniture Co.,* 2012 WL 567377, at *8 (N.D. Ill. Feb. 21, 2012) (finding discrepancies between an employee's evaluations and the stated reasons for termination, combined with email traffic regarding the employee's disability could allow a reasonable jury to conclude that the employer discriminated on the basis of disability). For these reasons, summary judgment is denied as to Count II.

### b. Failure to Accommodate (Count III)

Count III alleges that MWRDC failed to accommodate Freeman's disability in violation of the ADA. MWRDC has moved for summary judgment on Count III. Freeman cross motioned for summary judgment on the issue of whether MWRDC accommodated Freeman until it decided to longer accommodate him in violation of the ADA.

To state a failure to accommodate claim, Freeman must prove that (1) he is a qualified individual with a disability; (2) MWRDC was aware of the disability; and (3) MWRDC failed to reasonably accommodate that disability. *Connors v. Wilkie,* 984 F.3d 1255, 1260–61 (7th Cir. 2021). If Freeman establishes the prima facie elements of the claim, the burden shifts to MWRDC "to prove that the requested accommodation would impose an undue hardship." *Id.*

at 1261. For the reason that follows, Freeman's motion is denied and MWRDC's motion is granted as to Count III.

Count III fails because Freeman is unable to establish the third element as a matter of law. The 2008 amendments to the ADA clarified that employers "need not provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability solely under" the "regarded as" prong. 42 U.S.C. § 12201(h). Following this amendment, courts in this Circuit have recognized that failure to accommodate claims cannot be pursued by individuals proceeding under the "regarded as" prong of the ADA. *See, e.g., Jenkins v. Chicago Transit Auth.,* 2020 WL 868535, at *7 n.5 (N.D. Ill. Feb. 20, 2021); *Taylor v. AM General LLC,* 2020 WL 1274862, at *3 (N.D. Ind. Mar. 16, 2020); *Cozad v. Ill. Dept. of Corr.,* 2018 WL 2758261, at *11 (C.D. Ill. Apr. 17, 2018).

The Court already concluded that Freeman's ADA claims may only proceed under the "regarded as" prong of the ADA's definition of disability, Section III.A.1, *supra.* Freeman's failure to accommodate claim is therefore barred by the Act and the Court grants MWRDC's Motion for Summary Judgment as to Count III. For this same reason, Freeman's Motion for Summary Judgment as to whether MWRDC accommodated Freeman until it decided to longer accommodate him in violation of the ADA is denied.

*c. Retaliation (Count IV)*

- 37 -

Count IV alleges MWRDC terminated Freeman for requesting reasonable accommodations in violation of the ADA's anti-retaliation provision. 42 U.S.C. § 12203. The District moved for summary judgment on Count IV and therefore the Court views the evidence in the light most favorable to Freeman. Freeman moved for summary judgment on the issue of whether MWRDC was aware of his disability. When considering that issue, the Court views the evidence in the light most favorable to the District.

An ADA retaliation claim requires proof of three elements: (1) Freeman engaged in a statutorily protected activity; (2) Freeman suffered an adverse employment action; and (3) the protected activity caused the adverse action. *Freelain v. Vill. of Oak Park,* 888 F.3d 895, 901. Neither party disputes that Freeman's termination is an adverse employment action that satisfies the second element. This Section therefore focuses on the first and third elements. For the reasons set forth below, MWRDC's Motion for Summary Judgment on Count IV is granted. Freeman's motion regarding the District's knowledge of his disability is denied.

The first element requires proof that Freeman engaged in a protected activity. An individual engages in a statutorily protected activity under the ADA when they seek an accommodation or raise a claim of discrimination due to their disability. *Preddie v. Bartholomew Cons. School Corp.,* 799 F.3d 806, 814-15 (7th Cir. 2015). Because Freeman's claims of discrimination arose after his

- 38 -

termination, the only way that Freeman could have experienced retaliation is if he sought an accommodation under the ADA.

Freeman argues that during the August 18, 2015 meeting with Stinson and Donnelly, he informed his supervisors that he was seeking treatment for AUD through the EAP and requested accommodations for this impairment. Freeman testified that Stinson shut down further conversation on the topic. In response, MWRDC argues that Freeman did not engage in a protected activity because he never informed the District of his enrollment in the EAP, let alone his AUD diagnosis. The District, therefore, did not interpret the August 18 meeting as seeking protection under the ADA. In support of this argument, MWRDC points to Stinson's email following the August 18 meeting, where he indicated he had referred Freeman to the EAP and makes no mention of Freeman's prior enrollment. The District further explains that none of the employees reported Freeman's request to the ADA Coordinator and no ADA file was opened for Freeman.

A review of the record also reveals that in August 2015 Freeman's EAP counselor, Williams, noted that Freeman was in denial about his problem with alcohol, casting doubt on his admission of such a problem to his supervisors. In addition, Dring recounted that during his August 24, 2015 meeting with Freeman, Freeman explained that the DUI was the result of a lapse in judgment. The Court cannot weigh conflicting evidence or make credibility

determinations on a motion for summary judgment. *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). And although the contemporaneous record may favor MWRDC, Freeman's testimony is sufficient to create a question of material fact as to MWRDC's actual knowledge of his AUD. *See Midland State Bank v. United States,* 2021 WL 1172705, at *9 (N.D. Ill. Mar. 29, 2021) (denying summary judgment, in part, because the Court could not weigh the credibility of deposition testimony against other contemporaneous records).

For these reasons, Freeman's Motion for Summary Judgment on the issue of MWRDC's knowledge of his disability is denied. In addition, because there is an open question of material fact as the District's knowledge of Freeman's AUD, there is also an open question as to whether Freeman engaged in a statutorily protected activity. Consequently, there is a question of fact as to the first element of Count IV.

The third element requires a causal relationship between Freeman's request for accommodations and his termination. As discussed in Section III.A.2 *supra,* the record does not reflect any significant disruption to the midnight crew's work after Freeman's license was suspended. Despite this, the stated reason for Freeman's termination was his inability to carry out the full extent of his duties. The disconnect between the reality of Freeman's performance and the stated reason for termination raises

a question of fact as to the cause of Freeman's termination. The existence of such a question, however, is not enough to survive summary judgment on the retaliation claim. Instead, Freeman must go one step further and identify facts in the record that suggest MWRDC's decision to terminate was caused by his request for accommodations.

The timeline is undisputed: Freeman first discussed his DUI and license suspension on August 18, 2015. The initial recommendation to terminate Freeman was made on September 4, 2015 and the official termination occurred on September 18, 2015. Freeman argues that based on these facts, he would not have been terminated if he had not disclosed his disability and requested accommodations. But timing alone is typically insufficient to survive summary judgment. *Kotaska v. Fed. Express Corp.,* 966 F.3d 624, 633 (7th Cir. 2020). Neither is simply pointing to the decisionmakers' knowledge that Freeman sought accommodations. *Id.* Instead Freeman must identify circumstantial evidence of retaliation in the record, which he failed to do. *Id.*

For these reasons, even if the first element resolves in his favor, Freeman has not established that there is a triable issue on causation. The District's Motion for Summary Judgment is granted as to Count IV.

### B. Title VII Discrimination Claims (Count V)

Title VII of the Civil Rights Act of 1968 makes it unlawful for employers to "to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2). Count V alleges that Freeman was denied an accommodation on the basis of his race in violation of Title VII. At summary judgment the Court undertakes a single inquiry and after considering the record as a whole determines "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Ortiz,* 834 F.3d at 765. MWRDC has moved for summary judgment as to this count, so the Court views the evidence in the light most favorable to Freeman. For the following reasons, the Court finds there is insufficient evidence for a factfinder to conclude that MWRDC failed to accommodate Freeman on the basis of his race and summary judgment is granted as to Count V.

The Fifth Amended Complaint alleges that "similarly situated Caucasian employees having lost their drivers licenses were provided alternative methods to complete their work for [MWRDC]." (Fifth Am. Compl. at 7.) MWRDC argues that Freeman has failed to substantiate this allegation because the comparator group is not comparable to Freeman in in all material respects. Freeman

acknowledges that there are material differences between himself and his comparator group but argues that there are still instances of probationary employees who experienced a driver's license suspension but were not terminated. He further argues that there is evidence that MWRDC granted the Employment Exemption to Caucasian employees, while he was denied this accommodation. The Court addresses each of these arguments below.

The record includes evidence of 17 employees, other than Freeman, who experienced a driver's license suspension or revocation during their employment with MWRDC. Of that group only three other employees had probationary status at the time of their license suspension. Two of those employees, George Lemon, a Black male, and Anthony Rendon, a Hispanic male, were terminated from their positions. Lemon and Rendon, however, had already achieved Civil Service status in another position with the District. Consistent with the Civil Service rules, upon termination of their probationary status Lemon and Rendon were returned to their previously attained Civil Service positions. The third probationary employee, Anthony Johnson, a Black male, received a five-day suspension. While Johnson's treatment was, on its face, different from Freeman, because Freeman and Johnson are both Black men, the disparate treatment between the two workers cannot form the basis for a Title VII claim.

A similar reason forecloses Freeman's arguments alleging MWRDC considered race when granting or denying the Employment Exemption. Of the 17 employees identified as having suspended or revoked driver's license, six were granted the Employment Exemption: 4 Black men, 1 white man, and 1 race unknown. (MWRDC Employment Exemption Examples, Pl.'s Stmt. of Facts, Ex. 9, Dkt. No. 164-10 (Employment Exemptions for Cook, Johnson-Bey, Smith, Prior, Barnett, and Stover); Discipline Chart at 1.) Contrary to Freeman's argument, the record does not reflect that the Employment Exemption was only given or even disproportionately given to Caucasian employees. As a result, this argument also fails as a basis for a Title VII claim.

The Court's review of the remaining record shows that it is devoid of any direct or indirect references to Freeman's race or anything that could give rise to the inference that race was a motivating factor in MWRDC's treatment. The Court therefore concludes that a reasonable factfinder could not conclude MWRDC denied Freeman an accommodation, or took any action, on account of his race. Summary judgment is therefore granted as to Count V.

## IV.  <u>CONCLUSION</u>

For the reasons stated herein, Freeman's Motion for Partial Summary Judgment (Dkt. No. 165) is denied. MWRDC's Motion for Summary Judgment (Dkt. No. 159) is granted in part and denied in

part. Summary judgment is granted as to Counts III, IV, and V. Summary judgment is denied as to Count II.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Dated: 9/21/2021